UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JUSTIN LLEWELLYN,

                          Plaintiff,

                                                          9:20-CV-179
v.                                                        (GLS/TWD)


S. PEACOCK,


                          Defendant.
_____

APPEARANCES:                              OF COUNSEL:

JUSTIN LLEWELLYN
Plaintiff, *pro se*
19-R-0168
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, New York 14411

HON. LETITIA JAMES                        LAUREN ROSE EVERSLEY
Attorney General for the State of New York  Assistant Attorney General
Counsel for Defendant
The Capitol
Albany, New York 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

Justin Llewellyn ("Plaintiff"), an inmate in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"), commenced this *pro se*

action pursuant to 42 U.S.C. § 1983, asserting his constitutional rights were violated at

Gouverneur Correctional Facility ("Gouverneur C.F.").  (Dkt. No. 5.)  The Honorable Gary L.

Sharpe, Senior United States District Judge, reviewed the amended complaint in accordance with

28 U.S.C. § 1915, and found Plaintiff's Fourteenth Amendment due process claim against

Deputy Superintendent for Administration Susan Peacock ("Defendant") required a response. (Dkt. No. 7.)

In the amended complaint, Plaintiff contends his due process rights were violated when Defendant acted with bias at his disciplinary hearing.  (Dkt. No. 5 at ¶¶ 36-38.)  Specifically, Plaintiff asserts Defendant conspired with the author of the misbehavior report giving rise to his disciplinary hearing and refused to call a rebuttal witness.  *Id*. at ¶¶ 18-22.  As a result of Defendant's actions, Plaintiff alleges he was unable to defend against the charges against him and was sentenced to 80 days of confinement in the special housing unit ("SHU"), along with an 80-day loss of recreation, packages, commissary, and phone privileges.  *Id*. at ¶ 23.

Defendant now moves to dismiss Plaintiff's amended complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 12.)  Defendant argues Plaintiff failed to adequately allege he was deprived of a protected liberty interest because the punishment at issue did not impose an atypical and significant hardship in relation to ordinary prison life.  *Id*. at 8.  Defendant does not appear to challenge that Plaintiff adequately alleged Defendant was biased in handling his disciplinary hearing.  Plaintiff did not respond to Defendant's motion.[1]  For the reasons that follow, the Court recommends Defendant's motion be denied.

## I.      RELEVANT FACTUAL BACKGROUND

The key factual issue in this case is whether Plaintiff suffered an atypical and significant hardship in relation to ordinary prison life.  To that end, the following facts are taken from Plaintiff's amended complaint and assumed to be true for the purposes of deciding this motion.

---

[1]  Plaintiff's failure to respond to this motion is not automatically fatal to his action.  Pursuant to this Court's Local Rules, the Court must still determine whether Defendant has "met its burden to demonstrate entitlement to the relief requested[.]"  L.R. 7.1(a)(3).

As noted above, Plaintiff was sentenced to 80 days of confinement in SHU and an 80-day loss of privileges.  (Dkt. No. 5 at ¶ 23.)  Prior to describing the conditions of SHU, Plaintiff explains Gouverneur C.F. is medium security prison, which has an "open communal dorm area" and no cells.  *Id*. at ¶ 45.  In contrast, Plaintiff considers SHU a "significant deprivation of one's liberty than of his usual prison amenities" and explains that while in SHU "all aspects of one's daily routine [are] severely curtailed and controlled."  *Id*. at ¶¶ 45, 47.

While in SHU, Plaintiff was kept behind a locked steel door in a 10'x10' cell for at least twenty-three hours a day.  *Id*. at ¶ 46.  The size of the cell gave him an "abnormal dread of claustrophobic narrow close quarters."  *Id*.  Plaintiff was not allowed to speak to his children over the phone and, while he could have visitors, he was only able to meet with them through plexiglass. *Id*. at ¶ 45.  Moreover, Plaintiff was not allowed to eat with other inmates nor was he allowed to engage with other inmates during "congretive [sic] outdoor activities."  *Id*. at ¶ 46.  During his time in SHU, Plaintiff was deprived of his personal property which included a reading lamp and other commissary and food items.  *Id*.  In addition to not being allowed these items, he alleges he was "cell fed like a wild animal through a []slot."  *Id*. at ¶ 45.

Additionally, Plaintiff lists a series of hygiene related hardships he experienced while in SHU.  For example, he could shower only twice per week and the water was ice cold.  *Id*. at ¶ 46.  He could not use a washcloth and was given a two-inch bar of soap.  *Id*.  Moreover, he was given "little to no hygiene products" besides the two-inch bar of soap and was not allowed to have deodorant, shampoo or any lotion.  *Id*. at ¶ 47.  Plaintiff also describes being shackled while traveling to and from the showers.  *Id*. at ¶ 46.

Separately, Plaintiff alleges he experienced religious and legal hardships while in SHU.  To that end, he was not able to attend religious events or "communally worship and [p]raise

within the ranks of his religious community." *Id.* Finally, while in SHU, Plaintiff asserts he was not able to "perfect his direct appeal" or participate in other legal obligations. *Id.*

## II.     DISCUSSION

### A.     Standard of Review

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*).  Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.*

## B.      Plaintiff's Due Process Claim

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  To state a procedural due process claim, a plaintiff must show "(1) that Defendants deprived him of a cognizable interest in life, liberty, or property, (2) without affording him constitutionally sufficient process." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation

marks omitted).  With respect to the first prong,[2] SHU confinement may implicate a prisoner's liberty interest if it "imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).  To determine whether the plaintiff endured an "atypical and significant hardship," courts consider the conditions of the disciplinary segregation and the duration of the segregated confinement.  *Davis v. Barrett*, 576 F.3d 129, 133 (2d Cir. 2009).

Though the Second Circuit has declined to establish any bright-line rules, it is well established that "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions" or "a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical."  *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir. 2004).

The Second Circuit has affirmed dismissal of due process claims in the absence of a detailed factual record in cases where the period spent in SHU was less than thirty days and there was no indication that the plaintiff endured unusual SHU conditions.  *Id*. at 66 (citing *Hynes v. Squillace*, 143 F.3d 653, 658-59 (2d Cir. 1998) (per curiam) (21 days); *Arce v. Walker*, 139 F.3d 329, 335-36 (2d Cir. 1998) (18 days); *Frazier v. Coughlin*. 81 F.3d 313, 317 (2d Cir. 1996) (12 days)).  Notably, the Second Circuit has reversed the dismissal of a prisoner's due process claims at the motion to dismiss stage where he alleged a 90-day SHU sentence and where for "at least part of his confinement, he was kept in SHU for twenty-four hours a day, was not permitted an hour of daily exercise, and was prevented from showering 'for weeks at a time.'"  *Ortiz v.*

---

[2]  As noted above, Defendant does not challenge whether Plaintiff has adequately alleged she failed to provide Plaintiff adequate process at his disciplinary hearing.  (*See generally* Dkt. No. 12-1.)

*McBride*, 380 F.3d 649, 655 (2d Cir. 2004) (further noting that, "ordinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week").

Here, after reviewing Plaintiff's amended complaint, including his allegations regarding the conditions of his confinement in SHU, the Court concludes he has adequately plead that he suffered atypical and significant hardships during his 80-day SHU confinement. *See Gonzalez-Cifuentes v. Torres*, No. 9:04CV1470 (GLS/DRH), 2007 WL 499620, at *3 (N.D.N.Y. Feb. 13, 2007) (noting that "[t]he Second Circuit has held that at least where the period of confinement exceeded thirty days, 'refined fact-finding' is required to resolve defendants' claims under *Sandin*." (citation omitted)); *Smart v. Goord*, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006) ("Smart has not alleged that the conditions of her confinement were more severe than normal SHU conditions . . . [h]owever, such detailed factual allegations are not necessary to withstand a motion to dismiss . . . [s]ince Smart has alleged that she was confined for seventy days, she has met her burden in alleging the deprivation of a protected liberty interest.").

As discussed in detail above, Plaintiff alleges that, during his SHU confinement, he was: (1) unable "to talk to his children over the phone," (2) "cell fed like a wild animal through a feet [sic] up slot," (3) "made to undergo visits through plexy glass[,]" (4) "wholly separated from his personal property, reading lamp, commissary, and food package items[,]" (5) forced to live in a smaller cell that was "more sparsely furnished than those the plaintiff usually occupied[,]" (6) unable "to attend religious programs and communally worship and raise within the rank of his religious community," (7) unable "to perfect his direct appeal and other active legal obligations in Court," (8) unable "to shower more than two times per [week,]" (9) forced to take "ice cold arctic showers with no wash cloth and a two inch bar of soap that had to be exchanged on a one

for one basis," (10) "shackled to and from the showers and other transit needs outside of a steel kept locked cell door," (11) unable "to engage in sports and congretive [sic] outdoor activities," (12) unable "to eat with his fellow peers," (13) deprived of "deodorant, shampoo, [and] lotion[,]" and (14) "housed around the most disruptive elements of all of New York State prisoners." (Dkt. No. 5 at 14-16; Dkt. No. 7 at 4.)

Defendant argues Plaintiff's allegations mirror "normal" SHU conditions and do not implicate any cognizable liberty interest. (Dkt. No. 12-1.) However, at least several of his allegations when viewed in a light most favorable to him, could be considered atypical hardships. The Court recognizes that DOCCS policy regulating conditions in SHU provide for access to certain privileges and personal items,[3] and that such deprivations may, in some circumstances, constitute an atypical and significant hardship. *See Palmer*, 364 F.3d at 66 (concluding that deprivation of personal clothing, hygienic products, reading materials, and family pictures, among other restrictions, was sufficient to raise triable issue of fact notwithstanding the "comparative shortness" of plaintiff's 77-day confinement to SHU). Undoubtedly, some of the allegations Plaintiff raises alone could be considered "normal" SHU conditions,[4] however, the

---

[3] *See, e.g.*, N.Y. Comp. Codes R. & Regs. tit. 7, §§ 302.2(i)(1)(i)–(ii) (providing that SHU inmates "will be permitted" one nonlegal visit per week and that "[t]here will be no limits on the number of legal visits"); 304.4(c)(2) (SHU inmates "who request[ ] to see a medical practitioner will be permitted an opportunity to do so in accord with all good security precautions"); 304.7 (providing that SHU "inmate[s] may obtain legal material from the law library" by ordering up to two items at a time for delivery); 304.12 (providing for limited general library materials to SHU inmates); 304.13(a) (providing that SHU inmates "shall be permitted to send and receive privileged and regular correspondence").

[4] For example, SHU inmates are entitled to one non-legal visit per week, telephone calls are only permitted for emergency or legal reasons and personal belongings are restricted. *Anderson v. Beaver*, 455 F. Supp. 2d 228, 231 (W.D.N.Y. 2006). Moreover, it is well settled that there is no liberty interest in a hot shower. *Logan v. Harvey*, No. 9:16-CV-1412 (FJS/CFH), 2017 WL 9511179 (N.D.N.Y. Sept. 26, 2017) ("a cold shower, while uncomfortable does not amount to a constitutional deprivation because inmates do not have a constitutional right to hot water").

Court finds that, viewing the allegations in light most favorable to Plaintiff, he has sufficiently alleged an atypical and significant hardship.

Furthermore, the Court is cognizant of the allegations related to the change in circumstances from the medium security "open communal dorm area" at Gouverneur C.F. as opposed to the much more restrictive conditions in SHU.  To that end, Plaintiff asserts his small 10'x10' cell gave him "abnormal dread of claustrophobic narrow close quarters."  (Dkt. No. 5 at ¶ 45.)  In the Second Circuit, it is generally accepted that "in a disciplinary confinement case, a comparison might be made to both conditions in administrative confinement and in the general prison population."  *Sealey v. Giltner*, 197 F.3d 578, 589 (2d Cir. 1999); *Zenon v. Downey*, No. 9:18-CV-0458 (LEK/ATB), 2018 WL 6702851, at *4 (N.D.N.Y. Dec. 20, 2018) (nothing that "the Court must compare the nature and duration of Plaintiff's confinement to the conditions in the general population and in routine administrative or protective confinement").  Here, granting Plaintiff the benefit of the doubt, the Court cannot say the severe change in prison conditions for eighty days is,[5] as a matter of law, not an atypical and significant hardship.

Moreover, Defendant relies too heavily on cases involving far fewer allegations—and in some cases no allegations—related to the conditions of confinement.  *See, e.g.*, *Judd v. Guynup*, 2012 WL 5472113, at *6 (N.D.N.Y. Oct. 17, 2012) (stating that "the pleading is *completely devoid* of factual allegations regarding how the SHU conditions differed from the ordinary incidents of prison life as experienced by other SHU or general population inmates" (emphasis

---

Additionally, it is well settled there is no protected interest in contact visits.  *Hernandez v. Sposato*, No. 14-CV-4593 (JFB/ARL), 2015 WL 4097784, at *4 (E.D.N.Y. July 8, 2015).

[5]  The Court finds it significant that Plaintiff alleges SHU confinement of 80 days, only 21 days shy of the equivocal 101-day timeframe for which the Courts have consistently found that a more robust factual record is required to be developed prior to dismissal.

added)); *Smith v. Costello*, No. 9:15-CV-0401 (BKS/DJS), 2017 WL 1155811, at *6 (N.D.N.Y.

Mar. 3, 2017) (recommending denying summary judgment motion where the plaintiff only

alleged he was "confined for twenty-three hours a day; deprived of most of his personal

property; and not permitted to watch television or attend activities with other inmates").  Other

cases Defendant relies upon were decided at the summary judgment stage with the benefit of a

fully developed factual record.  *See Allah v. Poole*, 506 F. Supp. 2d 174 (W.D.N.Y. 2007);

*Green v. Venettozzi*, No. 9:14-CV-1215 (BKS/CFH), 2018 WL 7917917 (N.D.N.Y. Nov. 21,

2018); *Pilgrim v. Bruce*, No. 9:05-CV-198 (GLS/GHL), 2008 WL 2003792 (N.D.N.Y. May 7,

2008); *Smith v. Costello*, 2017 WL 1155811.

Moreover, the Second Circuit strongly discourages district courts from finding, as a

matter of law, that a prisoner was not subjected to atypical and significant hardships without the

benefit of a fully developed record.  *See Davis v. Barrett*, 576 F.3d 129 (2d Cir. 2009).  The

court in *Davis* noted that a "detailed factual record" is required unless "the period of time spent

in SHU was exceedingly short—less than 30 days—and there is no indication that the plaintiff

endured unusual SHU conditions."  *Id*. at 135 (*citing Palmer*, 364 F.3d at 65-66).  Here, the time

Plaintiff spent in disciplinary confinement was not "exceedingly short" and the amended

complaint, read liberally, plausibly suggests the conditions in the SHU were a "dramatic

departure from the basic conditions" prisoners endure in the general population or during routine

administrative segregation.  *Sandin*, 515 U.S. at 484, 486; *Palmer*, 364 F.3d at 66; *Davis*, 576

F.3d at 134.  Accordingly, the Court finds Plaintiff has plausibly alleged a liberty interest in not

being confined for 80 days under such conditions as he described in the amended complaint.

IV.    **CONCLUSION**

For the reasons stated above, the Court recommends denying Defendant's motion to dismiss.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendant's motion to dismiss (Dkt. No. 12) be **DENIED**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[6]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: January 8, 2021
Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[6]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Overruling Risk - Negative Treatment

Overruling Risk    Appel v. Spiridon,    2nd Cir.(Conn.),    July 2, 2008

2007 WL 499620

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Juan Manuel GONZALEZ-CIFUENTES, Plaintiff,

v.

Constance TORRES, Key Board Specialist II;
Deputy Superintendent of Security; R. Doling;
Hearing Officer, Donald Selsky, Director,
Inmate Disciplinary Program; Gary Greene,
Superintendent, Marcy Correctional Facility; Glenn
S. Goord and Commissioner, State of New York
Department of Correctional Services, Defendants.

Civil Action No. 9:04-cv-1470 (GLS/DRH).

|

Feb. 13, 2007.

**Attorneys and Law Firms**

Juan Manuel Gonzalez-Cifuentes, North Babylon, NY, Plaintiff Pro Se.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Jeffrey P. Mans, Esq., Assistant Attorney General, of counsel, Albany, NY, for Defendants The Capitol.

### *ORDER*

GARY L. SHARPE, U.S. District Judge.

**\*1**  The above-captioned matter comes to this court following a Report-Recommendation by Magistrate Judge David R. Homer, duly filed January 16, 2007. Following ten days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, and the court having reviewed the Magistrate Judge's Report-Recommendation for clear error, it is hereby

ORDERED, that the Report-Recommendation of Magistrate Judge David R. Homer filed January 16, 2007 is ACCEPTED in its entirety for the reasons state therein, and it is further

ORDERED, that defendants' motion to dismiss (Docket No. 34) be GRANTED as to all moving defendants and all claims, and it is further

ORDERED, that defendant Deputy Superintendent of Security be DISMISSED from this action without prejudice, and it is further

ORDERED, that the Clerk of the Court is to enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED

### REPORT-RECOMMENDATION AND ORDER [1]

DAVID R. HOMER, U.S. Magistrate Judge.

Plaintiff pro se Juan Manuel Gonzalez-Cifuentes ("Gonzalez"), an inmate formerly in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to ⚑ 42 U.S.C. § 1983 alleging that defendants, six DOCS employees, violated his constitutional rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments. Compl. (Docket No. 1). Presently pending is (1) defendants' motion [2] to dismiss the complaint pursuant to Fed.R.Civ.P. 12(c) (Docket No. 34), and (2) Gonzalez's motion to compel discovery (Docket No. 31). For the following reasons, it is recommended that defendants' motion be granted and that defendant Deputy Superintendent of Security be dismissed without prejudice. It is also ordered that Gonzalez's motion be denied without prejudice.

### I. Background

The facts as alleged in the complaint are assumed to be true for the purposes of this motion. *See* Section II(A) *infra.*

In October 2001, while incarcerated at Great Meadow Correctional Facility in Comstock, New York, Gonzalez sent a $500 cash gift to the home of defendant Torres, a keyboard operator at Great Meadow. Compl. at ¶ 15. Torres took offense to the gift and retaliated against Gonzalez by filing a false inmate misbehavior report and having him placed in the Special Housing Unit ("SHU"). [3] *Id.* at ¶ 17, 19-20. While in SHU, defendants ordered a search of Gonzalez's prison

cell and confiscated twenty-five of his personal letters from his family. *Id.* at ¶¶ 21-22. On October 31, 2001, Gonzalez was served by Torres with an inmate misbehavior report for charges relating to the sending of the $500 gift. *Id.* at ¶ 23. On November 13, 2001, after a Tier III hearing [4] before defendant Doling, Gonzalez was found guilty of harassing Torres and sentenced to ninety days in keeplock. [5] *Id.* at ¶ 24-28. Gonzalez appealed the hearing disposition, but it was affirmed by defendant Selsky. *Id.* at ¶ 29.

**\*2** Gonzalez also filed a grievance complaining that the $500 was not credited to his inmate account or put in his personal property, but the grievance was denied. *Id.* at ¶ 32-33. Gonzalez then filed an Article 78 proceeding [6] in New York Supreme Court, but that action was dismissed. *Id.* at ¶¶ 34, 38. On April 11, 2003, Selsky reversed the disposition of Gonzalez's November 2001 disciplinary hearing. *Id.* at ¶ 37. This action followed.

## II. Discussion

Gonzalez asserts eleven causes of action in the complaint, alleging, *inter alia,* that defendants retaliated against him by filing a false misbehavior report, illegally seized his photographs and money, denied him access to the courts, and repeatedly violated his due process and equal protection rights. See Compl. at ¶¶ 43-66. Defendants seek dismissal of all claims.

### A. Motion to Dismiss

"The test for evaluating a [Fed.R.Civ.P.] 12(c) motion is the same as that applicable to a motion to dismiss under Fed.R.Civ.P. 12(b)(6)." *Irish Lesbian & Gay Org. v. Giuliani,* 143 F.3d 638, 644 (2d Cir.1998); *Burke v. New York,* 25 F.Supp.2d 97, 99 (N.D .N.Y.1998) (Munson, J.). Fed.R.Civ.P. 12(b)(6) authorizes dismissal of a complaint that states no actionable claim. When considering a motion to dismiss, "a court must accept the allegations contained in the complaint as true, and draw all reasonable inferences in favor of the non-movant." *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994). Dismissal is only warranted if it appears beyond a reasonable doubt that the nonmoving party can prove no set of facts in support of his or her claim which would be entitled to relief. *See Hishon v. King &*

*Spalding,* 467 U.S. 69, 73 (1984). In evaluating whether these requirements are met, complaints prepared pro se are held to less stringent standards than formal pleadings drafted by lawyers. *See Estelle v. Gamble,* 429 U.S. 97, 106 (1976); *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).

When a motion to dismiss is brought prior to an answer and discovery, a court is loath to grant the motion. *Lugo v. Senkowski,* 114 F.Supp.2d 111, 113 (N.D.N.Y.2000) (Kahn, J.) (citing *Wade v. Johnson Controls, Inc.,* 693 F.2d 19, 22 (2d Cir.1982)). This is true even if "the plaintiff is unlikely to prevail, unless the defendant can demonstrate that plaintiff is unable to prove facts which would entitle him [or her] to relief." *Id.* " 'This caution against dismissal applies with even greater force where the complaint is pro se, or where the plaintiff complains of a civil rights violation.' " *Lugo,* 114 F.Supp.2d at 113 (citation omitted); *see also Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477(2006).

### B. Fourteenth Amendment

In his complaint, Gonzalez repeatedly contends that he was denied "due process of law" in violation of the Fourteenth Amendment. Defendants' contend that Gonzalez has failed to state a cognizable due process claim.

### 1. Liberty Interest

**\*3** As a threshold matter, an inmate asserting a violation of his or her right to due process must establish the existence of a protected interest in life, liberty, or property. *See Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483-84 (1995). This standard requires a prisoner to establish that the deprivation was atypical and significant in relation to ordinary prison life. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999); *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Liberally construing the complaint, Gonzalez's protected liberty interest appears to be his sentence of ninety days in keeplock. "The Second Circuit has held that at least where the period of confinement exceeded thirty days,

"refined fact-finding" is required to resolve defendants' claims under *Sandin*. *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000)). No such fact-fiding can occur here on a motion to dismiss. Accordingly, defendants' motion on this ground should be denied.

## 2. Due Process

At a prison disciplinary proceeding, an inmate is entitled to (1) advance written notice of the charges, (2) an opportunity to call witnesses if it conforms with prison security, (3) a statement of evidence and reasons for the disposition, and (4) a fair and impartial hearing officer. *Kalwasinski v. Morse,* 201 F.3d 103, 108 (2d Cir.1999) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-64 (1974)). Additionally, the finding of guilt must be supported by some evidence in the record to comport with due process. *Massachusetts Corr. Inst. v. Hill,* 472 U.S. 445, 455 (1985); *Gaston v. Coughlin,* 249 F.3d 156, 162 (2d Cir.2001).

Here, Gonzalez fails to allege any violation of the procedural protections required by *Wolff*. *See Wolff,* 418 U.S. at 563-64. Liberally construing the complaint, Gonzalez's only objection to the disciplinary hearing was that he was found guilty of harassment without evidence to support the hearing officer's verdict. *See* Compl. at ¶¶ 49, 51. However, Gonzalez admits that he sent the $500 gift to Torres at her home address. *See id.* at ¶¶ 15, 47. Thus, Gonzalez's real objection to the disciplinary hearing is not lack of evidence but Doling's determination that the sending of $500 to Torres constituted "communication of a personal nature punishable as harassment." *Id.* at ¶ 27. Mere disagreement with the hearing officer's determination, or the fact that a hearing officer's determination was later overturned, does not, without more, constitute a violation of due process.

Therefore, it is recommended that defendants' motion on this ground be granted as to Gonzalez's due process claims.

## C. Equal Protection

Liberally construed, Gonzalez alleges that defendants discriminated against him because of his race (Hispanic) in violation of his equal protection rights under the Fourteenth Amendment. Comp. at ¶¶ 45, 47, 61. Defendants contend that this claim is without merit. *See* Defs. Mem. of Law (Docket No. 34) at 3, 6.

**\*4** The Fourteenth Amendment's Equal Protection Clause mandates equal treatment under the law. Essential to that protection is the guarantee that similarly situated persons be treated equally. *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985). "In order to establish an equal protection violation, the plaintiffs must show that they were treated differently than other people in similar circumstances and must establish that such unequal treatment was the result of intentional and purposeful discrimination." *Myers v. Barrett,* No. Civ. 95-1534(RSP/GJD), 1997 WL 151770, at \*3 (N.D.N.Y. Mar. 28, 1997). In addition, a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she [or he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *See Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000); *Neilson v. D'Angelis,* 409 F.3d 100, 105 (2d Cir.2005).

Here, Gonzalez makes only vague and conclusory allegations that he was denied the equal protection of the laws and thus has failed sufficiently to show an equal protection violation. *See De Jesus v. Sears Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Equally significant here is that the complaint contains no allegation as to which inmates in a similar situation were treated differently than Gonzalez. *Oliver v. Cuttler,* 968 F.Supp. 83, 88 (E.D.N.Y.1997).

Therefore, it is recommended that defendants' motion on this ground be granted.

## D. Retaliation

Gonzalez contends that as a result of being Hispanic and sending $500 to Torres, defendants retaliated against him by filing a false misbehavior report and sentencing him to ninety days in keeplock. *See* Compl. at ¶ 47. Defendants contend that Gonzalez's conclusory allegations of retaliation must be dismissed as they fail to state a claim.

In order to state an actionable claim for retaliation, a plaintiff must first allege that the plaintiff's conduct was constitutionally protected and that this protected conduct

was a substantial factor that caused the adverse action against plaintiff. *Dawes v. Walker,* 239 F.3d 489, 492 (2d Cir.2001), *overruled on other grounds,* *Swierkiewicz v. Sorema,* 534 U.S. 506 (2002). Retaliation claims are actionable because they may tend to chill an individual's exercise of constitutional rights. *Id.* at 491. However, courts must view retaliation claims with care and skepticism to avoid judicial intrusion into prison administration matters. *Id.* Conclusory allegations alone are insufficient to overcome a motion to dismiss in a civil rights action. *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987).

Here, Gonzalez contends that defendants retaliated against him "simply for being Hispanic and having exercised the right and privilege secured to him by the U.S. Constitution of giving money as a present to whoever he chose[s]...." Compl. at ¶ 47. First, neither of Gonzalez's alleged reasons for defendants' retaliation against him rise to the level of constitutionally protected conduct. Even liberally construed, nothing about the gift brings this conduct within the scope of the First Amendment right of association. That right protects "the right to create and sustain a family, marry, engage in childbirth, raise and educate one's children, and cohabitate with one's relatives...." *Braverman v. Suburban Scholastic Council,* No. 99-CV-1377, 2000 WL 554256, at *2 (N.D.N.Y. May 4, 2000). "The Constitution does not recognize a generalized right of social association." *Sanitation & Recylcing Indus. v. City of New York,* 107 F.3d 985, 996 (2d Cir.1997). At most, Gonzalez has alleged here a "generalized right of social association" and, therefore, his conduct falls outside the scope of the First Amendment. No other constitutional right could foreseeably be implicated here. Thus, Gonzalez fails sufficiently to allege a constitutionally protected activity as the genesis of the alleged retaliation.

**\*5** Second, Gonzalez alleges in only bare, conclusory terms that these alleged acts were taken in retaliation for his alleged constitutionally protected conduct. *See* *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) ( "a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone"). Thus, Gonzalez has not alleged specific facts that "give rise to a colorable suspicion of retaliation." *Id.*

Therefore, it is recommended that defendants' motion on this ground be granted as to gonzalez's claims of retaliation.

### E. Seizure of Property

Gonzalez contends that defendants searched his cell "without any reason or institutional interest" and seized twenty-five of his letters from his family. Compl. at ¶ 57. However, the Fourth Amendment does not prohibit such warrantless searches in a prison environment. *See* *Hudson v. Palmer,* 468 U.S. 517, 526 (1984) ("the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell"). Thus, even if searches of Gonzalez's cell and seizures of property occurred without a warrant or without probable cause as required by the Fourth Amendment, Gonzalez has no basis for a claim.

Gonzalez also contends that defendants must return the $500 he sent to Torres and the letters seized from his cell. Compl. at ¶¶ 42, 57, 59. "The Supreme Court has held that 'an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful post deprivation remedy for the loss is available.' " *Pitsley v. Comm'r of Corrs.,* No. Civ. 96-0372(RSP/DS), 1998 WL 178805, at *8 (N.D.N.Y. Apr. 13, 1998) (quoting *Hudson,* 468 U.S. at 533)). Because the State of New York allows inmates to pursue property deprivation claims in the New York Court of Claims, and Gonzalez could have done so here, Gonzalez has no viable § 1983 claim. *See Pitsley,* 1998 WL 178805, at *8 (citing *Smith v. O'Connor,* 901 F.Supp. 644, 647 (S.D.N.Y.1995)).

Therefore, it is recommended that defendants' motion on this ground be granted as to these claims.

### F. False Misbehavior Report

Gonzalez contends that "because of his race, Defendant Torres concocted a false misbehavior report" against him. Compl. at ¶ 45. However, an " 'inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' " *Alnutt v. Cleary,* 913 F.Supp. 160, 166 (W.D.N.Y.1996) (quoting *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). "There must be more, such as

retaliation against the prisoner for exercising a constitutional right." *Boddie v. Schnieder,* 105 F .3d 857, 862 (2d Cir.1997) (citing *Franco v. Kelly,* 854 F.2d 584, 588-90 (2d Cir.1988)). Here, as discussed supra, Gonzalez fails properly to allege that defendants took any retaliatory action in response to his exercising a constitutional right and therefore fails to allege a constitutional violation.

**\*6** Therefore, it is recommended that defendants' motion on this ground be granted.

### G. Access to Courts

Liberally construed, Gonzalez contends that he was denied access to the courts in violation of the First Amendment. Compl. at ¶ 39.

All persons have a constitutional right of access to the courts. *Lewis v. Casey,* 518 U.S. 343, 350 (1996); *Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997). To establish a violation of the right of access to the courts, a prisoner must demonstrate that his or her efforts to pursue a legal claim were impeded. *Lewis,* 518 U.S. at 351; *Bourdin v. Loughren,* 386 F .3d 88, 92-93 (2d Cir.2004). A plaintiff must demonstrate not only that a defendant's conduct was deliberate and malicious but also that this conduct caused an actual injury such as the "dismissal of an otherwise meritorious legal claim." *Cancel v. Goord,* No. 00-CV-2042(LMM), 2001 WL 303713, at \*4 (S.D.N.Y. Mar. 29, 2001) (citing *Lewis,* 518 U.S. at 351).

Here, Gonzalez alleges that Selsky attempted "to obstruct justice and deny Plaintiff access to the courts." Compl. at ¶ 39. However, Gonzalez identifies no particular case or claim which was impeded or how any defendant's conduct impeded his litigation of a claim or defense. He has thus failed sufficiently to allege any actual injury from this alleged incident, much less that Selsky's [or any other defendants] conduct was "deliberate and malicious." Thus, Gonzalez has no viable claim on this ground.

Therefore, it is recommended that defendants' motion on this ground be granted as to all such claims.

### H. Conspiracy

In his ninth cause of action, Gonzalez alleges that defendants conspired "to punish [him] because he was a Hispanic inmate and to deprive him of his right to due process and equal protection. Compl. at ¶ 61. To state a claim for relief under 42 U.S.C. § 1985(3), a plaintiff must show

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States.

*Mian v. Donaldson, Lufkin, & Jenrette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993). Here, even assuming that Gonzalez has sufficiently alleged an agreement among the defendants, for the reasons stated above, Gonzalez has failed sufficiently to allege as the objects of the conspiracy a deprivation of either due process or equal protection. *See* subsections II(B) & (C) *supra.* Moreover, Gonzalez only makes conclusory allegations of a conspiracy between the defendants. Thus, Gonzalez's conspiracy claims must fail. *See Webb v. Goord,* 340 F.3d 105, 111 (2d Cir.2003) (holding that conclusory statements alone cannot support a conspiracy allegation).

**\*7** Therefore, it is recommended that Gonzalez's conspiracy claim be dismissed.

### I. Qualified Immunity

Defendants also contend that they are entitled to qualified immunity. Qualified immunity generally protects governmental officials from civil liability insofar as their conduct did not violate clearly established constitutional law of which a reasonable person would have known. *Harlow*

*v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Aiken v. Nixon,* 236 F.Supp.2d 211, 229 (N.D.N.Y.2002), *aff'd,* 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003). A court must first determine that if plaintiff's allegations are accepted as true, there would be a constitutional violation. Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. *Aiken,* 236 F.Supp.2d at 230. Here, as discussed *supra,* accepting all of Gonzalez's allegations as true, he has not shown that defendants violated his constitutional rights.

Therefore, in the alternative, defendants' motion to dismiss on this ground should be granted.

### III. Unserved Defendant

Defendant Deputy Superintendent of Security has neither been served with process nor further identified. *See* Docket Entry dated Mar. 2, 2005 (summons issued). This defendant has not appeared in the action and was not a party to defendants' motion here. More than 120 days have now passed. Accordingly, it is recommended that the complaint be dismissed as to defendant Deputy Superintendent of Security without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b).

### IV. Gonzalez's Motion to Compel

Also pending is Gonzalez/s motion to compel discovery. Docket No. 31. If the recommendations herein are adopted by the district court, that motion will be moot. Accordingly,

Gonzalez's motion is denied without prejudice to renewal if the district court denies defendants' motion as to any claim or defendant.

### V. Conclusion

For the reasons stated above, it is hereby:

**RECOMMENDED** that:

1. Defendants' motion to dismiss (Docket No. 34) be **GRANTED** as to all moving defendants and all claims; and

2. Defendant Deputy Superintendent of Security be **DISMISSED** from this action without prejudice; and

**IT IS ORDERED** that Gonzalez's motion to compel (Docket No. 31) is **DENIED** without prejudice.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Sec'y of HHS,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

### All Citations

Not Reported in F.Supp.2d, 2007 WL 499620

### Footnotes

1    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2    The motion is made on behalf of all defendants except defendant Deputy Superintendent of Security. *See* section III *infra.*

3    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. Comp.Codes R. & Regs. tit. 7, § 300.2(b) (2006). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. *Id.* at pt. 301.

4    DOCS regulations provide for three tiers of disciplinary hearings depending on the seriousness of the misconduct charged. A Tier III hearing, or superintendent's hearing, is required whenever disciplinary penalties exceeding thirty days may be imposed. N.Y. Comp.Codes R. & Regs. tit. 7, §§ 253.7(iii), 270.3(a) (2006).

5    "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." *Green v. Bauvi,* 46 F.3d 189, 192 (2d Cir.1995); N.Y. Comp.Codes R. & Regs. tit. 7, § 301.6 (1995).

6    N.Y. C.P.L.R. art. 78 (McKinney 1994 & Supp.2006) establishes the procedure for judicial review of the actions and inactions of state and local government agencies and officials.

---

**End of Document**                                           © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 19 of 105

Logan v. Harvey, Not Reported in Fed. Supp. (2017)

2017 WL 9511179
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert LOGAN, Plaintiff,
v.
A. HARVEY, Defendant.

No. 9:16-CV-1412 (FJS/CFH)
|
Signed 09/25/2017
|
Filed 09/26/2017

**Attorneys and Law Firms**

Robert Logan, 03-A-0391, Sing Sing Correctional Facility, 354 Hunter Street, Ossining, New York 10562, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General for the State of New York, OF COUNSEL: MATTHEW P. REED, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224, Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

*\*1* Plaintiff pro se Robert Logan ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983 ("§ 1983") alleging that defendant A. Harvey—who at all relevant times was employed at Great Meadows Correctional Facility ("Great Meadows")—violated his rights under the Fourteenth Amendment. See Dkt. No. 1 ("Compl."). Presently pending before the Court is defendant's Motion to Dismiss pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6). Dkt. No. 21. Plaintiff filed a response in opposition to the motion. Dkt. No. 23. For the following reasons, it is recommended that defendant's Motion to Dismiss be granted.

**I. Background**

The facts are reviewed in the light most favorable to plaintiff as the non-moving party. See subsection II infra. At all relevant times, plaintiff was an inmate at Great Meadows. All but plaintiff's Fourteenth Amendment due process claim was dismissed upon this Court's initial review of the complaint pursuant to 42 U.S.C. § 1915(e). See Dkt. No. 9.

On February 2, 2014, C.O. Lovely issued plaintiff a misbehavior report alleging that he had engaged in lewd conduct (101.20), refused a direct order (106.10), and interfered with employee (107.10) stemming from plaintiff allegedly masturbating in his cell. Compl. ¶ 7. On February 14, 2014, Hearing Officer ("H.O.") Harvey conducted off-record interviews with randomly selected inmates regarding whether they had witnessed the incident. Id. ¶ 11. On February 14, 2014, H.O. Harvey convened a Tier III disciplinary hearing regarding the institutional violations and found plaintiff guilty on all counts. Id. ¶ 13. In making his determination, H.O. Harvey "relied on Officer K. Lovely's prior masturbation allegation that is uncontested by any misbehavior report, log book entry or supervisor notification to determine guilt." Id. Plaintiff received ninety days Secure Housing Unit ("SHU") [2] confinement and ninety days loss of privileges. Id. ¶ 16. On March 17, 2014, plaintiff's SHU confinement was modified to sixty days for good behavior. Id. ¶ 17. On April 23, 2014, DOCCS affirmed plaintiff's administrative appeal of his disciplinary hearing, as modified. Id. ¶ 18. On January 9, 2015, plaintiff's February 14, 2014 Tier III disciplinary hearing determination was administratively reversed. Id. ¶ 19. Plaintiff contends that during his sixty-day SHU confinement he suffered from sleep deprivation, stomach pain, vomiting, diarrhea, and nausea. Id. ¶¶ 23, 24.

**II. Legal Standard**

**A. Motion to Dismiss**

*\*2* Under Rule 12 (b)(6), a defendant may move to dismiss a complaint for a plaintiff's "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). When considering such a motion, a court must "construe plaintiff['s] complaint liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in plaintiff['s] favor." Selevan v. N.Y. Thruway Auth., 584 F.3d 82, 88 (2d Cir. 2009) (quoting Holmes v. Grubman, 568 F.3d 326, 335 (2d Cir. 2009) ) (internal quotation marks omitted). However, this "tenet is inapplicable to legal

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 20 of 105

Logan v. Harvey, Not Reported in Fed. Supp. (2017)

conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664 (2009) ) (internal quotation marks and alterations omitted).

Accordingly, to survive a motion to dismiss, a complaint must state a claim for relief that is " 'plausible on its face.' " Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007) (explaining that the plausibility test "does not impose a probability requirement ... it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." ) ); see also Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009) (holding that "[o]n a motion to dismiss, courts require enough facts to state a claim to relief that is plausible...." ) (internal citations omitted). Determining whether plausibility exists is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to special solicitude, that a pro se litigant's submissions must be construed liberally, and that such submissions must be read to raise the strongest arguments that they suggest. At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not consistent with the pro se litigant's allegations or arguments that the submissions themselves do not suggest that we should not excuse frivolous or vexatious filings by pro se litigants, and that pro se status does not exempt a party from compliance

> with relevant rules of procedural and substantive law ....

Id. (internal quotation marks, citations, and footnote omitted); see also Sealed Plaintiff, 537 F.3d at 191-92 ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally.") (internal citations omitted).

### III. Discussion [3]

#### A. Fourteenth Amendment

Defendant moves to dismiss plaintiff's complaint arguing that plaintiff's: (1) Fourteenth Amendment due process claim must fail as a matter of law; and (2) Article 78 proceeding does not resolve the issues presently before the Court. See Dkt. No. 21-1. Plaintiff, in response, again alleges that H.O. Harvey denied him a fair and impartial hearing that was against the weight of the evidence in violation of the Fourteenth Amendment. Compl. ¶¶ 37-39.

The Due Process Clause of the Fourteenth Amendment states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. To state a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege both that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

#### 1. Liberty Interest

*3 During his sixty days confined in SHU, plaintiff claims that (1) he was deprived of access to the courts when his legal papers were not brought to SHU; (2) he was deprived of sleep

Logan v. Harvey, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 21 of 105

due to the constant cell light illumination which caused him headaches and blurred vision; (3) he suffered stomach pain, vomiting, diarrhea, and nausea from the food; (4) he suffered unhygienic conditions due to the cold shower water; and (5) he suffered a delay in his vocational food service certification training. See Compl. ¶¶ 21-26.

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484); see Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999) (quoting Sandin, 515 U.S. at 486) ("Although there is no bright-line rule regarding the length or type of sanction that would give rise to an 'atypical and significant hardship,' this standard will not be met unless the disciplinary and administrative sanctions are onerous."). Plaintiff's sixty-day stay in SHU could only be said to have violated the Fourteenth Amendment if the conditions of his confinement were "atypical" or "significant." Sandin, 515 U.S. at 483-84.

### a. SHU Duration

Plaintiff alleges that he suffered "significant a-typical [sic] and undue hardship" during his sixty days in SHU confinement. Compl. ¶ 20. However, plaintiff was held for only sixty days, and such a short duration of confinement generally does not amount to an "atypical and significant hardship." See Reynoso v. Selsky, 292 Fed.Appx. 120, 122-23 (2d Cir. 2008) (summary order) (internal citations omitted) ("We have previously held that 305 days of confinement under normal segregated housing unit conditions met the Sandin standard for atypicality and that a 101-day aggregated confinement in a highly-restrictive segregated housing of a New York correctional facility, without more, was not an atypical confinement."); Borcsok v. Early, 299 Fed.Appx. 76, 78 (2d Cir. 2008) (summary order) ("Even if we include the eleven days that [the plaintiff] spent in

the SHU before the disciplinary hearing with the ninety days he received as part of his penalty, the duration of his confinement was neither atypical nor significant."); Jackson v. Onondaga County, 549 F. Supp. 2d 204, 218 (N.D.N.Y. 2008) (dismissing the plaintiff's procedural due process claim where the plaintiff alleged he was confined to SHU for 49 days and experienced conditions normally associated with SHU). Thus, the length of plaintiff's SHU confinement alone does not set forth a constitutional violation. Assessment of the conditions of confinement is necessary to determine whether plaintiff had a protected liberty interest.

### b. SHU Conditions

Plaintiff alleges that, while confined in SHU, he was deprived of his court materials, and suffered sleep deprivation, stomach ailments due to the food, unhygienic conditions due to cold showers, and a delay in his vocational certification. See Compl. ¶¶ 21-26. The Second Circuit has held that SHU confinement of fewer than 101 days generally will not constitute an atypical and significant hardship implicating an inmate's liberty interest unless the conditions of confinement "were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004).

**\*4** In assessing SHU conditions on a motion to dismiss, the Second Circuit stated:

> In the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in SHU was exceedingly short—less than the 30 days that the Sandin plaintiff spent in SHU—and there was no indication that the plaintiff endured unusual SHU conditions.

Palmer, 364 F.3d at 65; see Davis v. Barrett, 576 F.3d 129, 135 (2d Cir. 2009) ("Here, the record lacks any evidence of the conditions for other inmates in administrative confinement, or in the general prison population.... A

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 22 of 105

Logan v. Harvey, Not Reported in Fed. Supp. (2017)

detailed factual record containing information as to the actual conditions in both administrative segregation and for the general population is necessary for the court to make the type of comparison required."); see also Brooks v. DiFasi, 112 F.3d 46, 49 (2d Cir. 1997) ("[T]he decision in Sandin entailed careful examination of the actual conditions of the challenged punishment compared with ordinary prison conditions.").

Plaintiff's allegation that he was deprived of sleep because of cell lighting may result in an atypical confinement. See Tafari v. McCarthy, 714 F.Supp.2d 317, 367 (N.D.N.Y. 2010) ("Courts have previously recognized that sleep constitutes a basic human need and conditions that prevent sleep violate an inmate's constitutional rights."). Similarly, plaintiff's claim of illness due to food may amount to an atypical or significant condition. Although a plaintiff's dislike of food or the occasional presence of spoiled food generally does not result in an atypical confinement, if a plaintiff alleged that his meals were regularly spoiled or improperly prepared, and as a result, he or she became sick, this would result in an atypical or significant hardship. See Lunney v. Brureton, No. 04 Civ. 2438 LAK GWG, 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2006) ("Insofar as [the plaintiff] alleges that the food in the prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a case of action.... Here, however [the plaintiff] alleges that his meals were regularly spoiled and/or improper prepared ... [and] eating the meals caused him to get sick...."). Here, plaintiff's claim related to the food does not provide sufficient detail for the Court to determine, as a matter of law, that the quality or preparation of his food was an atypical or significant condition. Palmer, 364 F.3d at 65; Davis, 576 F.3d at 135.

Plaintiff's remaining claims, however, generally do not constitute atypical or significant hardships. Plaintiff alleges that he suffered unhygienic conditions because the cold water prevented him from showering. Compl. ¶ 26. He claims that, because he did not shower due to the cold water, he became covered in "feces, urine, and musk excrements [sic] for over two weeks, while other SHU inmates received hot showers." Id. However, this claim does not establish a protected liberty interest. It is well-settled that "there is no liberty interest in a hot shower." Cantey v. Martuscello, No. 16-CV-1008 (TJM/CFH), 2017 WL 3190725, at *3 (N.D.N.Y. June 8, 2017); see Hodge v. Sidorowicz, No. 10 CIV. 428 (PAC/MHD), 2011 WL 6778524, at *20 (S.D.N.Y. Dec. 20, 2011), report and recommendation adopted by

Hodge v. Sidorowicz, No. 10 CIV. 428 (PAC/MHD), 2012 WL 701150 (S.D.N.Y. Mar. 6, 2012) (finding that a failure to provide hot showers for inmates cannot "amount to a condition so severe and pervasive as to threaten inmate health or safety."). A cold shower, although uncomfortable, does not amount to a constitutional deprivation because "[i]nmates do not have a constitutional right to hot water." Cantey, 2017 WL 3190725, at *3 (citation omitted). Therefore, plaintiff's choice to remain in his feces and urine in lieu of taking a shower does not result in an atypical or significant hardship.

*5 Further, plaintiff's allegation that he was deprived of access to the courts when his legal papers were not brought with his remaining property to SHU does not establish a protected liberty interest. See Pilgrim v. Bruce, No. 9:05-CV-198 (GLS/GHL), 2008 WL 2003792, at *15 (N.D.N.Y. May 7, 2008) (finding that deprivation of access to law library because of disciplinary confinement does not result in an atypical confinement); Carter v. Carriero, 905 F. Supp. 99, 103-04 (W.D.N.Y. 1995) (holding that limited law library access due to SHU disciplinary segregation does not result in an atypical, significant deprivation). [4]

Lastly, plaintiff's allegation that he was delayed in achieving his vocational certification fails to amount to an atypical condition of confinement because "a prisoner has no protected liberty interest in a particular job assignment." Frazier v. Coughlin, 81 F.3d 313, 318 (2d Cir. 1996). Moreover, plaintiff's inability to participate in a vocational problem does not hinder his ability to receive early release or parole because such claim is "speculative and fails to allege interference with a protected liberty interest." Nieves v. Prack, 172 F. Supp. 3d 647, 652 (W.D.N.Y. 2016) (internal citation and quotation marks omitted). Accordingly, plaintiff has not established that his lack of access to hot showers, his legal materials, and his vocational training amounted to an atypical or significant condition of confinement.

At this stage in the proceeding, plaintiff should be afforded the opportunity to further demonstrate the conditions of his confinement against that of the general prison population to determine whether his allegations that he suffered sleep deprivation and stomach ailments due to the food adequately establish a liberty interest. See Palmer v. Goss, No. 02 Civ. 5804(HB), 2003 WL 22327110, at *6 (S.D.N. Y Oct. 10, 2003). A detailed factual record would allow the Court to determine whether plaintiff's allegations were comparable with ordinary prison conditions. See, e.g., Samms

v. Fischer, No. 9:10-CV-0349 (GTS), 2013 WL 5310215, at *7 (N.D.N.Y. Sept. 20, 2013) ("It is possible that 60 days in an unsanitary cell in SHU could (when compared with other cells and sentences) constitute an atypical and significant hardship in relation to the ordinary incidents of prison life sufficient to convey on a prisoner a protected liberty interest under the due process clause."). Although the undersigned concludes that plaintiff failed to demonstrate that his lack of access to hot showers, his legal materials, and his vocational training amounted to atypical or significant conditions of confinement, his sleep deprivation and food conditions arguably could rise to the level of atypical or significant. Because the factual record is not developed as to the full extent of plaintiff's alleged sleep deprivation and food conditions in SHU and plaintiff has alleged more than a speculative statement that he was deprived of his due process rights, the undersigned cannot conclude as a matter of law that plaintiff's conditions fail to allege a deprivation of a liberty interest as it relates to these conditions. Compare Smart v. Goord, 441 F. Supp. 2d 631, 641 (S.D.N.Y. 2006) (concluding that the plaintiff demonstrated deprivation of a liberty interest even though she was confined for only seventy days and failed to provide any detail as to the conditions of her confinement) with Smith v. Fischer, No. 9:07-CV-1264, 2009 WL 632890, at *7 (N.D.N.Y. Feb. 2, 2009) (internal citation and quotation marks omitted) (emphasis in original) (concluding that a liberty interest can be established at the motion to dismiss stage where the plaintiff "*alleged the existence of conditions in SHU far inferior to those prevailing in the prison in general*" rather than bare conclusory allegations "that [the plaintiff] served [his] SHU term under conditions more severe than normal SHU conditions."). Plaintiff's allegations relating to these two conditions of confinement *may*, upon further fact-finding, [5] establish an atypical and significant hardship amounting to a protected liberty interest. See Ortiz v. McBride, 380 F.3d 648, 655 (2d Cir. 2004) ("Based on these and [the plaintiff's] other allegations relating to his treatment in SHU, we think that, if proved, they could establish conditions in SHU 'far inferior' to those prevailing in the prison in general. We thus conclude that [the plaintiff] has alleged that the ninety-day SHU sentence imposed on him was, under the circumstances, a hardship sufficiently 'atypical and significant' to withstand a Rule 12(b)(6) motion as to the first part of the due process test."); Smith v. Fischer, No. 9:07-CV-1264, 2010 WL 145292, at *7 (N.D.N.Y. Jan. 11, 2010) ("Here, the time Plaintiff spent in disciplinary confinement was not 'exceedingly short' and the ... complaint, read liberally, plausibly suggests that Plaintiff endured unusual SHU conditions because Plaintiff has alleged that he was deprived of medication, moved to a top bunk, and assaulted. Thus, under [Second Circuit] precedents, a detailed factual record is required to determine whether Plaintiff was deprived of a liberty interest."). Accordingly, the undersigned cannot conclude as a matter of law, based on the current record, that plaintiff fails to allege the deprivation of a protected liberty interest. [6]

## 2. Procedural Due Process

**\*6** Assuming plaintiff has a protected liberty interest at stake, plaintiff's complaint fails to plausibly suggest that he was denied procedural due process protections at the Tier III disciplinary hearing. See Giano, 238 F.3d at 225 (noting that in order to state a prima facie due process violation, the plaintiff must establish that the defendant deprived the plaintiff of his or her liberty interest as a result of insufficient process). Although inmates retain their constitutional right to due process protections, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974); see also Arce v. Walker, 139 F.3d 329, 335 (2d Cir. 1998) (holding that an inmate is entitled to minimal due process protections when being involuntary placed in administrative confinement).

> Certain due process protections therefore apply where disciplinary proceedings may lead to the loss of good time credit or would subject an inmate to solitary confinement in the SHU. Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken.

Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citation omitted).

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 24 of 105

Logan v. Harvey, Not Reported in Fed. Supp. (2017)

#### a. Notice

An accused inmate is required to receive advanced written notice of the charges against him. 🟧⚠️ Sira v. Morton, 380 F.3d 57, 70 (2d Cir. 2004). Plaintiff was provided a copy of his misbehavior report on February 2, 2014, well before the commencement of this disciplinary hearing on February 11, 2014. See Compl. ¶ 6; Dkt. No. 1-1 at 50. Therefore, plaintiff was provided with written notice of the charges of which he was accused in advance of his hearing, and was not denied procedural due process on this ground. [7]

#### b. Fair and Impartial Hearing Officer

Plaintiff claims that he was denied a fair and impartial hearing officer because H.O. Harvey relied on "his own prosecutorial insertion" and "unsubstantiated evidence" in determining plaintiff's guilt. Compl. ¶¶ 37-39. Plaintiff contends that H.O. Harvey's determination of guilt was based on his own quasi-prosecutorial functioning, when he stated to C.O. Lovely, "[Y]ou saw ... movement under the sheet in the genital area." Compl. ¶ 14. It appears plaintiff is suggesting that H.O. Harvey was leading C.O. Lovely to a conclusion that she did not independently suggest. Id.

An inmate is entitled to a fair and impartial hearing officer to preside over his or her disciplinary hearing. 🟧 Sira, 380 F.3d at 69. However, "the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally." 🟧 Francis v. Coughlin, 891 F.2d 43, 46 (2d Cir. 1989). Instead, "due process requires only that the hearing officer not be a 'hazard of arbitrary decision making.' " Espinal v. Goord, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (quoting 🟧 Wolff, 418 U.S. at 571). Due process is thereby satisfied so long as there is "some evidence" that substantiates the hearing officer's decision. 🟧 Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985).

Plaintiff's claim that C.O. Harvey inserted his own "prosecutorial" statement while questioning C.O. Lovely is not supported by the record. The disciplinary hearing transcript, which plaintiff attached to his complaint as an exhibit, shows that H.O. Harvey's question paraphrased C.O. Lovely's prior testimony:

HARVEY: Okay, uh and were you able to see his hand or his hand movement?

LOVELY: *I was able to see movement*

**\*7** HARVEY: Okay and the third question is what caused you to think that Logan was masturbating? In other words I guess thats [sic] he wants to see what you or describe what you saw?

LOVELY: *because the lower [region] of where it is ... the sheet was moving back and forth.*

HARVEY: Okay, alright, so you didn't see ... Okay, alright so there was a sheet there but *you saw ... movement under the sheet in the genital area?*

LOVELY: yes.

Dkt. No. 1-1 at 63-64 (emphasis added). H.O. Harvey's alleged "quasi-prosecutorial insertion" is nothing more than H.O. Harvey repeating the witness' testimony back to her to confirm her statement and ensure a clear and complete record. Id. That H.O. Harvey used a leading question does not mean that he guided C.O. Lovely's answer or engaged in any inappropriate or partial conduct during his questioning.

Plaintiff also claims that H.O. Harvey's reliance on "unsubstantiated evidence to determine guilt" violated his "due process right to a fair and impartial hearing." Compl. ¶ 39. The "some evidence" standard set forth by the Supreme Court of the United States "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board." 🟧 Hill, 472 U.S. at 455-56 (emphasis added).

After reviewing the complaint and its attachments, it is clear that plaintiff was afforded a fair and impartial hearing officer. The Tier III hearing transcript demonstrates that H.O. Harvey explained to plaintiff his rights and the hearing officer's obligations throughout the proceeding, read a copy of the misbehavior report into the record, and gave plaintiff ample time to respond to the allegations in the misbehavior report and call the appropriate witnesses. See Dkt. No. 1-1 at 50-69. Additionally, the transcript establishes that H.O. Harvey's determination of guilt was based on the "some evidence" standard set forth in 🟧 Hill. 472 U.S. at 455. H.O. Harvey

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 25 of 105

Logan v. Harvey, Not Reported in Fed. Supp. (2017)

stated that, in making his determination, he relied on the following evidence:

> misbehavior report dated 2/2/14, written by C.O. Lovely, charging [plaintiff] with rule violations 107.10 interference with employee, 106.10 direct order, 101.20 lewd conduct, which alleges that as C.O. Lovely was making rounds ..., she passed [plaintiff's] cell[,] observed [plaintiff] on [his] gate masturbating. She gave [plaintiff] a direct order to cease but [he] continued.... [O]ne testimony of [plaintiff's] witness Mendez ..., who testified he over heard a conversation between [plaintiff] and C.O. Lovely where she indicated she did not observe [plaintiff] masturbating. Two C.O. Lovely who testified she observed [plaintiff] on [his] cell gate, with a sheet wrapped around [him] with rapid hand movement under the sheet in [his] crotch area.

Dkt. No. 1-1 at 68-69. Plaintiff appears to suggest that, because C.O. Lovely did not actually see his hand and genitals —as they were blocked by the sheet—it cannot be said that she observed him masturbating. Compl. ¶¶ 13-15. Although plaintiff's version of the events presented a different picture of the incident, H.O. Harvey, although not required, "was entitled to make credibility determinations in rendering his decision and Plaintiff's own testimony to the contrary does not render the disposition unsupported by some evidence." Kotler v. Daby, No. 9:10-CV-136 (MAD/CFH), 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (citing Breazil v. Bartlett, 998 F. Supp. 236, 244 (W.D.N.Y. 1997) ). The fact that C.O. Lovely relied on circumstantial evidence— plaintiff's hand moving back and forth near his genitals behind the sheet—to conclude that plaintiff was masturbating, but did not directly view his hand or genitals, does not preclude H.O. Harvey's guilty determination. See generally Rudd v. Sargent, 866 F.2d 260, 262 (8th Cir. 1989) (holding that corrections officer's misbehavior report constituted "some evidence" despite the officer not witnessing the violation). The disciplinary hearing transcript does not support a finding that H.O. Harvey was anything other than a fair and impartial

hearing officer, as there was ample evidence to support a guilty determination. See Blackshear v. Woodward, 9:13-CV-1165 (FJS/CFH), 2014 WL 2967752, at *10 (N.D.N.Y. July 1, 2014) (concluding that the hearing officer was fair and impartial because he "did not fail to view facts in a fair and neutral manner" or impose an atypical punishment.). Therefore, plaintiff was afforded and fair and impartial hearing officer, and was not denied procedural due process on that basis.

### c. Reasonable Opportunity to Call Witnesses and Present Documentary Evidence

**\*8** An inmate is entitled to a reasonable opportunity to call witnesses and present documentary evidence at a hearing. Sira, 380 F.3d at 69. Here, plaintiff was given the opportunity to make opening and closing argument in support of his position. Dkt. No. 1-1 at 52-55, 67-68. Plaintiff also questioned the inmate housed nearest to him at the time of the alleged incident, as well as C.O. Lovely, who filed the initial misbehavior report. Id. at 58, 62. Plaintiff requested ten additional witnesses, and H.O. Harvey limited that number to four of plaintiff's choosing, advising plaintiff that, if necessary, he could add more witnesses after calling the first four. Id. at 56. When the first four witnesses refused to testify, H.O. Harvey asked if plaintiff had any other witnesses he wished to call, and plaintiff declined. Id. at 61. Therefore, plaintiff received a reasonable opportunity to call witnesses and present documentary evidence, and was not denied procedural due process on this ground. [8]

### d. Written Statement of Disposition

At the close of a disciplinary hearing, an inmate is entitled to a written statement of disposition disclosing the evidence the hearing officer relied on and the reasons for any disciplinary action taken. Sira, 380 F.3d at 69. It is clear from the disciplinary hearing transcript that H.O. Harvey read aloud and on-the-record his disposition, in which he stated the evidence on which he relied. Dkt. No. 1-1 at 68-69. Plaintiff does not allege that defendant failed to provide him with a copy of this disposition; in fact, plaintiff attached a copy of the transcript to his complaint. Id. at 2-3. Accordingly, plaintiff had received a written statement of disposition. Therefore, plaintiff's procedural due process rights were not violated on this ground.

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 26 of 105

Logan v. Harvey, Not Reported in Fed. Supp. (2017)

In sum, because plaintiff fails to demonstrate that his procedural due process rights were violated during the disciplinary proceedings, as he received notice of the charges against him, a fair and impartial hearing officer, a reasonable opportunity to call witnesses and present documentary evidence, and a written statement of the disposition, he has failed to demonstrate that he was denied procedural due process. Although plaintiff has arguably demonstrated a protected liberty interest, as plaintiff must demonstrate both a protected liberty interest and a denial of due process to state a Fourteenth Amendment violation, and plaintiff has not made this demonstration, he has not demonstrated a prima facie Fourteenth Amendment claim. See Mitchell, 974 F. Supp. at 342 ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege both that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process."). Accordingly, it is recommended that defendant's Motion to Dismiss be granted.

**B. Article 78 Proceeding**

Defendant argues that plaintiff's Article 78 proceeding does not resolve the issues before the Court because the state standard for evidence in disciplinary hearings is "considerably stricter" than the federal standard. Dkt. No. 21-1 at 9. Plaintiff does not address this argument in his opposition. Although the undersigned recommends the complaint be dismissed for failure to state a claim, this argument will be reviewed briefly for completeness.

In New York State, "[t]he focus of the court's inquiry therefore is ... on whether [the evidence] is 'sufficiently relevant and probative' to constitute substantial evidence." Foster v. Coughlin, 76 N.Y.2d 964, 966 (1990) (internal citation omitted). The New York standard is more demanding than the federal "some evidence" standard. See Friedl v. City of N.Y., 210 F.3d 79, 85 (2d Cir. 2000). "Because the state standard is stricter, the reversal of a disciplinary ruling on administrative appeal or review by state court based on insufficient evidence does not necessarily establish an inmate's federal due process claim." Johnson v. Goord, 487 F. Supp. 2d 377, 382 n.1 (S.D.N.Y. 2007) (citing Sira, 380 F.3d at 76, n.9).

*9 Here, plaintiff filed an Article 78 proceeding in state court challenging the April 23, 2014 affirmation of his disciplinary hearing determination. Compl. ¶ 19; Dkt. No. 21-1 at 6. Defendant H.O. Harvey was not named a respondent in the Article 78 proceeding. Dkt. No. 1-1 at 18. On January 9, 2015, DOCCS reviewed and administratively reversed plaintiff's February 14, 2014 disciplinary hearing determination. Id. at 13. Thereby, plaintiff's Article 78 proceeding was dismissed as moot. Id. at 14-15. Neither DOCCS' reversal nor the dismissal of the Article 78 proceeding resolve the issues presently pending before the Court because the reversal of plaintiff's disciplinary hearing "does not automatically establish [his] federal claim." Sira, 380 F.3d at 76, n.9. "[I]t is federal constitutional standards, not state law or regulations, that define the requirements of procedural due process," and plaintiff's claim cannot be resolved by state regulations. Israel v. Bradt, 228 F. Supp. 3d 237, 240 (W.D.N.Y. 2017) (quoting Johnson v. Goord, 487 F. Supp. 2d 377, 385 (S.D.N.Y. 2007) ). Therefore, neither the DOCCS' reversal nor the Article 78 dismissal resolve the issues before the Court, and the Court must properly make its own determination to resolve the claims pending in this § 1983 action.

**IV. Conclusion**

**WHEREFORE**, for the reasons stated herein, it is hereby

**RECOMMENDED**, that defendant's Motion to Dismiss (Dkt. No. 21) be **GRANTED**, and plaintiff's complaint (Dkt. No. 1) be **DISMISSED in its entirety with prejudice**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir.

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 27 of 105

**Logan v. Harvey, Not Reported in Fed. Supp. (2017)**

1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 9511179

## Footnotes

1   This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

2   SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

3   All unpublished opinions cited to by the Court in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

4   Plaintiff did not raise a First Amendment access to the courts claim. However, even if he had, the undersigned observes, for purposes of this argument only, that such a claim would unlikely be successful, as plaintiff was in SHU—and a part from his legal materials—for only 60 days and does not allege that any of his legal cases were dismissed as a result of this temporary lack of access to his materials. See Harris v. Keane, 962 F. Supp. 397, 404-05 (S.D.N.Y. 1997).

5   As will be discussed in the following subsection, because the undersigned concludes that plaintiff failed to demonstrate a denial of procedural due process, that plaintiff may be able to establish a protected liberty interest with respect to his conditions of confinement does not require a finding that this case survive the Motion to Dismiss as plaintiff must establish both a protected liberty interest and a denial of procedural due process to state a prima facie Fourteenth Amendment claim. See Mitchell, 974 F. Supp. at 342 ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege both that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

6   In his Motion to Dismiss, defendant does not address whether plaintiff's SHU confinement implicated a liberty interest, nor does he concede that point. Dkt. No. 21-1 at 6.

7   Plaintiff does not allege that he was denied notice of his charges. See generally Compl.

8   Plaintiff does not allege that he was denied an opportunity to call witnesses and present documentary evidence. See generally Compl. Further, the Court previously dismissed plaintiff's claim of lack of assistance in preparing for the hearing, as any prejudice was remedied when plaintiff was afforded the opportunity to question witnesses during the hearing. Dkt. No. 9 at 5-8.

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 28 of 105

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

2018 WL 6702851
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Luis ZENON, Plaintiff,
v.
Patrick DOWNEY, et al., Defendants.

9:18-CV-0458 (LEK/ATB)
|
Signed 12/20/2018

**Attorneys and Law Firms**

Leo Glickman, Stoll, Glickman Law Firm, Brooklyn, NY, for Plaintiff.

Matthew P. Reed, David A. Rosenberg, New York State Attorney General, Albany, NY, for Defendants.

**DECISION AND ORDER**

Lawrence E. Kahn, U.S. District Judge

**I. INTRODUCTION**

 *1  Plaintiff Luis Zenon alleges that he was abused by correctional officers and state troopers after two prisoners escaped from Clinton Correctional Facility in the Village of Dannemora, New York. Dkt. No. 1 ("Complaint") ¶¶ 1–3. He brings claims for violations of his constitutional rights under 42 U.S.C. § 1983. Id. ¶¶ 59–115. All Defendants but Correction Officer Patrick Downey have moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Dkt. No. 18 ("Motion"). For the reasons that follow, the Motion is granted with respect to defendants Anthony Annucci and Joseph Belliner and otherwise denied.

**II. LEGAL STANDARD**

Rule 12(b)(6) requires a complaint to be dismissed if it "fail[s] to state a claim on which relief may be granted." To state a valid claim, a complaint must allege "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 8(a)(2). The Court may disregard "legal conclusions couched as factual allegations" that are "devoid of further factual enhancement." Ashcroft v. Iqbal, 556

U.S. 662, 678 (2009). However, "[w]hen there are well-pleaded factual allegations," a court must take them as true, id. at 679, and "draw[ ] all reasonable inferences in the plaintiff's favor," Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). To " 'nudge[ ] [the plaintiff's] claims across the line from conceivable to plausible,' " the facts need only " ' raise a reasonable expectation that discovery will reveal evidence' of the wrongdoing alleged, 'even if it strikes a savvy judge that actual proof of those facts is improbable.' " Citizens United v. Schneiderman, 882 F.3d 374, 380 (2d Cir. 2018) (quoting Twombly, 550 U.S. at 556–57, 570).

When deciding a motion to dismiss under Rule 12(b)(6), "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010). It may also consider "documents or information contained in [the] defendant's motion papers if the plaintiff has knowledge or possession of the material and relied on it in framing the complaint," as well as "facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence." Envtl. Servs. v. Recycle Green Servs., 7 F. Supp. 3d 260, 270 (E.D.N.Y. 2014) (quoting In re Merrill Lynch & Co., 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003) ).

**III. FACTUAL BACKGROUND**

As required, the Court draws the following facts from the Complaint and the documents it incorporates, and it takes those facts as true. Harris, 572 F.3d at 71.

On June 6, 2015, two inmates—Richard Matt and David Sweat—escaped from the "honor block" at Clinton. Compl. ¶¶ 2–3. Prisoners gained "honor block" housing as a reward for good behavior. State of N.Y. Office of the Inspector General, "Investigation of the June 5, 2015 Escape of Inmates David Sweat and Richard Matt from Clinton Correctional Facility," June 2016 ("Inspector General's Report"). [1]  Inmates on the honor block were subject to the same security measures as other prisoners, but had more privileges, "including longer recreation periods on weekdays and weekends when they were allowed to remain in their cells or congregate on the 'flats,' or open areas ... where they could cook and engage in recreational and social activities." Compl. ¶ 19. At the time of the escape, Plaintiff had lived on the honor block for seven years, where he worked as a porter. Id. ¶ 28.

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 29 of 105

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

He slept in a cell near the one occupied by Matt and Sweat and knew them well. Id. ¶ 29.

**\*2** In the days after the escape, "[d]ozens of inmates who were in the honor block or who worked in the tailor shop were brutally interrogated, beaten, and tortured by prison guards." Id. ¶ 81. "Inmates described a strikingly similar catalog of abuses, including being beaten while handcuffed, choked, and slammed against cell bars and walls." Michael Schwirtz & Michael Winerip, "After 2 Killers Fled, New York Prisoners Say, Beatings Were Next," New York Times, Aug. 11, 2015 ("New York Times Article"); see also Corr. Assoc. of N.Y., "10 Things You Need to Know about Brutality and Abuse at Clinton Correctional Facility," Sept. 4, 2015 ("C.A.N.Y. Report"). [2] Inmates reported being interrogated and beaten by correctional officers, including officers wearing jackets labeled "Crisis Intervention Unit." N.Y. Times Article. "In the two weeks after the escape, inmates from Clinton's honor block were dispersed, many of them sent to solitary confinement at other prisons" without evidence they were involved in the escape. Id. They were "beaten during their transfers" and shackled so tightly as to cause scars and bruising. Id.

Plaintiff endured a similar ordeal. In the afternoon of June 6, 2015, the day of the escape, Plaintiff was handcuffed and taken from his cell to a room where numerous people—"some ... in suits, others in Crisis Intervention Unit jackets," and defendant Patrick Downey, a Clinton correctional officer—were waiting. Compl. ¶ 31. There, the officers "aggressively question[ed]" Plaintiff about Matt and Sweat and "choked" him "until he changed color" three times. Id. ¶ 32.

Plaintiff "was [then] locked in his cell until June 9, 2015," when officers took him in his underwear to a room, told him not to speak, shackled him, and put him in a van with two other inmates. Id. ¶¶ 35–36. "[O]fficers were screaming at them to not say a word to one another." Id. By the time he arrived at Great Meadow Correctional Facility, Plaintiff was "in great pain due to the handcuffs being very tight on him." Id. ¶ 37. "After they arrived, he asked an officer to loosen his cuffs because his circulation was cut off," but before anyone did so, he "passed out from the pain and stress." Id. ¶ 38. When he regained consciousness, the officer called Plaintiff a "pussy" and told him to get up, but Plaintiff was too weak to stand. Id. ¶ 39. "The officer then kicked him in the face and took the handcuffs off." Id. While being escorted to his cell at Great Meadow, Plaintiff was also "punched in the stomach numerous times." Id. ¶ 40.

Plaintiff was placed in solitary confinement in the Segregated Housing Unit ("SHU") at Great Meadow. Id. ¶ 40. Two days later, another prisoner called Plaintiff's wife to tell her Plaintiff was in the SHU. Id. ¶ 41. Later, "a sergeant came to him and said that if [your] family calls again, you're not going to like what happens, then elaborat[ed]" that Plaintiff "belonged ... to Clinton." Id. For thirty-one days, Plaintiff was forced to spend twenty-four hours per day in his small cell in the same clothes without any of his personal belongings, and was forbidden from speaking with anyone, including doctors and his family. Id. ¶¶ 44–49. He was never given an opportunity for a hearing or any other means to challenge his confinement. Id. ¶ 48. Plaintiff asserts that he "and many others were placed in [the] SHU to cover up the crimes of correction officers" by ensuring that their victims "were isolated from the outside world" and could not contact lawyers, family, or doctors to complain. Id. ¶ 50.

Plaintiff has sued Downey, a number of John Doe State Troopers and Correction Officers, and multiple John Doe Supervisors at Clinton and Great Meadow. Id. ¶¶ 26–27. He has also named as defendants Anthony Annucci and Joseph Belliner, the Acting Commissioner and Deputy Commissioner for Correctional Facility Operations, respectively, of the New York Department of Correction and Community Supervision ("DOCCS"). Id. ¶ 17. Finally, he names as defendants Clinton Superintendent Steven Racette, First Deputy Superintendent Donald Quinn, and Deputy Superintendent for Security Stephen Brown (collectively, the "Clinton Supervisors"); and Great Meadow Superintendent Christopher Miller, First Deputy Superintendent Matthew Thoms, Deputy Superintendent for Security Rodney Eastman, and Sergeant Francis Scarlotta, who manages the SHU (the "Great Meadow Supervisors"). Plaintiff alleges that Defendants—either directly or by managing their subordinates—violated his Eighth and Fourteenth Amendment rights against cruel and unusual punishment and the deprivation of liberty without due process of law.

**\*3** Downey has answered the Complaint. Dkt. No. 19 ("Downey Answer"). Annucci, Belliner, and the Clinton and Great Meadow Supervisors have moved to dismiss. Mot. [3]

## IV. DISCUSSION

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 30 of 105

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

Section 1983 provides a right to sue for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. Though "Section 1983 itself creates no substantive rights," it provides "a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). To state a valid claim under it, a plaintiff must allege that (1) a person acting under color of state law (2) deprived the plaintiff of a right guaranteed under the Constitution or a federal statute. Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010).

Defendants do not contest that, if it happened, the alleged June 6, 2015 beating and interrogation of Plaintiff at Clinton would entitle him to relief from the officers directly involved in the incident under the Eighth and Fourteenth Amendments. However, they argue that Plaintiff's solitary confinement at Great Meadow without a hearing did not violate due process or constitute cruel and unusual punishment. They also argue that the Complaint lacks allegations suggesting that any of them were personally involved in the beatings or in setting the conditions of Plaintiff's solitary confinement. Except with respect to Annucci and Belliner, the Court disagrees.

### A. Denial of Due Process

To successfully state a claim under § 1983 for denial of due process, a plaintiff must adequately plead (1) that he possessed a liberty interest and (2) that the defendants deprived him of that interest without a fair process, which must include adequate notice and an opportunity to be heard. Ortiz v. McBride, 380 F.3d 649, 654 (2d Cir. 2004). Segregated confinement deprives a state prisoner of "liberty" when it (a) imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," Sandin v. Conner, 515 U.S. 472, 484 (1995), and (b) the "state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint," Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996). State statutes and regulations satisfy prong (b) if they "require, in language of an unmistakably mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates." Tellier v. Fields, 280 F.3d 69, 81 (2d Cir. 2000).

As a threshold matter, Defendants argue that New York regulations—which authorize transfer to an SHU for "administrative," "protective," or "any other reason," 7 N.Y.C.R.R. § 301.7(a)—do not create a liberty interest in remaining free of the SHU because they do not sufficiently limit official discretion to confine inmates for such non-disciplinary reasons. See Defs.' Mem. at 7. New York state officials made the same argument twenty years ago in Lee v. Coughlin, 26 F. Supp. 2d 615, 631 (S.D.N.Y. 1998) ("First, the defendants argue, New York State regulations do not create a liberty interest in remaining free from SHU, and instead the State retains the discretion to place inmates in SHU for any reason."). Then-Judge Sotomayor rejected it, recognizing that the Second Circuit has "long recognized that [New York] statutes and regulations limited the discretion of prison officials in placing inmates in restrictive confinement, SHU or administrative, thereby creating a liberty interest." Id. (citing Wright v. Smith, 21 F.3d 496, 499 (2d Cir. 1994), among other cases). Indeed, "New York prison officials themselves recognize[d] the limited nature of their discretion in that the 'catchall' provision of New York regulations that permits placement in SHU 'for any other reason' is used only in 'emergency or unusual situations,'" and in fact, "New York regulations limit the exercise of ... discretion in placing prisoners in both punitive and non-punitive confinement." Id. at 633. Thus, New York regulations purport to create a liberty interest that is deprived through SHU confinement. Sandin did not alter this conclusion. Id.

**\*4** Rather, "[t]he issue that Sandin ... create[d] is whether [SHU] confinement imposes an atypical and significant hardship on the inmates in relation to the ordinary incidents of prison life." Lee, 26 F. Supp. at 631, meaning "a dramatic departure from the basic conditions" of the plaintiff inmate's sentence, Sandin, 515 U.S. at 484. If DOCCS regularly imposes hardships of comparable severity and duration on other prisoners, such that they are to be expected as part of the plaintiff's criminal sentence, then freedom from such conditions "is not a right of 'real substance'" which the federal constitution "protects." Welch v. Bartlett, 196 F.3d 389, 393 (2d Cir. 1999). Thus, the Court must compare the nature and duration of Plaintiff's confinement to the conditions in the general population and in routine administrative or protective confinement. Id.

The Second Circuit has established guidelines for how long a prisoner must be confined under "standard SHU

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 31 of 105

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

conditions"—which include confinement alone in a cell for twenty-three hours per day, exercise in a yard for one hour per day, two showers per week, inability to work or study, and fewer family visits than are allowed in the general population —to implicate a liberty interest. Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000). In Colon, the court held that 305 days of such confinement is longer than "periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration" and requires due process protections. Id. In Sealey v. Giltner, in contrast, it held (on a limited record) that the plaintiff had not shown that 101 days of standard SHU confinement was "atypical." 197 F.3d 578, 589–90 (2d Cir. 1999).

Nevertheless, "SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of Sealey or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004). In other words, even when the duration of a prisoner's solitary confinement is not long enough to constitute a deprivation of "real substance," the attendant conditions of such may nonetheless make it sufficiently atypical and significant to implicate a liberty interest. Id. at 66. Thus, in Palmer, the Court denied the defendant prison officials' motion for summary judgment because even though the plaintiff inmate was confined in the SHU for only seventy-seven days, he was deprived of his personal effects, including hygienic products, personal clothing and food, family pictures, and reading and writing materials, and was kept completely "out of communication from his family." Id. The court found that, "at least based on the record as it stands now, [plaintiff] should have the opportunity to demonstrate that the conditions of his confinement vis-a-vis both the conditions in administrative confinement and in the general prison population were sufficiently harsh to violate a liberty interest despite the 'comparative shortness' of his confinement." Palmer, 364 F.3d at 66; see also Davis v. Barrett, 576 F.3d 129, 134 (holding that a more detailed factual record was required to determine whether unsanitary conditions of 41-day administrative confinement, in which plaintiff was denied books, commissary privileges, and his one hour of exercise per day, entitled plaintiff to due process).

Although the duration of Plaintiff's confinement in the SHU—thirty-one days—is shorter than the seventy-seven days in Palmer and forty-one days in Davis, the Second Circuit was in those cases considering whether the plaintiff had developed enough evidence in discovery to prove that the conditions in solitary were sufficiently extraordinary to prove a constitutional violation at trial. To survive a pre-discovery motion to dismiss, however, Plaintiff need only demonstrate "a reasonable expectation that discovery will reveal evidence" of such a violation. Twombly, 550 U.S. at 556–57. And if Plaintiff's allegations are true, the conditions of his solitary confinement were even more severe than in Palmer. Defendants severely abused him on his way to the SHU, where he was locked up for twenty-four hours per day without contact with his family or medical attention for one month. Compl. ¶¶ 35–50. In addition, unlike Palmer, who was sentenced to a definite term in the SHU, Plaintiff could see no light at the end of the tunnel; no one told him whether or when he would be released from the SHU. These conditions not only deviated from prior judicial findings describing "standard SHU conditions," Colon, 215 F.3d at 231, but also violated multiple DOCCS regulations. [4] Therefore, it is plausible that the conditions alleged in the Complaint were a "dramatic departure from the basic conditions" prisoners endure in the general population or during routine administrative segregation. Sandin, 515 U.S. at 484, 486; Palmer, 364 F.3d at 66; Davis, 576 F.3d at 134.

**\*5** Because Plaintiff had a liberty interest in not being confined for thirty-one days under such conditions, he was entitled to adequate notice of the reasons for confinement and "an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation" within "a reasonable time following [his] transfer." Wright, 21 F.3d at 499–500. The Complaint states that Plaintiff was given no such notice or hearing. Compl. ¶ 48. Accordingly, it states a plausible claim that Plaintiff's SHU confinement violated the Fourteenth Amendment.

### B. Cruel and Unusual Punishment

The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. State officials violate it if they "wantonly" inflict unnecessary pain on a prisoner. Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013). An

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 32 of 105

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

Eighth Amendment claim has two elements: one objective—the defendant must inflict a sufficiently serious harm—and the other subjective—he or she must inflict it with a culpable mental state. Crawford v. Cuomo, 796 F.3d 252, 256 (2d Cir. 2015). Adverse conditions of confinement are sufficiently serious if they "pose an unreasonable risk of serious damage to [an inmate's] health" or deprive him of " 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." Walker, 717 F.3d at 125. "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.' " Id. Extreme temperatures, egregiously unsanitary conditions, prolonged sleep deprivation, or a "substantial risk of serious harm from other inmates" can constitute unconstitutional conditions of confinement. Id. at 126–28. "A prison official has sufficient culpable intent" if he is "deliberately indifferent" to such conditions, meaning that "he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. N.Y.C. Dep't of Corrs., 84 F.3d 614, 620 (2d Cir. 1996); see also Farmer v. Brennan, 511 U.S. 825, 837 (1994) (stating that "deliberate indifference" equates to "criminal recklessness," which requires "more than mere negligence" but "less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result").

When using force against a prisoner, guards must "appl[y] [it] in a good-faith effort to maintain or restore discipline," to serve a legitimate penological objective, and not "maliciously and sadistically to cause harm." Wilkins v. Gaddy, 559 U.S. 34, 37 (2010) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992) ). To be excessive, force need not cause significant injury. Id. That said, "[n]ot every push or shove ... violates a prisoner's constitutional rights." Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973). To determine whether the defendants "maliciously" inflicted "unnecessary" pain, the Court must consider the degree of force used, any injuries to the prisoner, any "threat reasonably perceived by the responsible officials," and "any efforts made by the defendants to temper the severity of a forceful response" to determine whether the defendants "maliciously" inflicted "unnecessary" pain. Id. (citing Hudson, 503 U.S. at 6–7).

However, when an officer uses unconstitutionally excessive force, the deliberate indifference of fellow officers—knowing the excessive force would be used and refusing to take reasonable steps to stop it—makes them liable, too. Clark v. Gardner, 256 F. Supp. 3d 154, 167 (N.D.N.Y. 2017).

**\*6** Arguing that the conditions of Plaintiff's solitary confinement were not severe enough to violate the Eighth Amendment, Defendants focus on Plaintiff's allegations that "he was denied personal belongings, a change of clothes, writing materials, grievance forms, and phone calls," Defs.' Mem. at 9. "[R]estrictions on telephone use, recreational activities, visitation, and personal property ... are a generally accepted aspect of SHU confinement." Id. (citing Green v. Cent. Off. Review Comm., No. 06-CV-6312, 2012 WL 1191596, at \*5 (W.D.N.Y. Apr. 9, 2012) ). Imposed for a short period, those restrictions alone would not satisfy the Eighth Amendment's objective element. Id.; see also Dixon v. Goord, 224 F. Supp. 2d 739, 748 (S.D.N.Y. 2002) ("[A]llegations of having been cut off from the prison population, a computer program, religious services, legal research, medical showers and personal property, as well as limits on food access, *and other normal incidents of SHU confinement*, are not violations of the Eighth Amendment.") (emphasis added).

However, the Complaint alleges that Plaintiff endured more than the ordinary strictures of SHU confinement described in Green or Dixon. First, the guards choked Plaintiff, beat him, fastened his handcuffs into a tourniquet, ignored his pleas to loosen them, and beat him again without any legitimate penological purpose. Compl. ¶ 32, 37–39. These actions alone constituted the "wanton" infliction of "unnecessary pain" sufficient to violate the Eighth Amendment. See Meriwether v. Coughlin, 879 F.2d 1037, 1047 (2d Cir. 1989) (finding "that there was sufficient evidence of excessive force" where "the plaintiffs testified that were assaulted by guards, and there was no evidence that any physical abuse was necessary to transfer the plaintiffs"). Then, in addition to denying him books and personal property, Great Meadow officials kept him incommunicado for thirty-one days, isolating him from family and mental health staff while he recovered from the physical and psychological trauma inflicted by his custodians.[5] Compl. ¶¶ 42–49. They did so not for any legitimate penological reason, but to stifle reports of abuses committed by Clinton correction officers. Id. ¶ 50. It is plausible, therefore, that Plaintiff's incommunicado, constant confinement rendered his ordeal all the more

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 33 of 105

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

"incompatible with the evolving standards of decency that mark the progress of a maturing society," Hudson, 503 U.S. at 10–11, because it materially exacerbated his already severe psychological trauma for no legitimate reason. See Delaney v. DeTella, 256 F.3d 679, 684–85 (7th Cir. 2001) (explaining that prolonged isolation in solitary confinement can cause "substantial psychological damage" which, when imposed without "any legitimate penological need," violates the Eighth Amendment). Accordingly, it is plausible that the guards who attacked Plaintiff, placed him in the SHU, and maintained his abnormally seclusive conditions of solitary confinement wantonly inflicted unnecessary pain and, therefore, violated the Eighth Amendment.

### C. Supervisor Liability
However, the fact that line officers directly involved in Plaintiff's abuse violated the Constitution does not mean their supervisors may be held liable under § 1983. Section 1983 does not impose "respondeat superior" liability; a supervisor may not be held liable for damages for constitutional violations merely because he had authority over the wrongdoers. Iqbal, 556 U.S. at 676. "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Id. In Colon v. Coughlin, the Second Circuit held that:

> *7 the personal involvement of a supervisory defendant may be shown by evidence that (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates

by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d 865, 873 (2d Cir. 1995). Thus, "Colon permitted supervisory liability in situations where the supervisor knew of and acquiesced in a constitutional violation committed by a subordinate." Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009).

After the Supreme Court's later decision in Iqbal, 556 U.S. at 676–77, 682 (holding that supervisors' "knowledge and acquiescence" in the discriminatory purpose behind their subordinate's actions was insufficient to violate the Equal Protection Clause, and requiring plaintiffs to plead facts showing that supervisors "purposefully adopted" a discriminatory policy), some courts in the Second Circuit held that constitutional claims against supervisory officials may no longer be "based on [a defendant's] failure to take corrective measures," and that § 1983 "imposes liability only where that supervisor directly participated in the alleged violation or had a hand in creating a policy or custom under which the unconstitutional practices occurred." Sash, 674 F. Supp. 2d at 543–44. Therefore, they concluded that "only the first and part of the third Colon categories [would] pass Iqbal's muster." Id.

In Turkmen v. Hasty, however, the Second Circuit clarified that Iqbal, properly read, teaches merely that supervisory officers are liable when, "through their own actions, they satisfy each element of the underlying constitutional tort." 789 F.3d 218, 250 (2d Cir. 2015), rev'd on other grounds, Ziglar v. Abbasi, 137 S. Ct. 1843 (2017). Therefore, "Iqbal does not preclude ... claims [against government officers] premised on deliberate indifference," as opposed to a purposefully illegal policy or practice, "when the underlying constitutional violation requires no more than deliberate indifference." Id. Therefore, a supervisory official violates both the Eighth and Fourteenth Amendments when he or she acts with "deliberate indifference" to the facts that his subordinates are unnecessarily abusing prisoners, id. at 150–51 (finding allegations that a prison's warden knew about widespread detainee abuse, but permitted it to continue, sufficed to state a claim under the Eighth Amendment), and taking their liberty without due process, Newton v. City of

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 34 of 105

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

New York, 779 F.3d 140, 156 (2d Cir. 2015) ("A state prison guard's deliberate indifference to the consequences of his conduct for those under his control and dependent upon him may [also] support a claim [for a violation of the Fourteenth Amendment Due Process Clause] under § 1983.").

Like a line officer, a supervisor acts with the requisite deliberate indifference if he or she "knew of and acquiesced in [the] constitutional violation." Sash, 674 F. Supp. 2d at 54. [6] "Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." Walker, 717 F.3d at 125. In addition, a supervisor's wilful blindness will not protect him. If a defendant "merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist (as when a prison official is aware of a high probability of facts indicating that one prisoner has planned an attack on another but resists opportunities to obtain final confirmation)," he was deliberately indifferent to that risk. Farmer, 511 U.S. at 862 n.8.

**\*8** The Complaint plausibly alleges that the Clinton Supervisors consciously disregarded a high risk that their subordinates would harm Plaintiff. Colon, 58 F.3d at 873. Matt and Sweat's high-profile escape, for which Clinton's leadership was ultimately accountable, drew the attention of the national media, the public, and the New York Governor's office, and placed urgent demands on the Clinton Supervisors to prioritize the investigation and follow it closely. Compl. ¶¶ 79–82, 106; N.Y. Times Art. The "catalogue of abuses" described by honor block inmates was "strikingly similar:" officers repeatedly beat and suffocated them during interrogations then transferred them to other prisons to be locked incommunicado in solitary confinement. N.Y. Times Art.; see also Compl. ¶¶ 6, 32, 50, 81; C.A.N.Y. Rep. ¶¶ 1, 5, 7. These patterns suggest coordination not only among the Jon Doe correction officers and troopers perpetrating the abuses (who worked for multiple different agencies), but also with supervisory officials who directed the investigation and were in a position to authorize prisoner transfers. It is plausible to infer that such widespread, coordinated abuses during the likely closely-monitored investigation could not have happened without the Clinton Supervisors' knowing acquiesce, or wilful blindness. See Alexander v. Cuomo, No. 17-CV-309, 2018 WL 2041576, at *6 (N.D.N.Y. Feb. 26, 2018) (finding that similar

allegations by other Clinton inmates were sufficient to state a claim that superintendent Racette was deliberately indifferent to the beatings after Matt and Sweat's escape). Moreover, Plaintiff plausibly states that the Clinton Supervisors must have known Plaintiff, who bunked near Matt and Sweat and knew them well, was especially susceptible to violent interrogation or retaliation by guards in the wake of the escape. Compl. ¶¶ 29, 84; Farmer, 511 U.S. at 482 (noting that evidence that defendant knew of victim's special vulnerability to abuse may support an inference of deliberate indifference). Therefore, the claims against the Clinton Supervisors survive.

The Great Meadow Supervisors—one step removed from the closely-watched investigation and prolific abuses at Clinton —present a closer question. Nevertheless, there was also a pattern in the conditions imposed exclusively on honor block inmates who were transferred to Great Meadow: unlike other SHU inmates, they were beaten in transit and locked up without their personal property or access to professionals or family who could address their injuries or hear their stories. Compl. ¶¶ 50, 108; N.Y. Times Art.; C.A.N.Y. Rep. ¶ 7. That consistency in treatment implies both (1) that the subordinate officers coordinated amongst themselves to maintain report-suppressing conditions of confinement; and (2) that the Great Meadow Supervisors must have either knowingly cooperated or been wilfully blind to such wide-reaching and coordinated behavior. As such, at this early stage, it would be inappropriate to dismiss the claims against them.

However, Plaintiff does not provide enough facts from which to infer that Commissioner Annucci and Deputy Commissioner Belliner, both executive officers who supervised the numerous prisons in New York State, ordered the abuses at Clinton or Great Meadow or knew or (with respect to the due process violations) should have known about them in time to prevent them. Although Plaintiff alleges in general terms that he "made numerous complaints to various prison authorities and to other officials explaining that his safety and security were in serious jeopardy [at Clinton] because of threats and harassment by correction officers in connection with the investigations of the escape," Compl. ¶ 80, and "made complaints to various prison authorities and to other officials in connection with the living the conditions in the SHU," id. ¶ 107, Plaintiff gives no reason to believe that his complaints ever reached Annucci or Belliner's offices, or that either executive knew how the investigation into the Clinton escape was being conducted on the ground. As a result, the district court in Alexander held that the

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 35 of 105

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

similar allegations in that case failed to suggest that Annucci was personally involved in the alleged abuse. 2018 WL 2041576, *5. This Court agrees. [7]

## V. CONCLUSION

**\*9** Accordingly, it is hereby:

**ORDERED**, that the Motion to Dismiss (Dkt. No. 18) is **GRANTED** with respect to the claims against Annucci and Belliner and **DENIED** in all other respects. The claims against Annucci and Belliner are **DISMISSED** without prejudice.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 6702851

---

### Footnotes

1    The Complaint incorporates the Inspector General's Report by reference. Compl. ¶ 53.

2    The New York Times Article and C.A.N.Y. Report are also incorporated in the Complaint by reference. Id. ¶¶ 6 n.2, 81 n.3. They are available at and (last visited December 19, 2018).

3    From this point onward, for ease of reference, the Court will use the term "Defendants" to mean only the defendants that joined in the Motion, unless otherwise specified.

4    See, e.g., N.Y.C.R.R.§§ 304.3 ("Inmates confined in the SHU must be permitted one hour of outdoor exercise daily, exclusive of the time it takes to go to and return from the exercise area, beginning on the day following admission."), 304.4 (requiring "[a] qualified medical practitioner ... to examine each inmate upon admission to an SHU" and to "visit the SHU once in every 24-hour period to examine into the state of health of the inmates confined in such unit," and providing that "[a]ny inmate who requests to see a medical practitioner will be permitted an opportunity to do so in accord with all good security precautions"), 304.12 (requiring that two books and one magazine be available to each inmate), 304.13 ("Each inmate shall be permitted to send and to receive privileged and regular correspondence.").

5    Defendants also cite Coffey v. Hollenback No. 14-CV-196, 2016 WL 770087 (N.D.N.Y. Jan. 27 2016). However, the duration of confinement, among other things, distinguishes Plaintiff's solitary confinement from the plaintiff's in Coffey, which lasted only six days. Id. at *6.

6    Sash was an Eighth Amendment case. In Darnell v. Pineiro, the Second Circuit held that "deliberate indifference" has different meanings in the Fourteenth and Eighth Amendment contexts. 849 F.3d 17, 35 (2d Cir. 2017). Under the Eighth Amendment, as indicated earlier, "deliberate indifference" is a two-pronged, objective and subjective standard, meaning that the risk of harm to the inmate must be sufficiently serious and the official must actually know of and disregard it. Id. at 32. But to violate the Due Process Clause of the Fourteenth Amendment, the official need only "fail[ ] to act with reasonable care to mitigate the risk that [a] condition posed to the [inmate] even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." Id. at 35 (emphasis added). In any event, since Defendants' conduct plausibly satisfies the more stringent Eighth Amendment standard, the distinction between the two standards is immaterial at this stage.

7    In his Opposition to the Motion, Plaintiff quotes Clinton Superintendent Racette's testimony, in his June 6, 2015 deposition for this case, that Acting Commissioner Annucci "took residence in [Racette's] office" and that Racette "was not making any decisions from the 6th [of June] on" because Annucci and Belliner were present in the facility and effectively in charge of the investigation. Dkt. No. 22 ("Opposition") at 14. However, those facts are not in the Complaint, its attachments, or its references. "[A] non-moving party cannot overcome a motion to dismiss simply by asserting new facts or theories for the first time in its opposition." Nicosia v.

Zenon v. Downey, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 36 of 105

Town of Hempstead, No. 16-CV-1176, 2017 WL 9485669, at *5 (E.D.N.Y. June 14, 2017), adopted, No. 16-CV-1176, 2017 WL 3769246 (E.D.N.Y. Aug. 28, 2017); see also K.D. ex rel. Duncan v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 209 (S.D.N.Y. 2013) ("Plaintiffs cannot amend their complaint by asserting new facts or theories for the first time in opposition to Defendants' motion to dismiss."). Therefore, the Court cannot consider those new allegations in deciding the Motion.

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5472113
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Charles JUDD, Plaintiff,

v.

GUYNUP, Sgt., Clinton Correctional Facility;
Capt. Paul Woodruff, Hearing Officer, Defendants.

Civ. No. 9:12–CV–00058 (NAM/RFT).
|
Oct. 17, 2012.

**Attorneys and Law Firms**

Charles Judd, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Adrienne J. Kerwin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

**\*1** Charles Judd, a New York State prison inmate proceeding
*pro se* and *in forma pauperis,* commenced this civil rights
action, pursuant to 42 U.S.C. § 1983, alleging that
Defendants violated his procedural due process rights under
the Fourteenth Amendment. *See* Dkt. No. 14, Am. Compl. [1]
Defendants now move for dismissal of the Amended
Complaint pursuant to Federal Rule of Civil Procedure 12(b)
(6). Dkt. No. 19. Plaintiff opposes the Motion. Dkt. No.
21. For the reasons that follow, it is recommended that
Defendants' Motion be **GRANTED** and the entire Complaint
be **DISMISSED.** However, in light of Plaintiff's *pro se*
status, it is further recommended that Plaintiff be afforded an
opportunity to amend his pleading.

### I. BACKGROUND

What follows is a summary of the facts alleged in the
Plaintiff's pleadings and Response [2] to Defendants' Motion,
which must be accepted as true for the purposes of addressing
Defendants' Motion to Dismiss. *See infra* Part II.A.

On August 19, 2011, there was an "uprising" in or near the
North Yard of the Clinton Correctional Facility. Am. Compl.
at ¶ 5. At the time of the uprising there were as many as
259 inmates in the vicinity of the North Yard at Clinton. *Id.*
Plaintiff, denies participation in the uprising. *See generally*
Am. Compl. Defendant Gunyup, an area supervisor, was in
the North Yard at the time of the uprising, and directed another
officer to lock the Plaintiff up. *Id.* at ¶ 10; Pl.'s Opp'n at p. 1.

Thereafter, Plaintiff was "charged in a single misbehavior
report for violating a host of prison rules arising from a[n]
uprising at [Clinton]." Pl.'s Affirm. at ¶ 4. The report did
"not indicate the words or actions [Plaintiff] employed in
the alleged incident[.]" Am. Compl. at ¶ 5. On August 26,
2011, a superintendent's hearing was held and presided over
by Defendant Woodruff. *Id.* at ¶ 1.

The evidence presented at the hearing included the testimony
of Plaintiff, the testimony of Defendant Guynup, and video
of the uprising. *Id.* at ¶¶ 3 & 11. Throughout the duration
of the hearing, Plaintiff averred that he was not in the
area where the alleged incident took place nor involved in
any way in the uprising. *Id.* at ¶¶ 1, 4, & 9. Defendant
Guynup testified that "no Staff member observed plaintiff
engag[ing] and/or participat[ing] in the alleged uprising."
*Id.* at ¶ 11. Furthermore, "at no relevant time[ ]" did the
videotapes reviewed by Defendant Woodruff "clearly ...
identify [ ] the Plaintiff." *Id.* at ¶ 4. Nevertheless, Defendant
Woodruff found Plaintiff guilty and sentenced him to 545
days of confinement in SHU, with a concomitant "loss of
all privileges commissary, phone, packages; and loss of good
time credit." *Id.* at ¶ 1; Pl.'s Affirm. at ¶ 7. Plaintiff appealed
Defendant Woodruff's determination. *Id.*

On October 26, 2011, Defendant Woodruff's decision was
reversed and a new hearing was ordered. Amend. Compl.,
Attach. Supt. Hr'g Review. Thereafter a rehearing was
conducted by J. Earl on November 9, 2011, and all charges
were "dismissed because there was no 'Substantial Evidence'
in the record to find the Plaintiff guilty as charged." Pl.'s
Affirm. at ¶ 7.

**\*2** During his confinement in SHU, Plaintiff's blood
pressure increased, requiring him to take medication, and he
suffered from depression. Pl.'s Opp'n at p. 1.

## II. DISCUSSION

### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. See *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by* *Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] *solely* relies and which is *integral to the complaint'* may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. See *Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. at 697 (citing *Twombly* ). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. at 678. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* In this respect, to survive dismissal, a plaintiff "must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 440 U.S. at 555). Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. at 679–80.

**\*3** With this standard in tow, we consider the plausibility of Plaintiff's Amended Complaint.

### B. Eleventh Amendment

The Eleventh Amendment states, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although by its terms, the amendment bars suit by citizens of one state against another state, the Supreme Court has held that such amendment similarly bars suits against a state

by its own citizens. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). "The Eleventh Amendment thus 'affirm[s] that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III.' " *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.Supp. 426, 447–48 (2d Cir.1999) (citing *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)). Thus, sovereign immunity provided for in the Eleventh Amendment prohibits suits against the state, including a state agency in federal court. *Pennhurst State School & Hosp. v. Halderman,* 465 U.S. at 98–101; *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993); *Daisernia v. State of New York,* 582 F.Supp. 792, 796 (N.D.N.Y.1984). To the extent a state official is sued for damages in his or her official capacity, "such a suit is deemed to be a suit against the state, and the official is entitled to invoke the eleventh amendment immunity belonging to the state." *Rourke v. New York State Dep't of Corr. Servs.* 915 F.Supp. 525, 539 (N.D.N.Y.1995) (citing *Berman Enters., Inc. v. Jorling,* 3 F.3d 602, 606 (2d Cir.), *cert. denied,* 510 U.S. 1073, 114 S.Ct. 883, 127 L.Ed.2d 78 (1994); *Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993)); *see also Mathie v. Fries,* 121 F.3d 808, 818 (2d Cir.1997) ("A claim against a government officer in his official capacity is, and should be treated as, a claim against the entity that employs the officer ....").

However, whether state officials sued in their official capacities are entitled to Eleventh Amendment immunity depends also upon the relief sought in the complaint. The Second Circuit has held that in accordance with *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), "acts of state officials that violate federal constitutional rights are deemed not to be acts of the state and may be subject of injunctive or declaratory relief in federal court." *Berman Enters., Inc. v. Jorling,* 3 F.3d at 606 (citations omitted); *see also Rourke v. New York State Dep't of Corr. Servs.,* 915 F.Supp. at 540.

In the instant case, Plaintiff seeks only monetary damages. Therefore, Plaintiff's claims against all Defendants in their official capacities should be **DISMISSED.**

### C. Due Process

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners[,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

**\*4** Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr.3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that

in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement may not implicate a constitutionally protected liberty interest.");

*Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F.3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F.3d 137; *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*5** Plaintiff asserts that he was deprived of due process in connection with the Woodruff hearing because he was found guilty without sufficient evidence. Prior to assessing the substance of this claim, we must determine whether, as a result this disciplinary hearing, Plaintiff was deprived of a protected liberty interest.

On August 26, 2011, Defendant Woodruff sentenced Plaintiff to serve 545 days in SHU, without "any privileges" including commissary, phone, packages, and good time credit. However, Plaintiff's conviction was subsequently overturned on appeal and Plaintiff was released from SHU on either October 26, 2011 or November 9, 2011.[3] Therefore, despite being sentenced to 545 days of SHU confinement, Plaintiff only actually served between 67 and 76 days. Accordingly, Plaintiff's argument that the 545–day SHU sentence implicated a liberty interest is fatally flawed. Am. Compl. at ¶ 6. Plaintiff incorrectly assumes that the material time period in a *Sandin* analysis is the length of the sentence imposed rather than the length of time an inmate actually spent in SHU confinement. However, courts in this Circuit have interpreted *Sandin* and its progeny to mean just the opposite. That is, in the Second Circuit, it is the length of the *actual* punishment that is relevant in determining whether a period of SHU confinement implicates a cognizable liberty interest, and, not as the Plaintiff would argue, the length of the sentence imposed. *Scott v. Albury,* 156 F.3d 283, 287–88 (2d Cir.1998) ("No right to due process is implicated in the prison context *unless* a liberty interest has been deprived, and we read *Sandin [v. Conner]* to require that we look to actual punishment in making this determination."). Thus, the Second Circuit has made clear that whether a punishment is atypical and significant is to be measured by the time actually spent in disciplinary confinement, not the potential time that might have been spent. Therefore, the relevant period of confinement for the purposes of our *Sandin* analysis is the 67–76 days Plaintiff spent in SHU confinement in connection with the sentence that was ultimately reversed, and not the 545–day period Plaintiff was initially sentenced to.

Moreover, in the Second Circuit, SHU confinement under **normal conditions** of SHU confinement "lasting fewer than 101 days ha[s] been found not to amount to atypical and significant hardship." *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 606 (S.D.N.Y.2009) (citing *Sealy v. Giltner,* 197 F.3d at 588–90). A number of district courts in this Circuit have found that periods of SHU confinement around or exceeding 67–76 days did *not* constitute a deprivation under *Sandin. See Edmonson v. Coughlin,* 1996 WL 622626, at *4–5 (W.D.N.Y. Oct.4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Alvarado v. Kerrigan,* 152 F.Supp.2d 350,

355 (S.D.N.Y.2001) (93 days) (citing *Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y. July 28, 2000) (75 days confinement); *Jackson v. Johnson,* 15 F.Supp.2d 341, 361–62 (S.D.N.Y.1998) (99 days); *Trice v. Clark,* 1996 WL 257578 at *3 (S.D.N.Y. May 16, 1996) (150 days)). That is not to say that any period of confinement that does not last longer than 101 days cannot be atypical. *See* *Palmer v. Richards,* 364 F.3d at 65 (noting that SHU confinements of less than 101 days could constitute atypical and significant hardships if the conditions were more severe than the "normal SHU conditions"). Rather, it means that in the absence of some allegation that the conditions of the confinement were harsher than the "ordinary incidents of prison life," such a short period of confinement would not ordinarily implicate a cognizable liberty interest.

**\*6** Plaintiff's pleading is completely devoid of factual allegations regarding how the SHU conditions differed from the ordinary incidents of prison life as experienced by other SHU or general population inmates at Clinton. The only allegations submitted by the Plaintiff relevant to the conditions he endured during his confinement in SHU, are two terse statements Plaintiff haphazardly threw into the Affirmation attached to his Amended Complaint and in his brief Response to the Defendants' Motion to Dismiss. In his Affirmation, Plaintiff merely notes that his disciplinary sentence included a concomitant denial of all privileges, including phone, commissary, and packages, as well as a loss of good time credit. Pl .'s Affirm. at ¶ 7. In his Opposition, Plaintiff expands on his alleged suffering by noting that while in SHU, his blood pressure increased, requiring medication, and he suffered from depression. Dkt. No. 21. Even when construed liberally, these additional facts do not support a plausible inference that the conditions of his confinement were unduly harsh or atypical in comparison with the ordinary incidences of prison life at Clinton.

The Plaintiff's naked allegations that as a condition of his confinement he lost package, phone, and commissary privileges are insufficient to support the inference that these losses were atypical for SHU or general population inmates at Clinton. In order to survive a motion to dismiss Plaintiff must allege that these deprivations represented conditions "much more severe than normal SHU conditions." *See* *Parks v. Smith,* 2009 WL 3055279, at *10 (N.D.N.Y. Aug.17, 2009) ("Where a prisoner contends merely that his SHU confinement lasted for a period of something less than 101 days, without alleging that he served that SHU term under

conditions more severe than normal SHU conditions, his right to relief under a procedural due process theory is purely speculative."). Here Plaintiff has merely noted that he lost these privileges, he has not alleged that such losses were in any way more severe than the losses faced by other SHU detainees.

With regard to the Plaintiff's medical ailments, the Court will not assume that the conditions of his confinement caused Plaintiff's medical issues. Absent some allegation establishing a causal connection between the Plaintiff's medical problems and the conditions he endured while in segregative confinement, these allegations are insufficient to state a plausible due process claim. *C.f.* *Delaney v. Selsky,* 899 F.Supp. 923, 927–28 (N.D.N.Y.1995) (finding atypical conditions of confinement where a seven foot tall prisoner in an SHU cell—which is smaller than a normal cell—was forced "to stand or lay in an uncomfortable and compromising position," causing him to experience "back problems"). Absent some allegation to the contrary there is no reason to believe that the Plaintiff would not have suffered from the very same medical ailments had he been confined to general population.

**\*7** Lastly, Plaintiff's allegations with regard to the loss of good time credits is insufficient to establish a deprivation of a liberty interest. Putting aside for the moment that his sentence was reversed on appeal, the Second Circuit has made clear that an inmate has no liberty interest in the opportunity to earn good time credit. *Abed v. Armstrong,* 209 F.3d 63, 66–67 (2d Cir.2000) (noting that good time credit is a discretionary matter and thus an inmate has no liberty interest in the opportunity to earn good time credit); *see also* N.Y. CORRECT. LAWW § 803 (outlining New York's discretionary good time credit program).

Therefore, in light of the fact that Plaintiff's period of confinement was relatively short and he has not stated sufficient facts from which to conclude that the conditions of the his confinement were significantly different than the typical conditions of general population or SHU confinement at Clinton, the Court recommends that the Plaintiff's due process claim against Defendant Woodruff be **DISMISSED.**

### D. Defendant Guynup

Plaintiff's allegations regarding Defendant Guynup are poorly pled and confusing. It is unclear as to how, if at all, Defendant Guynup was personally involved in any alleged wrongdoing. Plaintiff's allegations against Defendant Guynup are few in number, and for the most part, are wholly conclusory. The Plaintiff made three allegations from which any personal involvement on the part of Defendant Guynup, if it exists at all, could be culled: (1) "Sgt. Guynup, as area Superior, had ratified, condoned, sanctioned, and particip [ ]ated" in the actions that led to his confinement in SHU; (2) that he ordered another correction officer to "lock [Plaintiff] up;" and (3) that he testified at the Plaintiff's hearing. Am. Compl. at ¶¶ 10 & 11; Pl.'s Affirm. at p. 1. As to point one when construed liberally, it would appear that the Plaintiff is attempting to state that Defendant Guynup is liable by virtue of his role as a supervisor. Defendant's argue that Defendant Guynup cannot be held liable in a supervisory capacity because he is not in fact a supervisor, and even if he were, Plaintiff has failed to allege that Defendant Guynup was personally involved in any wrongdoing. For the reasons that follow, we agree with the Defendants and recommend that Plaintiff's claims against Defendant Guynup be **DISMISSED.**

The Second Circuit has held that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citations omitted). Moreover, "the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement." *Kinch v. Artuz,* 1997 WL 576038, at *2 (S.D.N.Y. Sept.15, 1997) (citing Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir.1995) & *Wright v. Smith,* 21 F.3d at 501) (further citations omitted). Thus, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**\*8** The Second Circuit has stated that a supervisory defendant may have been personally involved in a constitutional deprivation within the meaning of § 1983 if he: (1) directly participated in the alleged infraction; (2) after learning of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred or allowed such policy or custom to continue; or (4) was grossly negligent in managing subordinates who caused the unlawful condition or event. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986) (citations omitted). Pointedly, "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003) (quoting *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)); *see also Wright v. Smith,* 21 F.3d at 501 (defendant may not be held liable simply because he holds a high position of authority). As alleged, the involvement of Defendant Guynup, does not fall into any of these categories.

First, Plaintiff fails to provide any facts support the proposition that Guynup "ratified, condoned, sanctioned and participa[ ]ted" in a constitutional violation. Am. Compl. at ¶ 10. Plaintiff, at best, casts this as an argument. *Id.* ("Plaintiff [ ] argue[s] ... Sgt. Guynup ... ratified, condoned, sanctioned...."). Such conclusory statements, by themselves, cannot constitute a cause of action. It is possible that the Plaintiff intended to allege that the Defendant Guynup became personally involved when he ordered the Plaintiff to be locked up after the uprising on August 19. The Plaintiff's vague allegation, and paucity of facts that Defendant Guynup locked him up cannot be the basis for Defendant's personal involvement. [4]

The only other allegation made by Plaintiff that could support an inference of personal involvement is Plaintiff's allegation that Defendant Guynup appeared and testified at his hearing. Plaintiff alleges that Defendant Guynup testified that no staff member observed Plaintiff engaged in or participating in the uprising. Am. Compl. at ¶ 11. Merely testifying at a disciplinary hearing—particularly when the testimony given is favorable to the accused—is insufficient to establish personal involvement. *See Muhammad v. Pico,* 2003 WL 21792158 at *16–17 (S.D.N.Y. Aug.5, 2003).

A common sense evaluation of the aforementioned factors leads us to the conclusion that the Plaintiff has failed to sufficiently allege any facts which could plausibly support a claim against Defendant Guynup based on personal involvement or supervisory liability. Therefore, we recommend that Defendants' Motion to Dismiss the claims against Defendant Guynup be **GRANTED.**

### E. Leave to Amend

The Second Circuit has cautioned courts in this District from dismissing *pro se* complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Thompson v. Carter,* 284 F.3d 411, 416 (2d Cir.2002) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)); *see also Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) ("Certainly the court should not dismiss without granting leave to amend at least once when a liberal reading of the [*pro se* ] complaint gives any indication that a valid claim might be stated."). As stated above the Amended Complaint is devoid of sufficient facts from which to conclude that the conditions of Plaintiff's confinement were unduly harsh or atypical, more importantly, Plaintiff has failed to sufficiently allege that a cognizable liberty interest was at stake in this case. Therefore, we find that Plaintiff has failed to state a claim upon which relief could be granted and dismissal would be appropriate. The Amended Complaint is similarly devoid of any factual allegations linking Defendant Guynup's personal involvement, beyond the allegation that he is a supervisor, to any wrongdoing or constitutional infringement. However, in light of Plaintiff's *pro se* status, this Court recommends he be provided an opportunity to amend his Complaint to cure the deficiencies described herein, namely, providing further factual allegations regarding the conditions of his 67 to 76 day confinement in SHU, and setting forth a proper basis to find that Defendant Guynup participated in any wrongdoing.[5]

**\*9** Should the District Judge adopt this recommendation, we provide the following guidance for Plaintiff in drafting an amended complaint. Plaintiff should note that any amended complaint, *which shall supersede and replace in its entirety the previous Complaint,* must contain a caption that identifies, by name, each individual and/or entity that Plaintiff is suing in the present lawsuit, and must bear the case number assigned to this action. **Plaintiff should note that any defendant not named in the amended pleading shall not be a defendant in this action.** No portion of any prior Complaint shall be incorporated into his amended complaint by reference. The body of Plaintiff's amended complaint must contain *sequentially numbered paragraphs containing only one act of misconduct per paragraph.* If Plaintiff claims that his civil and/or constitutional rights were violated by more than one defendant, or on more than one occasion, he shall include a corresponding number of paragraphs in his amended complaint for each such allegation, with each paragraph specifying (i) the alleged act of misconduct; (ii) the date on which such misconduct occurred; (iii) the names of each and every individual who participated in such misconduct; (iv) where appropriate, the location where the alleged misconduct occurred; and, (v) the nexus between such misconduct and Plaintiff's civil and/or constitutional rights.

## III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that the Defendants' Motion to Dismiss (Dkt. No. 19) be **GRANTED; and** it is further

**RECOMMENDED,** that in light of his *pro se* status, the Plaintiff be **GRANTED LEAVE TO AMEND** prior to dismissing the entire case; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

## All Citations

Not Reported in F.Supp.2d, 2012 WL 5472113

## Footnotes

1    Plaintiff filed an Amended Complaint as of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(A).

2    For the purposes of evaluating a motion to dismiss brought against a *pro se* plaintiff, the Second Circuit has deemed facts found in a plaintiff's response to a defendant's motion to dismiss to be part of the plaintiff's complaint—even though they were not contained within the original complaint. *See* Drake v. Delta Air Lines, Inc., 147 F.3d 169, 170 (2d Cir.1998) (*per curiam* ).

3    It is unclear from the Plaintiff's pleading whether he was released from SHU after his case was overturned and a rehearing was demanded on October 26, 2011, or whether he remained incarcerated until all charges were dismissed on November 9, 2011. Thus, it is not possible to know from the pleading exactly how long Plaintiff was actually segregated in SHU.

4    Had Plaintiff clearly alleged that Defendant Guynup personally placed him in SHU, or directed that he be placed in SHU, on August 19, after the uprising, our analysis on the point of personal involvement would have been different. However, our ultimate conclusion would not change, because Plaintiff failed to identify a cognizable liberty interest that could sustain a due process claim. *See supra* Part II.B.

5    Any amended complaint should contain factual allegations connecting the variation in these conditions to the health problems experienced by the Plaintiff. Additionally, Plaintiff should make a conscientious effort to include a more thorough and detailed time line of the his SHU confinement, including the dates he was confined to and released from SHU.

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4097784
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Derick HERNANDEZ, Plaintiff,

v.

Sheriff Michael SPOSATO, Undersheriff Hesse,
Captain Ford, Sgt. Curtin, John Doe, Defendants.

No. 14–CV–4593 (JFB)(ARL).
|
Signed July 8, 2015.

**Attorneys and Law Firms**

Derick Hernandez, pro se.

Pablo Fernandez of the Nassau County Attorney's Office,
Mineola, NY, for the defendants.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

 **\*1** Incarcerated *pro se* plaintiff Derick Hernandez
("plaintiff" or "Hernandez") brings this action
against defendants Sheriff Michael Sposato ("Sposato"),
Undersheriff Hesse, Captain Ford, Sgt. Curtin, and John
Doe (collectively, "defendants"), alleging a violation of his
constitutional rights pursuant to 42 U.S.C. § 1983. Plaintiff
claims that, while he was housed at the Nassau County
Correctional Center ("NCCC") pending trial, defendants
wrongfully prevented him from any "contact visits" after he
was involved in violent altercations with another inmate.

Defendants move to dismiss the complaint on the ground that
plaintiff has failed to allege a violation of a constitutionally
protected right.[1] For the following reasons, the Court agrees,
and grants the motion to dismiss.

**I. BACKGROUND**

*A. Factual Background*

The Court takes the following facts from the complaint. These
are not findings of fact by the Court; instead, the Court
assumes these facts to be true for purposes of deciding the
pending motion and construes them in a light most favorable
to plaintiff, the nonmoving party.

Plaintiff was in detention at NCCC when the events at
issue occurred, pending trial in state court.[2] On or about
November 9, 2013, plaintiff alleges that he was involved in
a violent altercation with another inmate, Isaiah Johnson, in
his housing unit. (Compl. at IV.) Plaintiff alleges that the
prison officials intervened, moved plaintiff and Johnson to
cells further from each other, and put a "keep separate" order
in place. (*Id.*)

Plaintiff then alleges that, on or about November 12, 2013,
he was called down to the visit floor for a contact visit. (*Id.*)
Approximately twenty minutes after plaintiff was called down
to the visit floor, plaintiff alleges Johnson was also brought
down by the guards for a visit. (*Id.*) Plaintiff alleges the guards
seated Johnson behind plaintiff, and Johnson then punched
him from behind, causing plaintiff to turn around to "protect
myself." (*Id.*)

Plaintiff alleges that, after the second incident on the visit
floor, defendants sent him a letter notifying him that he was
restricted from having any further contact visits. (*Id.*) Plaintiff
asserts that he has had no contact visits since that incident
and that defendants have not responded to his appeals of the
restriction;[3] plaintiff asserts this restriction is unjust because
defendants precipitated the incident by bringing Johnson to
the visit floor when plaintiff was present, despite the fact that
they should have been aware a "keep separate" order was in
place. (*Id.*)

*B. Procedural Background*

Plaintiff filed the complaint in this action on July 31, 2014.
Defendants moved to dismiss on October 6, 2014. Plaintiff
opposed on November 19, 2014, and the defendants replied
on December 19, 2014. The matter is fully submitted, and the
Court has fully considered the submissions of the parties.

**II. STANDARD OF REVIEW**

**\*2**  In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff.

See  Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir.2006);  Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 100 (2d Cir.2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.' "  Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F .3d 86, 91 (2d Cir.2010) (quoting  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal,* setting forth a two-pronged approach for courts deciding a motion to dismiss. 556 U.S. 662 (2009). The Supreme Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  Id. at 679 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. at 678 (quoting and citing  Twombly, 550 U .S. at 556–57 (internal citation omitted)).

Where, as here, the plaintiff proceeds *pro se,* courts are " 'obliged to construe his pleadings liberally.' "  Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir.2008) (quoting  McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir.2004)); *see also*  McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir.1999) (stating that a *pro se* plaintiff's pleadings must be interpreted "to raise the strongest arguments that they suggest" (citation and internal quotation marks omitted)). A *pro se* plaintiff's complaint, while liberally interpreted, still must " 'state a claim to relief that is plausible on its face.' "  Mancuso v. Hynes, 379 F. App'x 60, 61 (2d Cir.2010) (quoting  Iqbal, 556 U.S. at 678); *see also* Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009).

## III. DISCUSSION

Plaintiff asserts that defendants violated his constitutional rights under  Section 1983. To prevail on a claim under  Section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law.  42 U.S.C. § 1983.  Section 1983 does not itself create substantive rights; it offers "a method for vindicating federal rights elsewhere conferred."  Patterson v. Cnty. of Oneida, 375 F.3d 206, 225 (2d Cir.2004).

**\*3**  Plaintiff asserts that defendants' restriction of his contact visits was a violation of his Fourteenth Amendment right to due process. [4] (Pl.'s Opp. at 1–2.) Plaintiff demands injunctive relief (presumably restoring his contact visits), as well as compensatory and punitive damages. (Compl. at V.)

Accepting the factual allegations set forth in the complaint as true and drawing all reasonable inferences in favor of the plaintiff, the Court nonetheless finds that plaintiff has failed to state a plausible claim under  Section 1983. Defendants argue that plaintiff has failed to state a claim under  Section 1983 because his claim—which solely involves the restriction of his contact visits—does not involve the deprivation of any right, privilege, or immunity secured by the Constitution. (Defs.' Mem., ECF No. 13, at 7–9.) The Court agrees.

"To establish a claim under the Due Process Clause, a plaintiff must demonstrate that he possesses a constitutionally protected interest in life, liberty, or property, and that state action has deprived him of that interest."  Doe v. Pataki, 3 F.Supp.2d 456, 466 (S.D.N.Y.1998) (citing  Valmonte v. Bane, 18 F.3d 992, 998 (2d Cir.1994)). In this case, only plaintiff's purported liberty interest—not any interest in life or property—was affected by the restriction of his contact visits. See  Baskerville v. Goord, No. 97 Civ. 6413(BSJ), 1998

WL 778396, at *6 (S.D.N.Y. Nov. 5, 1998). To prevail on this procedural due process claim under Section 1983, plaintiff must show that (1) he possessed a protected liberty interest and (2) defendants deprived him of that interest as a result of insufficient process. *See, e.g., Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Ky. Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

Inmates' liberty interests derive from two sources: (1) the Due Process Clause itself, or (2) state statutes or regulations. *Arce,* 139 F.3d at 333. The Supreme Court, however, "has narrowly circumscribed [the scope of the Due Process Clause itself] to protect no more than the 'most basic liberty interests in prisoners,' " *id.* (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)), limiting it to freedom from restraints that "exceed[ ] the sentence in ... an unexpected manner," *Sandin v. Conner,* 515 U.S. 472, 478 (1995). Thus, the Due Process Clause does not protect against an adverse change in an inmate's conditions of confinement so long as the change is " 'within the normal limits or range of custody which the conviction has authorized the State to impose.' " *Arce,* 139 F.3d at 333–34 (quoting *Sandin,* 515 U .S. at 484); *see Sandin,* 515 U.S. at 479 n.4 (observing that proscribed conditions of confinement must be "qualitatively different from the punishment characteristically suffered by a person convicted of crime, and [have] stigmatizing consequences") (citation and internal quotation marks omitted).

**\*4** State statutes and regulations also confer liberty interests on prisoners. *Arce,* 139 F.3d at 334. A prisoner's confinement or restraint violates a state liberty interest if it "imposes [an] atypical and significant hardship on an inmate in relation to the ordinary incidents of prison life." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin,* 515 U.S. at 484).

With respect to the contact visits at issue in this case, courts in the Second Circuit have consistently held that neither the Due Process Clause nor New York state law create a protected liberty interest for inmates with respect to contact visits. *Baskerville,* 1998 WL 778396, at *6 (dismissing Section 1983 claims under Fifth and Fourteenth Amendments for deprivation of contact visits because "contact visits of prison inmates are a privilege for inmates, not a right, and thus do not give rise to a liberty interest protected by the due process clause"); *Mateo v. Heath,* No. 11 Civ. 636(LAP), 2012 WL 1075836, at *3 (S.D.N.Y. Mar. 29, 2012) (same); *Zimmerman v. Burge,* No. 06–CV–0176 (GLS) (GHL), 2008 WL 850677, at *2 (N.D.N.Y. Mar. 28, 2008) (finding that "there is abundant case law establishing that inmates have no liberty or property interest in contact visits" under the Due Process Clause or New York law); *Saxon v. Goord,* No. 06–CV–0826, 2007 WL 1695582, at *4 (W.D.N.Y. June 7, 2007) ("It is well-established that contact visits are a *privilege* for inmates, not a *right.*") (emphasis in original). This Court finds the analysis contained in these cases to be persuasive. Their logic follows from the Supreme Court's holding in *Overton v. Bazzetta,* 539 U.S. 126 (2003), which found that " '[a]n inmate does not retain rights inconsistent with proper incarceration,' and that 'freedom of association is among the rights least compatible with incarceration.' " *Mills v. Fischer,* No. 09–CV–0966A, 2010 WL 364457, at *2 (W.D.N.Y. Feb. 1, 2010) (quoting *Overton,* 539 U .S. at 131).

Moreover, even if there were a protected liberty interest in plaintiff's contact visits, the facts alleged in the complaint clearly demonstrate that defendants were well within their discretion to restrict plaintiff's visitation privileges. "The evaluation of whether or not [visitation privileges] should be granted to a prisoner once he is in a facility that has developed such a program is committed to the considered judgment of prison administrators, who are actually charged with and trained in the running of the particular institution under examination." *Hernandez v. Coughlin,* 18 F.3d 133, 138 (2d Cir.1994) (internal quotations omitted) (citing *Olone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987); *Bell v. Wolfish,* 441 U.S. 520, 562 (1979) ( "[e]nsuring security and order at the institution is a permissible nonpunitive objective" sufficient to justify restrictions on prisoners)). As the Supreme Court held in *Bell,* prison officials have wide latitude "to take appropriate action to ensure the safety of inmates and corrections personnel." 441 U.S. at 547. Here, by his own admission in the complaint, plaintiff was involved in at least two violent altercations with another inmate, the second of which actually occurred on the visitation floor. Plaintiff also alleges that his contact visits were restricted after that second altercation occurred; the locus of his complaint against defendants is that the second altercation only occurred

because defendants negligently precipitated the fight by bringing Johnson to the visitation floor when plaintiff was there, despite the institution of a "keep separate" order. Notwithstanding this purported error, on the face of plaintiff's complaint, he admits to being involved in these incidents of violence, including one incident on the visitation floor when other inmates and their outside visitors were apparently present, and only disclaims responsibility for initiating one of the altercations. Therefore, as discussed above, given the discretion granted to prison officials to maintain order and safety at the institution, plaintiff alleges no facts that would support a plausible claim that defendants somehow acted arbitrarily or without purpose in restricting his contact visits.

*See    id.* at 548 n.29 (finding that the body of the Supreme Court's precedent regarding restrictions on convicted inmates and pretrial detainees reflects that "courts should defer to the informed discretion of prison administrators because the realities of running a corrections institution are complex and difficult, courts are ill equipped to deal with these problems, and the management of these facilities is confided to the Executive and Legislative Branches, not to the Judicial Branch."). [5]

**\*5**  Therefore, the Court finds that plaintiff has failed to state a plausible claim under Section 1983, because the alleged injury caused by defendants does not affect a right, privilege, or immunity protected by the Due Process Clause or New York law. The motion to dismiss is granted in its entirety.

## IV. LEAVE TO AMEND

Having concluded that plaintiff has failed to state a plausible claim under Section 1983, the Court has considered whether he should be afforded an opportunity to amend his complaint. The Second Circuit instructs that a district court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim

might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (quotation omitted). Nevertheless, "[l]eave to amend, though liberally granted, may properly be denied for: 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the amendment, futility of amendment, etc.' " *Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir.2008) (quoting *Foman v. Davis,* 371 U.S. 178, 182 (1962)); *see also    Burch v. Pioneer Credit Recovery, Inc.,* 551 F.3d 122, 126 (2d Cir.2008).

Though mindful of the plaintiff's *pro se* status, the Court finds that any attempt to amend the complaint would be futile. Here, the deficiencies in plaintiff's claim are substantive in nature and, as such, cannot be remedied by amendment. Accordingly, the Court declines to grant plaintiff leave to file an amended complaint.

## V. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion to dismiss and dismisses the Section 1983 claim with prejudice. The Clerk of the Court shall enter judgment accordingly and close the case. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and, therefore, *in forma pauperis* status is denied for purpose of an appeal. *See    Coppedge v. United States,* 369 U.S. 438, 444–45 (1962).

SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2015 WL 4097784

## Footnotes

1    Defendants also argue, *inter alia,* that plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), that his complaint fails to allege a plausible

*Monell* claim, and that the individually named prison officials are shielded by qualified immunity. Such issues are moot in light of the Court's ruling that plaintiff has failed to state a plausible claim under 📖 Section 1983 and, thus, the Court does not address them.

2    After plaintiff was tried and convicted in state court in February 2014, he was indicted in federal court on separate charges and is currently pending trial before Judge Joanna Seybert. (*See United States v. Derick Hernandez et al.,* No. 14–CR–00264 (JS).)

3    The length of the contact visit restriction is unclear—plaintiff appears to assert that he has had no contact visits from the time of the second fight to the filing of the complaint, but also alleges that defendants informed him the restriction would last only "till I leave and return." (Compl. at 2.) For the purposes of the motion, the Court will assume that the restriction lasted at least from November 2013 through July 2014, when plaintiff filed the complaint, but that there was a defined endpoint connected to plaintiff's ongoing criminal case.

4    It is not clear from the face of his complaint which constitutional rights plaintiff asserts were violated by this restriction. However, in plaintiff's opposition to the motion to dismiss, he asserts that, "My [complaint] stated I was barred from having 'contact visits,' which was a 'double jeopardy' punishment because I was never given a sanctioned 'loss of contact visits' from the hearing officer." (Pl.'s Opp., ECF No. 17., at 1–2.) Though plaintiff references the "double jeopardy" provision of the Fifth Amendment, which prohibits an individual from being prosecuted or punished twice for the same offense, the rest of the statement—as well as the assertions made by plaintiff in the complaint with respect to his contact visits being taken away without justification or review—appears to assert a violation of due process caused by defendants' restriction of plaintiff's contact visits. The Court will therefore construe plaintiff's complaint, brought against state officials, as a procedural due process claim under the Fourteenth Amendment.

5    Furthermore, plaintiff appears to assert in his opposition that, even though his contact visits were taken away for some undefined period, he is still allowed "booth visits" with his family, though he cannot "touch, hold, or kiss" his family when they visit him. (Pl.'s Opp. at 5.) His ability to visit with family members, therefore, appears not to have been totally abridged, only limited.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   5

Smith v. Costello, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 50 of 105

2017 WL 1155811
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jason SMITH, Plaintiff,
v.
Sergeant A. COSTELLO and
Tammy White, Defendants.

Civ. No. 9:15-CV-0401 (BKS/DJS)
|
Signed 03/03/2017

**Attorneys and Law Firms**

JASON SMITH, 410 Saint Nicholas Ave., Apt. 7C, New York, New York 10027, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, OF COUNSEL: NICOLE E. HAIMSON, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224, Attorney for Defendants.

**REPORT-RECOMMENDATION and ORDER**

Daniel J. Stewart, United States Magistrate Judge

 **\*1** *Pro se* Plaintiff Jason Smith brings this action, pursuant to 42 U.S.C. § 1983, claiming that Defendants violated his constitutional rights when he was incarcerated at Bare Hill Correctional Facility ("Bare Hill") while in the custody of the Department of Corrections and Community Supervision ("DOCCS"). Dkt. No. 1, Compl. Briefly summarized,[1] Plaintiff alleges that, on April 12, 2013, Defendant Costello, a correctional officer, began to harass him in the course of investigating a threatening note that was found on another correctional officer's desk. *See id.* at ¶¶ 7, 11, 15, & 17. Plaintiff drafted a letter complaining of the harassment to the Governor, but the letter was confiscated by Costello on April 14. *Id.* at ¶¶ 28-29. In retaliation for writing the letter, Costello assaulted Plaintiff several times and on April 15, issued him a misbehavior report charging him with writing the threatening note. *Id.* at ¶¶ 30, 39, 42, & 43. At a subsequent Tier III disciplinary hearing, held on April 19 and April 24, Defendant White found Plaintiff guilty of the charges and sentenced him to serve ninety days in the special housing unit ("SHU"). *Id.* at ¶¶ 44-46. Plaintiff asserts the following claims: (1) an Eighth Amendment excessive force claim

against Defendant Costello; (2) First Amendment retaliation claims against Defendants Costello and White; and (3) a Fourteenth Amendment due process claim against Defendant White. *Id.*

Presently before the Court is Defendants' Motion for Summary Judgment, to which Plaintiff has not responded. Dkt. No. 38, Defs.' Mot. Summ. J. The grounds for Defendants' Motion are that: (1) Plaintiff failed to exhaust his administrative remedies on his excessive force and retaliation claims; (2) Plaintiff's retaliation claims fail because (a) there is no causal connection between any protected speech and Defendants' actions, and (b) Defendants would have taken the actions they did regardless of any protected activity on the part of Plaintiff; and (3) Plaintiff's due process claim fails because he has failed to establish a protected liberty interest. *Id.* For the reasons that follow, the Court recommends that Defendants' Motion be **granted** on the grounds that Plaintiff failed to exhaust administrative remedies on his excessive force and retaliation claims and failed to establish a protected liberty interest for his due process claim.

**I. SUMMARY JUDGMENT STANDARD**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)).

 **\*2** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 51 of 105

Smith v. Costello, Not Reported in Fed. Supp. (2017)

of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir. 1995)). "A verified complaint is to be treated as an affidavit for summary judgment purposes, and therefore will be considered in determining whether material issues of fact exist." *Colon v. Coughlin,* 58 F.3d at 872.

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994), accord, *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

When a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e)(3). "If the evidence adduced in support of the summary judgment motion does not meet [the movant's] burden [of production], 'summary judgment must be denied *even if no opposing evidentiary matter is presented.' "* *Amaker v. Foley,* 247 F.3d 677, 681 (2d Cir. 2001) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 160 (1970)). "An unopposed summary judgment motion may also fail where the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.' " *Vermont Teddy Bear Co. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.

2004) (quoting *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996)).

## II. EXHAUSTION

### A. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake,* 136 S. Ct. 1850, 1856 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement. Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo,* 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord,* 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). [2]

*3 In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 52 of 105

Smith v. Costello, Not Reported in Fed. Supp. (2017)

IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett,* 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia,* *Porter v. Nussle,* 534 U.S. at 524); *see also* *Neal v. Goord,* 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by* *Porter v. Nussle,* 534 U.S. 516.

In addition to the formal grievance procedure described above, the regulations provide for an expedited grievance procedure for claims of employee "harassment." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

If the superintendent determines that the allegations do not represent a bona fide case of harassment, the allegations are automatically routed to the IGRC for resolution according to the formal three-step grievance procedure outlined above. *Id.* at § 701.8(c). If the superintendent finds that the allegations do represent a bona fide case of harassment, then he must either initiate an in-facility investigation by higher ranking personnel, or request an investigation by the Inspector General's Office, and if criminal activity is involved, the superintendent may request an investigation by the New York State Police Bureau of Criminal Investigations. *Id.* at §§ 701.8(d); *see also* *Perez v. Blot,* 195 F. Supp. 2d 539, 542-43 (S.D.N.Y. 2002) (describing the grievance system).

The superintendent must render a decision within twenty-five calendar days of receipt of the grievance. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(f). If the superintendent fails to respond within this required time-frame, the inmate may appeal his grievance to CORC by filing a notice of decision to appeal with the inmate grievance clerk. *Id.* at § 701.8(g). If the inmate receives a response from the superintendent and wishes to appeal to CORC, he must file a notice of decision to appeal with the inmate grievance clerk within seven calendar days of receipt of the response. *Id.* at § 701.8(h).

In sum, the expedited procedure set forth above allows inmates to bypass filing a formal grievance by instead "reporting" the incident. *See* *Perez v. Blot,* 195 F. Supp. 2d at 544. Such a process is wholly consistent with the underlying concern of employee harassment.

## B. Plaintiff's Failure to Exhaust Administrative Remedies

Here, the record establishes that Plaintiff did not fully exhaust his administrative remedies on his excessive force or retaliation claims. Records maintained by CORC indicate that Plaintiff did not appeal a grievance to CORC relative to the incidents that allegedly occurred in April 2013. Dkt. No. 38-12, Decl. of Jeffery Hale, dated June 6, 2016, Ex. A. Furthermore, Plaintiff admitted several times at his depositions that he did not file a formal grievance on these claims. Dkt. No. 38-6, Decl. of Nicole Haimson, dated Aug. 23, 2016, Ex. A, Dep. of Jason Smith, dated Dec. 9, 2015 ("Pl.'s Dep. (Dec. 9, 2015)"), at p. 114; Dkt. No. 38-7, Haimson Decl., Ex. B, Dep. of Jason Smith, dated June 14, 2016 ("Pl.'s Dep. (June 14, 2016)"), at pp. 64-65. Although Plaintiff alleges that he might have written complaint letters outside of the grievance procedure, *see* Pl.'s Dep. (June 14, 2016) at pp. 65-66, "the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro,* 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015). The fact that Plaintiff asserted his excessive force and retaliation claims in his appeal of his disciplinary hearing is also insufficient to grieve those claims. *See* *Ortiz v. McBride,* 380 F.3d 649, 653-54 (2d Cir. 2004).

**\*4** A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake,* 136 S. Ct. at 1858. As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a

grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60. [3]

It is undisputed that Bare Hill and Upstate Correctional Facility ("Upstate"), which Plaintiff was transferred to on April 26, 2013, had inmate grievance programs available to inmates during the relevant time period. Hale Decl. at ¶ 11. At his depositions, Plaintiff raised several possible excuses for his failure to access the grievance process. First, Plaintiff claimed he did not understand the grievance process at the time, *see* Pl.'s Dep. (Dec. 9, 2015) at p. 123; Pl.'s Dep. (June 14, 2016) at pp. 72-75; however, Plaintiff also acknowledged that he received orientations on the grievance program at both Bare Hill and Upstate, *see* Pl.'s Dep. (June 14, 2016) at pp. 70-71 & 74. Plaintiff also claimed that he quickly learned to file grievances. Pl.'s Dep. (Dec. 9, 2015) at p. 124; Pl.'s Dep. (June 14, 2016) at pp. 67-68. Next, Plaintiff claimed that his mail was tampered with. Pl.'s Dep. (June 14, 2016) at p. 68 & 77. Yet Plaintiff offered no support for this allegation, and admitted that he never saw anyone tamper with his mail. *Id.* at p. 79. This allegation is also misdirected because Plaintiff admits that he did not attempt to file a grievance with the IGRC relative to these claims. *Id.* at p. 77.

Finally, Plaintiff claims that he did not file a grievance because he was afraid of retaliation by the Defendants. Pl.'s Dep. (Dec. 9, 2015) at pp. 116-17; Pl.'s Dep. (June 14, 2016) at p. 89. Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. 136 S. Ct. at 1860. The Second Circuit has stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill v. New York,* 380 F.3d 680, 688 (2d Cir. 2004). A "generalized fear of retaliation" is insufficient to excuse a failure to exhaust. *See Brown v. Napoli,* 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009); *Harrison v. Stallone,* 2007 WL 2789473, at *5-6 (N.D.N.Y. Sept. 24, 2007). As to Defendant White, Plaintiff articulates no more than a "generalized fear of retaliation." Plaintiff states that she did not threaten him, but that he was nonetheless intimidated because she was "helping her fellow co-workers." Pl.'s Dep. (June 16, 2016) at p. 90.

**\*5** With respect to Defendant Costello, on the other hand, Plaintiff alleges that he made a specific threat against him to not file a grievance. *Id.* at pp. 90-91; Compl. at ¶ 42. Specific threats of retaliation may reasonably deter an inmate from filing a grievance, particularly when the threats follow an assault. *See, e.g.,* *Hemphill v. New York,* 380 F.3d at 688 (remanding for determination of availability of administrative remedies where officer threatened to retaliate against the plaintiff if he filed a complaint). However, any issue of fact about the availability of administrative remedies at Bare Hill created by Plaintiff's allegations regarding threats by Costello, does not extend to Upstate. Plaintiff was transferred to Upstate on April 26, 2013, twelve days after Plaintiff alleges that Costello first assaulted him. An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a). Additionally, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* § 701.6(g). Plaintiff therefore had nine days to file a grievance and thirty-three days in which to request an extension after his transfer to Upstate. Plaintiff speculates that Costello might have known correctional officers at Upstate, Pl.'s Dep. (June 16, 2016) at pp. 91-92, but that amounts to a mere "generalized fear of retaliation." Thus, while Plaintiff's allegations regarding Costello's threats may create an issue of fact about the availability of administrative remedies at Bare Hill, they do not create an issue of fact about the availability of administrative remedies at Upstate. *See Wallace v. Fisher,* 2015 WL 9275001, at *4 (N.D.N.Y. Dec. 18, 2015) (finding that even if administrative remedies were unavailable to the plaintiff at first correctional facility, there was no issue of material fact that they were available following his transfer to a second correctional facility); *Newman v. Duncan,* 2007 WL 2847304, at *4 (N.D.N.Y. Sept. 26, 2007) (finding that administrative remedies were available to inmate where he was transferred out of facility where officer had threatened him).

Accordingly, the Court finds that Plaintiff has not shown any issue of fact regarding the availability of administrative remedies that would excuse his failure to exhaust. The Court therefore recommends that Plaintiff's excessive force and retaliation claims be **dismissed** for failure to exhaust.

### III. PLAINTIFF'S DUE PROCESS CLAIM

The misbehavior report issued by Defendant Costello charged Plaintiff with violations of prison rules 102.10—Threats and 107.11—Harassment. Dkt. No. 38-4, Decl. of Albert Costello, dated Aug. 22, 2016, at ¶ 10. On April 19 and April 24, 2013, Defendant White conducted a Tier III disciplinary hearing on the misbehavior report. Dkt. No. 38-10, Decl. of Tammy

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 54 of 105

Smith v. Costello, Not Reported in Fed. Supp. (2017)

White, dated Aug. 22, 2016, at ¶¶ 6-7. At the conclusion of the hearing, White found Plaintiff guilty of the charges based upon the inmate misbehavior report; the testimony of Costello, who investigated the threatening note; the testimony of witnesses requested by Plaintiff, who were unable to verify Plaintiff's presence in the dorm; and the testimony of Burnet, the correctional officer who received the threatening note. Dkt. No. 38-8, Haimson Decl., Ex. C at p. 22. White sentenced Plaintiff to three months in SHU, with corresponding loss of recreation, packages, commissary, telephone privileges, as well as a recommendation of three months loss of good time. White Decl. at ¶ 7. White's hearing determination was reversed and expunged by the director of SHU on June 24, 2013. Haimson Decl., Ex. C at pp. 1-2. Plaintiff was released on July 11, 2013. Dkt. No. 38-9, Haimson Decl., Ex. D at p. 1. Since Plaintiff was first put in SHU on April 15, 2013, he served approximately eighty-seven days in SHU.

Plaintiff claims that he was deprived of due process because Defendant White did not allow Plaintiff to call three of his witnesses; declined to order a hand writing analysis of the threatening note; and refused to listen to recordings of phone conversations that would supposedly establish Plaintiff's location at the time the threatening note was placed. Compl. at ¶ 54. Throughout his confinement in SHU, Plaintiff claims that he was confined for twenty-three hours a day; deprived of most of his personal property; and unable to attend programs, watch television, attend congregate outdoor recreation, associate with other inmates, attend congregate meals, and attend congregate religious services. *Id.* at p. 9. Defendants argue that summary judgment is appropriate on Plaintiff's due process claim because there is no protected liberty interest at stake. Dkt. No. 38-2, Defs.' Mem. of Law at pp. 16-19.

In order to establish a procedural due process claim arising out of a prison disciplinary proceeding, a plaintiff must show that he (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000). A prisoner's liberty interest is "generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995); *see also Sealey v. Giltner*, 116 F.3d 47, 52 (2d Cir. 1997). Whether the conditions of a segregation amount to an atypical and significant hardship "turns on the duration of the segregation and a comparison with the conditions in

the general population and in other categories of segregation." *Acre v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998); *see also Sealey v. Giltner*, 197 F.3d at 586 ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." (citation omitted)).

**\*6** The Second Circuit has held that, under "normal conditions," confinement in SHU for a period of up to 101 days is not an atypical hardship, while confinement for more than 305 days is an atypical hardship. *Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Colon v. Howard*, 215 F.3d 227, 231-32 (2d Cir. 2000). The Second Circuit has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards*, 364 F.3d at 64-65 (quoting *Colon v. Howard*, 215 F.3d at 232). "In those situations, a district court must 'make a fact-intensive inquiry,' examining the 'actual circumstances of SHU confinement' in the case before it." *Id.* at 65 (citations omitted).

In this case, Plaintiff served eighty-seven days in SHU, which, under normal conditions, is insufficient to establish that he experienced an atypical hardship. The evidence provided in support of Defendants' Motion establishes that all of Plaintiff's complaints fall within the "normal" conditions of confinement in SHU. Plaintiff's complaint that he was confined for twenty-three hours a day simply describes normal SHU conditions, in which inmates are confined in their cells for twenty-three hours a day, permitted one hour of outdoor exercise a day, and allowed a minimum of three showers per week. Dkt. No. 38-11, Decl. of Donald Venettozzi, dated Aug. 18, 2016, at ¶ 8. Similarly, Plaintiff's complaint that he was denied certain privileges and deprived of his personal property describes typical SHU restrictions. *Id.* Inmates in SHU are limited as to the personal property they may possess, but are allowed certain items. *Id.* Plaintiff admits that he was allowed to have certain items in his cell, including books, magazines, and pictures; writing materials; religious items; hygienic products; prescription medications; and clothing and bedding. Pl.'s Dep. (June 14, 2016) at pp. 37-46. Inmates in SHU have limited access to commissary, Venettozzi Decl. at ¶ 8, which Plaintiff admits he received,

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 55 of 105

Smith v. Costello, Not Reported in Fed. Supp. (2017)

Pl.'s Dep. (June 14, 2016) at pp. 46-47. Inmates in SHU are not permitted to attend meals, recreation, or religious services with other inmates, since the purpose of SHU is to separate certain inmates from the general prison population. Venettozzi Decl. at ¶ 9. However, Plaintiff was able to practice his religion in his cell and received meals that were consistent with his beliefs. Pl.'s Dep. (June 16, 2016) at pp. 52-53.

Thus, Plaintiff's claims that he was confined for twenty-three hours a day; deprived of most of his personal property; and not permitted to watch television or attend activities with other inmates fail to establish that he was confined under atypical conditions. Accordingly, because Plaintiff's confinement does not implicate a protected liberty interest, the Court recommends that summary judgment be **granted** on his due process claim against Defendant White.

### IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 38) be **GRANTED** and this action **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [4] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 1155811

### Footnotes

1    For a more complete summary of Plaintiff's allegations, reference is made to the initial screening of this action, performed pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Dkt. No. 10 at pp. 4-5.

2    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir 1999). Defendants properly raised the affirmative defense in their Answer. *See* Dkt. Nos. 16 at ¶ 9 & 28 at ¶ 9.

3    The Second Circuit previously set forth a three-part inquiry for when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The Second Circuit has stated that "*Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016).

4    If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday,

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 56 of 105

**Smith v. Costello, Not Reported in Fed. Supp. (2017)**

Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

---

**End of Document**                                            © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 57 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

2018 WL 7917917
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shawn GREEN, Plaintiff,
v.
D. VENETTOZZI, et al., Defendants.

No. 9:14-CV-1215 (BKS/CFH)
|
Signed 11/21/2018

**Attorneys and Law Firms**

Shawn Green, 97-A-0801, Clinton Correctional Facility, P.O. Box 2000, Dannemora, New York 12929, Plaintiff pro se.

OF COUNSEL: DENISE P. BUCKLEY, ESQ., Assistant Attorney General, Attorney General for the State of New York, The Capitol, Albany, New York 12224, Attorney for defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

CHRISTIAN F. HUMMEL, U.S. MAGISTRATE JUDGE

**\*1** Plaintiff pro se Shawn Green ("plaintiff"), who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Acting Special Housing/Inmate Disciplinary Program Director D. Venettozzi; DOCCS Chief Medical Officer C.J. Koenigsmann; [2] Regional Health Services Administrator ("RHSA") R. Blair; RHSA R. Grinbergs; DOCCS RHSA R. McDewitt; Superintendent ("Supt.") D. Uhler; Lieutenant ("Lt.") W. Trombly; Corrections Officer ("C.O.") R. Richards, Health Services Director ("FHSD") V. Mandalaywama; physician G. Schroyer; physician's assistant ("P.A.") M. Kowalchuk; Acting Nurse Administrator M. Sturgen; radiologist technologist P. Robertson; and registered nurses C. Atkinson, J. Bergeron, G. Wilson – who, at all relevant times, were employed or had duties at Upstate Correctional Facility ("Upstate") – violated his constitutional rights under the First, Eighth, and Fourteenth Amendments. See Dkt. No. 16 ("Am. Compl."). Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure

("Fed. R. Civ. P."). Dkt. No. 121. Plaintiff opposed defendants' motion, and defendants filed a reply. Dkt. Nos. 127, 129. For the following reasons, it is recommended that defendants' motion be granted.

### I. Background

#### A. Plaintiff's Recitation of the Facts

The facts are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II.A infra. Plaintiff alleges that prior to his transfer to Upstate, an endocrinologist at Wende Correctional Facility implemented a treatment plan that effectively managed plaintiff's diabetes mellitus. Am. Compl. ¶ 7. A pediatrist at Wende prescribed plaintiff arch supports and Eucerin cream to treat his heel injury, pain in his feet, and "conditions of xerosis." Id. ¶ 8. On February 25, 2014, one day after plaintiff's transfer to Upstate, P.A. Kowalchuk, "for non-medical reasons," discontinued plaintiff's treatment and "inserted her own 'uninformed/superficial treatment plan' without plaintiff's consent." Id. ¶ 9. Due to P.A. Kowalchuk's interference with plaintiff's treatment plan, plaintiff suffered a series of hyper/hypoglycemic episodes. Id. ¶ 11. On February 22, 2014, plaintiff was admitted to the Upstate infirmary due to low glucose readings. Id. ¶ 14. While hospitalized in the infirmary, plaintiff's morning hypoglycemic episodes went unaddressed by nursing staff for nearly two weeks. Id. ¶ 15. During that time period, Dr. Mandalaywama did not order diagnostic tests concerning plaintiff's "unstable" diabetes; thus, the proper treatment was not prescribed. Id. ¶ 16. Plaintiff claims that "[t]here is a custom at Upstate, where no noon medication/services are provided to facility population by [the] medical department," which was a contributing factor in his constant morning hypoglycemia and nighttime hyperglycemia. Id. ¶ 17. Between February 24, 2014 and April 28, 2014, plaintiff lost ten percent of his body weight, which "went undocument[ed], unmonitored[,] and untreated after being brought to [the] nursing personnel['s] attention." Id. ¶ 18.

**\*2** On March 21, 2014, plaintiff attended a podiatry consultation with non-party Mark Lentini, which was "immediately terminated from the onset following plaintiff invoking the right to a private medical consultation and access to medical care not be [interfered] with by [C.O.] Richards[.]" Am. Compl. ¶ 19. The next day, C.O. Richards issued plaintiff a misbehavior report for refusing a direct order

(106.10) and interference with an employee (107.10). Id. ¶ 20. P. Robertson, Mr. Lentini's assigned medical assistant, falsely entered into plaintiff's medical chart that he was "non-compliant and argumentative" at the March 21, 2014 appointment, and that plaintiff was "non-compliant with callout." Id. ¶ 22. Because of this false notation in his chart, plaintiff was denied treatment for his foot pain. Id. On March 24, 2014, FHSD Mandalaywama discontinued plaintiff's xerosis treatment. Id. ¶ 23. Soon after, nurse Atkinson refused to "objectively assess and treat" plaintiff's xerosis condition complaints. Id.

On April 1, 2014, Lt. Trombly commenced a disciplinary hearing regarding C.O. Richards misbehavior report. Am. Compl. ¶ 24. Plaintiff requested the consultation report that contained "Dr. Lentini['s] reference" from his appointment in order to "exonerate him of both charges," but Lt. Trombly denied his request without explanation and "under the pretense [that] Lentini's testimony [would] be 'redundant.' " Id. ¶¶ 24, 25. Instead, Lt. Trombly relied on the testimony of plaintiff, C.O. Richards, and P. Robertson. Id. ¶ 26. Lt. Trombly found plaintiff guilty of refusing a direct order, and sentenced him to three months in the special housing unit ("SHU") [3] and three months recommended loss of good time credits. Id. On May 22, 2014, Director Venettozzi "affirmed plaintiff's administrative appeal raising obvious aforesaid constitutional violations." Id. ¶ 27.

In April 2014, despite a physical therapy renewal evaluation, which noted that plaintiff continued to experience pain, and that his strength and range of motion still lacked, P.A. Kowalchuk refused to submit plaintiff's physical therapy renewal request. Id. ¶¶ 12, 13. P.A. Kowalchuk also did not allow plaintiff to have a daily p.m. snack to cure his bedtime hypoglycemia episodes. Id. ¶ 12. At an unspecified time, the medical staff approved plaintiff's physical therapy renewal request, and he attended an additional six weeks of therapy, with two visits per week. Id. ¶ 30. Dr. Schroyer was assigned to provide plaintiff with routine medical care during his confinement at Upstate, and provided him with "largely ineffective treatment ... for diabetes." Id. ¶ 31. Nurses Atkinson, Bergeron, and Wilson had a "systematic method of circumventing nurse hypoglycemia protocol aided by [Dr.] Schroyer and performed sick call procedures in a cursory manner, that resulted in the denial and interference in [p]laintiff's medical care and treatment[.]" Id. ¶ 33.

On April 27, 2014, Nurse Bergeron interfered with plaintiff's "prescribed therap[eu]tic meal" by posting a "food restriction

sign" on his cell door, which resulted in staff members depriving him of "fast acting carbohydrates for AM hypoglycemia," and frequently refused to provide him with his morning insulin, "unless [p]laintiff recite[d] din [numbers] posted on [his] cell door to her beforehand, that was an approximate cause of his PM hyperglycemia immediately thereafter." Am. Compl. ¶ 33. On September 3, 2014, non-party nurse B. Brue prepared a doctor referral for plaintiff's diabetes and the alleged ineffective treatment he had received. Id. ¶ 34. Plaintiff drafted numerous letters to Dr. Koenigsmann and RHSA Grinbergs, and filed approximately seventeen grievances concerning the inadequate medical care he received, which resulted in "progressive degenerative and advance development long-term health complications." Id. ¶ 35. RHSAs Grinbergs, Blair, and McDevitt failed to address plaintiff's inadequate medical care after such lack of care was brought to their attention. Id. ¶ 36. Nurse Sturgen, in her role as Acting Nurse Administrator, deprived plaintiff of adequate medical services by preparing "subjective/ subversive investigation reports" for plaintiff's grievances. Id. ¶ 39.

## B. Defendants' Recitation of the Facts

**\*3** In support of this motion, defendant filed a Statement of Material Facts. [4]

### 1. Plaintiff's Medical Treatment at Upstate

Plaintiff was confined at Upstate from February 24, 2014 through January 5, 2015. Dkt. No. 121-2 ¶¶ 1, 2. Prior to his transfer to Upstate, plaintiff was diagnosed with uncontrolled diabetes mellitus. Id. ¶ 4. On January 8, 2014, over a month before this transfer to Upstate, plaintiff received treatment for his diabetes mellitus, and it was noted that a follow-up would be scheduled in three months. Id. ¶ 5.

Plaintiff refused to comply with the medical treatment offered to him, and has a documented history of refusing to comply with treatment that pre-dates and post-dates his confinement at Upstate. Dkt. No. 121-2 ¶¶ 6-7. For example, on October 6, 2014, the day plaintiff filed his complaint, plaintiff refused medical personnel's attempts to gain consent for a Controlled B diet with an evening snack – that plaintiff had requested – as well as the urine test ordered by his primary care provider. Id. ¶ 8. A Controlled B diet is a special diet to assist in the treatment of diabetes. Id. ¶ 9. At the time of

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 59 of 105

his October 6, 2014 refusal of the Controlled B diet and the urine test, plaintiff did not report any medical issues or needs to the nursing personnel. Id. ¶ 10. Plaintiff refused a medical examination and/or treatment eight additional times from September 1, 2014 to October 6, 2014. Id. ¶ 11. Plaintiff routinely refused his glucose gel to treat his low blood sugars during the relevant period.

Throughout his confinement, plaintiff refused multiple attempts by medical personnel to treat him for symptoms associated with his diabetes mellitus, including refusals for glucose gel, insulin (lantus), a controlled B diet, medications, endocrinology consultation, medical trips, vital sign monitoring, etc. Dkt. No. 121-2 ¶ 13. The refusal forms demonstrate that plaintiff was advised of the risks and/or benefits of the medication or treatment offered, including possibility of increased blood sugar, coma, permanent organ damage, worsening of condition, stroke, or death. Id. ¶ 14. The refusal forms also show that plaintiff sometimes refused sick call entirely, or refused to state his DIN number. [5] Id. ¶ 15. On multiple occasions, plaintiff verbalized his understanding of the risks associated with refusing medication and/or treatment. Id. ¶ 16. Plaintiff also verbalized his understanding of the need to request emergency sick call if he became symptomatic for hypoglycemia. Id. ¶ 17. Plaintiff refused further assessment and treatment options although he was symptomatic for hypoglycemia. Id. ¶ 18. Plaintiff routinely refused to take medications, including metformin, on numerous occasions, and medical personnel repeatedly noted plaintiff's symptoms of hypoglycemia and that he repeatedly refused treatment. Id. ¶ 20.

**\*4** On or about September 25, 2014, plaintiff attended a medical appointment, and personnel noted in his ambulatory health record ("AHR"): "Refused glucose gel ... Pt not compliant ... Pt not receptive to agree to eat all meals." Dkt. No. 121-2 ¶ 21 (internal quotation marks and citation omitted). Medical personnel scheduled plaintiff for occupational therapy and consultations with various doctors for complaints including, but not limited to: pain in his hand and/or finger, uncontrolled diabetes mellitus, xerosis, heel pain, and dispensed arches. Id. ¶ 23. Medical personnel noted that plaintiff was non-compliant at a recommended appointment with podiatry on March 21, 2014 to address uncontrolled diabetes mellitus, xerosis, heel pain and dispensed arches. Id. ¶ 24. Plaintiff also refused to attend a scheduled endocrinology appointment on May 14, 2014 for this uncontrolled diabetes mellitus. Id.

Non-party nurse Kelly Rabideau made the March 21, 2014 entry in plaintiff's health chart indicating that he was non-compliant and argumentative at the podiatry clinic, and, therefore, that his behavior constituted a refusal; the entry was based on Nurse Rabideau's observations. Dkt. No. 121-2 ¶ 25. Plaintiff was scheduled to receive occupational therapy on a routine basis for his left 5th finger injury. Id. ¶ 26. Plaintiff's health was continuously monitored during his confinement at Upstate, and staff made numerous attempts to treat plaintiff pursuant to his treatment plan. Id. ¶ 27.

### a. Dr. Schroyer

Dr. Schroyer treated with plaintiff and/or reviewed the notations of other medical personnel pertaining to plaintiff on several occasions. Dkt. No. 121-2 ¶ 31. On February 27, 2014, Dr. Schroyer referred plaintiff for a transfer to the infirmary to monitor his diabetes mellitus symptoms due to his blood sugar level. Id. ¶ 32. On March 13, 2014, Dr. Schroyer reviewed an AHR entry indicating that plaintiff had requested an ophthalmology consult. Id. ¶ 33. Dr. Schroyer submitted the request for a new ophthalmology consult. Id. The March 13, 2014 AHR entry that Dr. Schroyer reviewed stated that plaintiff was a "brittle IDDM on Lantus and Metformin." Id. ¶ 34. The term "brittle IDDM" is commonly used by medical professionals to describe a "sub-type of type-1 diabetes (diabetes mellitus) that is particularly difficult to control." Id. ¶ 35. People who have "brittle diabetes" undergo "frequent, extreme swings in blood glucose levels, causing hyperglycemia or hypoglycemia." Id. ¶ 36.

Dr. Schroyer next interacted with plaintiff on March 17, 2014. Dkt. No. 121-2 ¶ 37. Pursuant to the AHR entry, plaintiff was hypoglycemic earlier in the day, with a fasting blood sugar of 49. Id. ¶¶ 38, 39. Plaintiff's fasting blood sugar should have been approximately 120. Id. ¶ 40. At the time, plaintiff was not taking his nighttime regular insulin, resulting in a low blood sugar level. Id. ¶¶ 41, 42. Dr. Schroyer determined that the best way to raise plaintiff's blood sugar level would be to stop prescribing him regular insulin and adjust his prescription for Lantus insulin. Id. ¶ 42. Dr. Schroyer believed that Lantus insulin could be beneficial because it needed to only be taken once a day and lasted for twenty-four hours. Id. ¶ 43. The next day, on March 18, plaintiff admitted to engaging in heavy exercise after this blood sugar was found to be 47. Id. ¶ 47. Heavy exercise can adversely affect blood sugar levels in someone who suffers from diabetes. Id. ¶ 48. Medical personnel counseled plaintiff regarding the

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 60 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

difficulty in regulating his blood sugar, the necessity of taking his insulin dose, and that he should exercise in moderation as opposed to engaging in heavy exercise. Id. ¶ 49. The AHR entry on March 18 indicates that plaintiff was "somewhat argumentative." Id. ¶ 50.

On March 19, 2014, plaintiff refused to take his medication and claimed that "he knows more than medical people do." Dkt. No. 121-2 ¶ 51 (internal quotation marks and citation omitted). The AHR entry for this date also indicates that plaintiff was aware of the risks of not receiving the proper treatment for his diabetes. Id. ¶ 52. The March 21, 2014 AHR entry indicates that plaintiff was non-compliant and argumentative, and that this behavior constituted a refusal to attend the podiatry clinic. Id. ¶ 53. Because diabetes can impact circulation, which can, in turn, impact foot health, inmates with diabetes are often referred for podiatry consults. Id. ¶ 54. Plaintiff's non-compliance with the podiatry clinic, in addition to his repeated refusals to make the prescribed medication, made his diabetes difficult to treat. Id. ¶ 55.

 **\*5** On March 24, 2014, Dr. Schroyer noted in plaintiff's AHR that plaintiff's fasting blood sugar level was 243, which was higher than normal, but significantly lower than it had been the previous day, wherein it ranged from 339 to 532. Dkt. No. 121-2 ¶ 44. Although a blood sugar level of 243 is not ideal, it is not life-threatening. Id. ¶ 45. Previous entries in plaintiff's AHR indicated that he had been repeatedly non-compliant with his prescribed medication, and was engaging in activity likely to have an adverse impact on his blood sugar levels. Id. ¶ 46. Dr. Schroyer elected not to change plaintiff's prescription for Lantus because plaintiff's blood sugar level had already begun to drop, and he felt like Lantus was the most suitable prescription to regain control of plaintiff's blood sugar. Id. ¶¶ 56, 57.

On April 10, 2014, medical personnel informed Dr. Schroyer that plaintiff had been in the infirmary for unstable diabetes. Dkt. No. 121-2 ¶ 58. Following plaintiff's discharge, Dr. Schroyer ordered standard blood tests to monitor plaintiff's condition. Id. ¶ 59. On April 24, 2014, Dr. Schroyer noted that plaintiff had refused to take Metformin despite being advised of the risks and benefits. Id. ¶ 60. Dr. Schroyer discontinued plaintiff's prescription for Metformin and noted that plaintiff would continue to be monitored at call out. Id. Although plaintiff complained of malnourishment, the AHR indicates that he appeared to be "very muscular with a well built physique and no signs of malnourishment." Id. ¶ 62.

On May 1, 2014, Dr. Schroyer reviewed plaintiff's blood sugar results and noted that plaintiff had been referred for an endocrinology consult. Dkt. No. 121-2 ¶ 70. He also urged plaintiff to comply with the prescribed treatment. Id. The next day, plaintiff was non-compliant with his treatment plan, and refused morning blood work (a "finger stick") and regular insulin. Id. ¶ 71. On May 17, 2014, plaintiff had unstable blood sugar, inconsistently allowed finger sticks and insulin medication ("coverage"), and refused to cooperate with any treatment offered. Id. ¶ 72. The next day, plaintiff underwent a comprehensive nursing and physician evaluation, and it was noted that plaintiff had unstable blood sugars, was non-compliant with the evaluation and treatment offered, refused podiatry and endocrinology consults, refused various medications, and refused blood pressure monitoring and antihypertensive medications. Id. ¶ 73. Plaintiff's AHR noted that he was told of the risk of medical complications due to his non-compliance. Id. That same day, Dr. Schroyer examined plaintiff's feet for any sign of complications associated with his diabetes, and determined that plaintiff's feet were normal. Id. ¶ 74. Plaintiff's heart rate and neurological exam results were also normal. Id. ¶¶ 75, 76. Dr. Schroyer provided plaintiff with a treatment plan, which included a prescription medicine for blood pressure, and an addition of four units of regular insulin each morning and evening in addition to what the medication he had been already prescribed. Id. ¶ 77.

On May 19, 2014, Dr. Schroyer recommended that plaintiff continue with the "same sliding scale insulin medication" and Lantus medication as previously prescribed. Dkt. No. 121-2 ¶ 78. The "sliding scale" refers to a method for administering insulin based on the patient's blood sugar level just before a meal. Id. ¶ 79. On May 31, 2014, Dr. Schroyer reviewed plaintiff's medical chart because plaintiff's fasting blood sugar was low. Id. ¶ 80. Dr. Schroyer offered plaintiff medication to raise his blood sugar level, but plaintiff was non-compliant, and refused a blood sugar test after breakfast. Id. On June 14, 2014, plaintiff's blood sugar was 64 in the morning, which was too low, and 317 in the evening, which was too high. Id. ¶ 81. Plaintiff refused treatment with glucose gel and verbalized an understanding of the risks and benefits. Id. ¶ 82.

 **\*6** On June 23, 2014, plaintiff indicated that he wanted to begin a Ramadan diet, and wanted his insulin to be adjusted when Ramadan started on June 28. Dkt. No. 121-2 ¶ 83. A Ramadan diet is not recommended for diabetics. Id. ¶ 84. Although medical personnel do not have the authority to refuse a Ramadan diet to an inmate, they may recommend that the inmate adhere to a diabetic diet for better control of

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 61 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

his diabetes. Id. ¶ 85. Plaintiff was advised that the Ramadan diet could adversely affect his health due to his unstable blood sugars, but he declined this advice. Id. ¶¶ 86, 87. On June 25, 2014, Upstate medical staff adjusted plaintiff's medication while he was on the Ramadan diet in an effort to keep his blood sugar level within a safe range by holding the sliding scale and regular insulin, administering Lantus, and "performing a blood sugar [test] at night time." Id. ¶ 88. On July 3, 2014, Upstate medical staff returned plaintiff to the sliding scale regular insulin in the morning and evening. Id. ¶ 89. On July 14, 2014, Dr. Schroyer attempted to "refine plaintiff's insulin coverage [by] prescribing an increase in his regular insulin if it register[ed] high." Id. ¶ 90.

On August 4, 2014, plaintiff refused a diabetic diet. Dkt. No. 121-2 ¶ 91. That same day, Dr. Schroyer referred plaintiff for a podiatry consult to address an in-grown toenail. Id. ¶ 91. He also gave plaintiff Eucerin cream for his feet. Id. ¶ 91. On August 30, 2014, plaintiff again had low blood sugar, but refused treatment. Id. ¶ 95. On September 8, 2014, Dr. Schroyer recommended that plaintiff's regular insulin coverage be continued and that he be given a regular finger stick test. Id. ¶ 96.

On October 6, 2014, plaintiff complained of indigestion. Dkt. No. 121-2 ¶ 97. Dr. Schroyer tested plaintiff for indigestion, and arranged to draw hemoglobin H1C. Id. Plaintiff refused an endocrinology consult that had previously been ordered. Id. On November 3, 2014, Dr. Schroyer noted that plaintiff's feet were a little dry, but he refused a podiatry consult, as well as a diabetic diet. Id. ¶ 98. Dr. Schroyer adjusted plaintiff's insulin order and gave plaintiff Eucerin cream. Id. On December 22, 2014, Dr. Schroyer checked plaintiff's blood pressure, weight, and other vital signs; plaintiff's blood sugar was low, but plaintiff refused his diabetic diet. Id. ¶ 99. Dr. Schroyer suggested that plaintiff take Glucerna to bring his blood sugar up to a "better level." Id.

### b. Dr. Mandalaywala [6]

In his role as FHSD, Dr. Mandalaywala oversees the entire health services for inmates at Upstate. Dkt. No. 121-2 ¶ 105. Dr. Mandalaywala also reviews grievances from inmates concerning complaints about their medical care at Upstate. Id. ¶ 107. Dr. Mandalaywala saw and/or reviewed the notations of other medical personnel pertaining to plaintiff on February 27, 2014; March 11, 2014; April 12, 2014; April 13, 2014; June 12, 2014; July 4, 2014; July 8, 2014; July 9, 2014;

July 23, 2014; July 24, 2014; and December 9, 2014. Id. ¶ 108. On February 27, 2014, Dr. Mandalaywala approved a referral for plaintiff to attend an endocrinology consultation to address plaintiff's uncontrolled diabetes mellitus. Id. ¶ 110. Dr. Mandalaywala also approved a referral for plaintiff to undergo a podiatry consultation to address issues arising from his uncontrolled diabetes, xerosis, and heel pain. Id. Dr. Mandalaywala approved transferring plaintiff to the infirmary to monitor his diabetes symptoms. Id. Plaintiff refused both the podiatric treatment and the endocrinology consultation. Id. ¶¶ 111, 112.

On March 11, 2014, Dr. Mandalaywala examined plaintiff and noted that his blood sugar levels needed to be checked "with coverage" three times a day. Dkt. No. 121-2 ¶ 117. Dr. Mandalaywala prescribed plaintiff "Lantus insulin 16 units, sliding scale, Metformin (500 mg by mouth), Enalopril (2.5 by mouth once a day), and Zantac (by mouth every night at bed time)." Id. Dr. Mandalaywala also referred plaintiff for an ophthalmology consultation. Id. On April 12, 2014, Dr. Mandalaywala adjusted plaintiff's prescription for Lantus insulin to regulate his blood sugar level. Id. ¶ 130. The next day, Dr. Mandalaywala again adjusted plaintiff's Lantus insulin because he had been "asymptomatic" for two nights in a row. Id. ¶ 131. On June 12, 2014, plaintiff refused his morning finger stick and refused to come to his cell door. Id. ¶ 132. Dr. Mandalaywala noted in plaintiff's AHR that he continued to be at risk for complications due to his non-compliance. Id. On July 24, 2014, Dr. Mandalaywala noted a treatment plan for plaintiff's insulin dosage to begin on July 28, 2014, describing the insulin types, dosages, times and additional coverage if needed. Id. ¶ 138.

**\*7** On December 9, 2014, Dr. Mandalaywala reviewed a note from Nurse Atkinson concerning plaintiff's request for State-issued boots. Dkt. No. 121-2 ¶ 139. There is no indication in plaintiff's medical records that Dr. Mandalaywala discontinued plaintiff's xerosis treatment. Id. ¶ 143.

### c. P.A. Kowalchuk

P.A. Kowalchuk saw and/or reviewed plaintiff's medical issues on February 25, 2014; February 27, 2014; March 12, 2014; March 19, 2014; April 14, 2014; April 16, 2014; April 18, 2014; April 21, 2014; April 25, 2014; May 9, 2014; May 22, 2014; May 27, 2014; May 28, 2014; May 30, 2014; June 13, 2014; June 27, 2014; July 2, 2014; August 12, 2014;

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 62 of 105

September 19, 2014; and December 17, 2014. Dkt. No. 121-2 ¶ 152. P.A. Kowalchuk evaluated plaintiff on February 25, 2014, and adjusted his medications in an effort to control plaintiff's irregular blood sugar readings. Id. ¶ 158. To the extent that P.A. Kowalchuk discontinued plaintiff's regular insulin coverage, except for the sliding scale, she increased plaintiff's Lantus insulin from twenty-four units to twenty-six units in the morning. Id. P.A. Kowalchuk decided to alter plaintiff's insulin coverage due to his fluctuating blood sugars, and gave direction as to how much insulin to administer if plaintiff's blood sugar reached a particular level. Id. ¶¶ 159, 162. P.A. Kowalchuk did not provide Eucerin for plaintiff's feet because she did not feel it was medically necessary; however, she noted that plaintiff should be evaluated by his treating physician at his next call out to determine whether any change in his condition would warrant Eucerin cream. Id. ¶ 163. At the February 25, 2014 appointment, P.A. Kowalchuk referred plaintiff for podiatry and endocrinology consultations, ordered a series of tests used in the treatment of diabetes, and refilled plaintiff's prescriptions for Enalapril and Zantac. Id. ¶¶ 165-67.

On February 27, 2014, after plaintiff complained that he did not receive his diabetic diet with an evening snack, P.A. Kowalchuk recommended that plaintiff be provided with the requisite diet. Dkt. No. 121-2 ¶¶ 169-70. The nurse on duty notified the mess hall and security staff that plaintiff's diabetic meal would start with the supper meal and include an evening snack. Id. ¶ 171. Plaintiff verbalized his understanding that he needed to notify the nursing and security staff should he not receive the proper meal in the future. Id. ¶ 172. Under proper medical protocol, plaintiff could not be provided an evening snack if he was not on the Controlled B diet and taking insulin; thus, during periods of non-compliance, plaintiff could not be provided an evening snack. Id. ¶¶ 174-76. At the February 27, 2014 visit, P.A. Kowalchuk assessed plaintiff and noted no other signs or symptoms of hypoglycemia other than low blood sugar. Id. ¶ 177. P.A. Kowalchuk administered Lantus insulin as prescribed, and provided plaintiff with a tube of glucose gel to use if needed, and then returned to the corrections officer bringing him lunch. Id. ¶¶ 178, 180. Plaintiff returned the glucose gel unused. Id. ¶ 181.

On April 14, 2014, P.A. Kowalchuk noted that plaintiff had underwent twelve physical therapy sessions for his hand, and felt that it was appropriate to discontinue these visits because plaintiff could perform the exercises in his cell. Dkt. No. 121-2 ¶ 185. Instead, P.A. Kowalchuk prescribed plaintiff warm packs to apply to his hands. Id. ¶ 186. Two days later, P.A. Kowalchuk wrote orders for plaintiff to restart Metformin at 500mg for thirty days twice a day, and to decrease Lantus insulin to ten units daily at nighttime with a finger stick. Id. ¶ 188. She also requested that the nursing staff administer his medication as plaintiff was routinely refusing medical care. Id. ¶ 189. On July 2, 2014, P.A. Kowalchuk again adjusted plaintiff's insulin as his blood sugar was too high. Dkt. No. 121-2 ¶ 191.

### d. Nurse Bergeron [7]

**\*8** Plaintiff's AHR indicates that she saw plaintiff for sick call or made notations in his AHR approximately fifty-one times throughout his confinement at Upstate. Dkt. No. 121-2 ¶ 200. When Nurse Bergeron met plaintiff for sick call, she routinely:

> evaluated plaintiff and any health-related complaints; recorded any symptoms she observed; as necessary, provided plaintiff with non-prescription (commonly referred to as "over the counter") medications including antacids for acid reflux, anti-fungal cream for his feet, Tylenol for complaints of pain and glucose gel for low blood sugar readings; and administered medication(s) that had been prescribed for plaintiff, including insulin to regulate blood sugar levels for his diabetes mellitus.

Id. ¶ 201. Plaintiff's AHR indicates that he frequently refused to comply with treatment and medications prescribed for him, and was occasionally confrontational. Id. ¶ 202. On April 16, 2014, Nurse Bergeron offered plaintiff glucose gel when his blood sugar reading was low, but he refused. Id. ¶ 204. Nurse Bergeron did not order plaintiff a dietary restriction on April 27, 2014, nor did she place a dietary restriction notice on plaintiff's cell. Id. ¶ 205. As a registered nurse, Nurse Bergeron is not authorized to order a dietary restriction of an inmate. Id. ¶ 206.

During Ramadan, it was noted in plaintiff's AHR that his July 4, 2014 morning finger stick reading was high. Dkt. No. 121-2

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 63 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

¶ 207. Pursuant to Dr. Mandalaywala's order, Nurse Bergeron administered ten units of regular insulin, and plaintiff's blood sugar level decreased. Id. On numerous occasions, plaintiff refused to state his DIN number, which constitutes a refusal of medications. Id. ¶¶ 211, 212. Plaintiff also often refused to see Nurse Bergeron at sick call, and, therefore, Nurse Bergeron was unable to provide him treatment. Id. ¶¶ 215, 216. At no point did Nurse Bergeron refuse plaintiff his morning insulin or prescribed medications. Id. ¶¶ 225, 226.

### e. Nurse Sturgen

Nurse Sturgen assumes the role of Acting Nurse Administrator in the absence of the regular Nurse Administrator, when such coverage is needed. Dkt. No. 121-2 ¶ 231. Nurse Sturgen has acted in this role throughout her employment, when necessary. Id. ¶ 232. Nurse Sturgen saw plaintiff for sick call on two occasions. Id. ¶ 237. On September 26, 2014, Nurse Sturgen met with plaintiff, and noted that he had been seen by podiatry for treatment and excision of bilateral ingrown toenails. Id. ¶ 238. On December 11, 2014, Nurse Sturgen met with plaintiff, and noted that he had been seen by optometry and was to follow-up in one year. Id. ¶ 239.

In her role as Acting Nurse Administrator, Nurse Sturgen is required to investigate inmates' complaints and grievances concerning allegations of nursing personnel misconduct. Dkt. No. 121-2 ¶ 242. On April 11, 2014, Nurse Sturgen completed an Investigative Report in conjunction with the investigation surrounding plaintiff's March 26, 2014 grievance (#53718-14). Id. ¶ 245. Nurse Sturgen stated:

> Grievant claims he is receiving inadequate medical care for his diabetes - claims Dr. Kumar does not know what he is doing. The chart was reviewed. The grievant is receiving proper medical care for his diabetes. Lantus insulin can be given either in the evening or in the morning. Lantus is a 24 hour insulin. Meals are covered with regular insulin according to the patient's blood sugar. This is called a sliding scale. This is the way Dr. Kumar has handled the grievant's

diabetes which is the community standard of care.

**\*9** Id. ¶ 246.

### f. Nurse Wilson

Nurse Wilson met with plaintiff for sick call on approximately seventeen occasions during his confinement at Upstate. Dkt. No. 121-2 ¶ 261. When Nurse Wilson met with plaintiff for sick call, she routinely:

> evaluated plaintiff's symptoms, recorded any symptoms she observed, administered medications such as insulin to regulate blood sugar levels for his diabetes mellitus, and, as necessary, she provided plaintiff with non-prescription (commonly referred to as "over the counter") medications including antacids for acid reflux and Vitamin E for dry, flaky feet when indicated.

Id. ¶ 262. On February 25, 2014, Nurse Wilson noted that plaintiff's prescriptions had been ordered via phone call to the pharmacy for refills. Id. ¶ 263. She educated plaintiff regarding his blood sugar, and informed him to notify the nursing staff as needed. Id. On July 29, 2014, Nurse Wilson met with plaintiff, and he requested an eye exam with the optometrist and a podiatry consultation. Id. ¶ 268. Plaintiff had previously seen the optometrist on April 17, 2014, and was not due for another optometry appointment, as plaintiff did not state any problems with his eyes. Id. ¶ 269. Nurse Wilson did not note any problems with plaintiff's feet, and did not order a podiatry appointment. Id. ¶ 270.

### g. Nurse Atkinson

Nurse Atkinson met with plaintiff for sick call on approximately seventy-five occasions throughout his confinement at Upstate. Dkt. No. 121-2 ¶ 85. When Nurse Atkinson met with plaintiff, "she routinely evaluated

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 64 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

plaintiff's symptoms, recorded any symptoms she observed, and, as necessary, she provided plaintiff with non-prescription (commonly referred to as "over the counter") medications including Medicidin-D, antacids for acid reflux, anti-fungal cream for his feet, Tylenol and Aspirin for complaints of pain." Id. ¶ 286. Plaintiff refused to meet with Nurse Atkinson for sick call numerous times. Id. ¶ 287. Plaintiff repeatedly refused glucose gel to treat his blood sugar levels, as well as Metformin and insulin. Id. ¶¶ 289, 290.

On May 18, 2014, Nurse Atkinson noted in plaintiff's AHR that a comprehensive nursing assessment had been performed and revealed that plaintiff had unstable blood sugar levels. Dkt. No. 121-2 ¶ 292. At the assessment, plaintiff was non-compliant, and refused to undergo an endocrinology consultation and a podiatry consultation. Id. He also refused to undergo "blood pressure evaluations," and declined Metformin, Zantac, Enalpril, and anti-hypertensive medications. Id. Nurse Atkinson terminated the call out due to plaintiff's behavior, and noted that she referred plaintiff to the Office of Mental Health ("OHM") and advised him to follow up with his primary care provider. Id. ¶¶ 292, 293. On May 31, 2014, plaintiff refused a follow-up finger stick check, even though the morning finger stick indicated that plaintiff's blood sugar level was low. Id. ¶ 296.

### h. Patti Robertson, Senior Radiologic Technologist

On March 21, 2014, Ms. Robertson performed an x-ray of plaintiff during a scheduled podiatry examination. Dkt. No. 121-2 ¶ 311. During the examination, Ms. Robertson observed plaintiff disobey a direct order from C.O. Richards. Id. ¶ 312. C.O. Richards instructed plaintiff to remove his right boot and sock only, as requested by the physician, but plaintiff attempted to remove the boots and socks off both of his feet. Id. ¶ 313. Ms. Robertson did not interact with plaintiff during the incident, and did not make a notation in plaintiff's chart. Id. ¶¶ 314, 315. On April 1, 2014, Ms. Robertson testified as to what she had witnessed on March 21, 2014 at plaintiff's Tier III disciplinary hearing. Id. ¶ 317.

### i. Russell Blair, RHSA

**\*10** In his role as RHSA, Mr. Blair's duties included, but were not limited to:

(1) acting as a liaison between facility executive teams and Division of Health Services Staff; (2) collaborating with facility superintendents and staff on applying health care policies and procedures and assessing their impact; (3) acting as a liaison with other DOCCS offices on administrative and operational related matters impacting Heath Services; (4) monitoring facility compliance with directives, policies and procedures regulating health care delivery; (5) participating in periodic facility-based quality management audits; (6) assisting in the development of Health Services policies and procedures; (7) investigating and responding to inmate related grievances in collaboration with Central Office Inmate Grievance Program staff; and (8) attending Central Office Review committee meetings as necessary.

Dkt. No. 121-2 ¶ 322. Mr. Blair does not personally provide medical care to inmates, decide an inmate's appropriate treatment, or resolve disputes between inmates and their doctors as to the appropriate medical treatment. Id. ¶ 323.

Mr. Blair received letters from plaintiff dated June 26, 2014; September 23, 2014; and October 1, 2014 concerning plaintiff's medical treatment. Dkt. No. 121-2 ¶ 328. Mr. Blair informed plaintiff that his concerns were being addressed by the Inmate Grievance Program ("IGP") at the facility where he resided, and that the Central Office, where Mr. Blair was employed, was not the proper avenue to address his grievance concerns. Id. ¶¶ 330, 331. Mr. Blair also advised plaintiff to utilize the sick call procedure to address his medical concerns. Id. ¶ 332. In his responses, Mr. Blair further advised plaintiff that the Division of Health Services had investigated his concerns, and that plaintiff should address his health concerns at an upcoming appointment with his primary care provider. Id. ¶ 333. Plaintiff routinely forwarded his grievances directly to the Central Office, and Mr. Blair repeatedly advised him

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 65 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

that, pursuant to DOCCS Directive 4040, grievances were first addressed at the facility level. Id. ¶ 340.

### j. Rita Grinbergs, RHSA

In her role as RHSA, Ms. Grinbergs' duties included those discussed supra. See Dkt. No. 121-2 ¶¶ 322, 346. Ms. Grinbergs received letters from plaintiff dated February 25, 2014; March 14, 2014; March 21, 2014; March 26, 2014; and March 30, 2014. Id. ¶ 351. In two of Ms. Grinbergs' responses, she advised plaintiff that his concerns were being addressed by the Upstate IGP. Id. ¶ 353. She also advised plaintiff that the Central Office was not the appropriate venue to address his grievance concerns, and that any medical issues should be brought to the attention of the Upstate medical staff. Id. ¶¶ 354, 355. In response to plaintiff's request to be transferred to another facility, Ms. Grinbergs informed plaintiff that the Division of Health Services had investigated his concerns and concluded that his health needs could be met at Upstate. Id. ¶ 356. In a third response, Ms. Grinbergs told plaintiff that the Division of Health Services had investigated his claims, and that he should address his medical concerns at his upcoming appointment with his primary care provider. Id. ¶ 357.

### k. Richard McDevitt, RHSA [8]

 **\*11** In her role as RHSA, Mr. McDevitt's duties included those discussed supra. See Dkt. No. 121-2 ¶¶ 322, 362. Mr. McDevitt received letters from plaintiff dated April 1, 2014; April 10, 2014; May 21, 2014; and May 21, 2014. Id. ¶ 366. In response to plaintiff's letters, Mr. McDevitt advised plaintiff that his concerns were being addressed by the Upstate IGP. Id. ¶ 369. Mr. McDevitt also advised plaintiff that the Central Office was not the proper venue to address his grievance concerns, and to address his medical concerns with the Upstate medical staff. Id. ¶¶ 370, 371. Mr. McDevitt informed plaintiff that the Division of Health Services had investigated his claims, and after review of his medical records, concluded that plaintiff routinely refused medical appointments and medication administration. Id. ¶ 372. Plaintiff's medical records also established that plaintiff had daily access to "comprehensive primary, secondary and emergent health care services." Id. As plaintiff's allegations concerning facility security issues and nursing staff malfeasance were unfounded, Mr. McDevitt informed plaintiff that the Division of Health Services encouraged him to cooperate fully with the

medical staff in the administration of his medical care plan. Id. ¶ 373.

### 2. C.O. Richards' Misbehavior Report and the Tier III Disciplinary Hearing

On March 21, 2014, C.O. Richards issued plaintiff a misbehavior report charging him with refusing a direct order (106.10) and interference with an employee or other person (107.10). Dkt. No. 121-2 ¶ 377. The misbehavior report indicated that C.O. Richards and non-party C.O. Rondo escorted plaintiff to a podiatry appointment. Id. ¶ 378. On entering the examination room, C.O. Richards inquired with the nurse and doctor as to what restraints and clothing needed to be removed. Id. ¶ 379. The doctor stated that plaintiff's right boot and sock needed to be removed. Id. C.O. Richards removed plaintiff's handcuffs, and plaintiff removed his right boot and sock. Id. ¶ 380. Plaintiff then proceeded to remove his left boot, and C.O. Richards advised him that the doctor only wanted him to remove his right boot and sock. Id. ¶¶ 381, 382. Pursuant to the misbehavior report, plaintiff became argumentative and stated, "I will due [sic] what I want and I want the doctor to look at my left foot also." Id. ¶ 383 (internal quotation marks and citation omitted). C.O. Richards gave plaintiff "several direct orders to only remove his right boot and plaintiff continued to yell and argue." Id. ¶ 384. C.O. Richards told plaintiff that if he continued to be disruptive, he would terminate the appointment. Id. ¶¶ 384, 385. Plaintiff continued to be argumentative, and stated, "I'm going to due [sic] what I want." Id. ¶ 386. C.O. Richards terminated the appointment, and returned plaintiff to a holding pen. Id. ¶ 388.

On April 1, 2014, Lt. Trombly commenced a Tier III disciplinary hearing concerning the allegations in the March 21, 2014 misbehavior report. Dkt. No. 121-2 ¶ 394. Plaintiff pleaded not guilty to the refusing a direct order charge, but admitted that he did not follow C.O. Richards' instructions because he "did not understand it was wrong." Id. ¶ 395. Non-party C.O. Loeb acted as plaintiff's employee assistant, and interviewed witnesses on plaintiff's behalf. Id. ¶¶ 399, 400. At the hearing, plaintiff requested as witnesses the nurse and doctor that were in the examination room, as well as two inmates. Id. ¶ 411. Lt. Trombly called Ms. Robertson, a senior x-ray technologist to testify. [9] Id. ¶ 412. Ms. Robertson confirmed C.O. Richards' account of the incident, and identified the doctor as non-party Dr. Langstein. Id. ¶¶ 413, 414. Lt. Trombly denied plaintiff's request to call Dr. Langstein as a witness because his testimony would have

been redundant to the testimony of C.O. Richards and Ms. Robertson. Id. ¶ 419.

Lt. Trombly found plaintiff not guilty of interference with an employee (107.10) and guilty of refusing a direct order, and sentenced plaintiff to three months in SHU and recommended three months loss of good time. Dkt. No. 121-2 ¶ 429. Plaintiff appealed his disciplinary disposition, and Director Venettozzi upheld the determination of guilty. Id. ¶¶ 445, 446.

## II. Discussion [10]

### A. Legal Standards

#### 1. Summary Judgment Standard

**\*12** "A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper."

Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

#### 2. N.D.N.Y. Local Rule 7.1(a)(3)

Local Rule 7.1(a)(3) requires a party moving for summary judgment to file and serve a Statement of Material Facts. See N.D.N.Y. L.R. 7.1(a)(3). "The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue." Id. The opposing party is required to file a response to the Statement of Material facts "admitting and/or denying each of the movant's assertions in matching numbered paragraphs." Id. "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." Id. (emphasis omitted).

Defendants argue that "plaintiff has provided no response to defendants' statement of material facts despite the fact that defendants specifically notified him of the consequences of failing to respond[.]" Dkt. No. 129 ("Def. Reply") at 3. Defendants acknowledge that plaintiff has provided a document entitled "Statement of Disputed Factual Issues," but note that the document only sets out twenty-five

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 67 of 105

*Green v. Venettozzi, Not Reported in Fed. Supp. (2018)*

alleged issues of material fact, and is not responsive to their statements. Id. at 4. Defendants contend that even if the undersigned construed plaintiff's "Statement of Disputed Factual Issues" as responsive to their Rule 7.1(a)(3) statement, it "would amount to nothing more than conclusory denials of defendants' factual assertions," which do not constitute a sufficient response under the Local Rules. Id.

**\*13** The undersigned is not required to "perform an independent review of the record to find proof of a factual dispute." Prestopnik v. Whelan, 253 F. Supp 2d 369, 371 (N.D.N.Y. 2003) (concluding that the "plaintiff's suggestion that the transcript and videotape of the [incident] be reviewed to identify support for her Statement of Material Facts Not in Dispute does not cure her failure to comply with Rule 7.1(a)(3)."). Although defendants argue, and the Local Rules provide, that the Court shall deem admitted any facts the nonmoving party fails to "specifically controvert" with specific citations to the record, pro se plaintiffs are afforded special solicitude in this District and within the Second Circuit. N.D.N.Y. L.R. 7.1(a)(3); Def. Reply at 3-4; see subsection II (A) supra. Accordingly, in deference to plaintiff's pro se status, the Court will independently review the record when evaluating defendants' Motion for Summary Judgment, and "treat plaintiff's opposition as a response to" defendants' Statement of Material Facts. Johnson v. Lew, No. 1:13-CV-1072 (GTS/CFH), 2017 WL 3822047, at *2 (N.D.N.Y. Aug. 30, 2017) ("Out of special solicitude to Plaintiff as a pro se civil rights litigant, however, the Court will treat his opposition as a response to Defendant's Rule 7.1 Statement, carefully reviewing it for any record-supported disputation of Defendant's Rule 7.1 Statement."); see Perry v. Ogdensburg Corr. Facility, No. 9:10-CV-1033 (LEK/TWD), 2016 WL 3004658, at *1 (N.D.N.Y. May 24, 2016) (determining that "although [p]laintiff failed to respond to the statement of material facts filed by [d]efendants as required under Local Rule 7.1(a)(3), the Court would invoke its discretion to review the entire record when evaluating the parties' respective Motions for summary judgment.").

### B. Personal Involvement

RHSAs Blair, Grinbergs, and McDevitt contend that they were not personally involved in the treatment of plaintiff's diabetes. See Def. Mem. of Law at 11-13; Dkt. Nos. 121-12 ("Blair Decl."), 121-14 ("Grinbergs Decl."), 121-16 ("McDevitt Decl.").[11] Supt. Uhler also argues that he was not personally involved in the underlying action. See Def. Mem. of Law at 11-13. Although not addressed by defendants in their brief, Ms. Robertson also argues that she was not personally involved in plaintiff's medical treatment plan. Dkt. No. 121-37 ("Robertson Decl.") ¶ 29. To hold a defendant liable under section 1983, the plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir. 1986). "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) ). Supervisory officials may not be held liable merely because they held a position of authority. See Wright, 21 F.3d at 501; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, a defendant may be considered "personally involved" if

(1) the defendant participated directly in the alleged constitutional violation;

(2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

(3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986) ).[12] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. See, e.g., Brown v. Artus, 647 F. Supp. 2d 190, 200 (N.D.N.Y. 2009). Moreover, a supervisor may delegate the responsibility to others, and personal involvement does not lie where the only allegation was that the defendant referred a complaint to the appropriate department or staff for investigation. Ortiz-Rodriguez v. N.Y. State Dep't of Corr. Servs., 491 F. Supp. 2d 342, 347 (W.D.N.Y. 2007).

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 68 of 105

### 1. Mr. Blair, Ms. Grinbergs, Mr. McDevitt

**\*14** Plaintiff contends that Mr. Blair, Ms. Grinbergs, and Mr. McDevitt failed to "remedy unconstitutional medical practice[s] at Upstate, assigned to them for resolution, allowing the continuance of unconstitutional medical practices at Upstate, exhibiting deliberate indifference by failing to act on unconstitutional practice made aware of that was occurring at Upstate." Dkt. No. 121-8 ("Pl. Dep.") at 127. The record demonstrates that, throughout his confinement at Upstate, plaintiff sent fourteen letters and/or other correspondence to the Central Office concerning plaintiff's allegations of inadequate medical care; complaints regarding nurses Atkinson, Bergeron, and Wilson, as well as x-ray technician Ms. Robertson; and a request for a transfer to a different facility. See generally Dkt. Nos. 121-13, 121-15, 121-17. Plaintiff addressed three of the letters to DOCCS Chief Medical Officer Koenigsmann and five to Ms. Grinbergs; the six remaining letters were copies of complaints and/or grievances. See id. Defendants informed plaintiff that his concerns were being addressed by the Upstate IGP, and that the Central Office was not the appropriate venue to address his grievance concerns. See Blair Decl. ¶¶ 20-21; Grinbergs Decl. ¶¶ 20-21; McDevitt Decl. ¶¶ 19-20. Defendants advised plaintiff to address his medical concerns using the sick call procedure, that the Division of Health Services had investigated his concerns, and that plaintiff should address his health care concerns at his upcoming appointment with his primary care provider. See Blair Decl. ¶¶ 22-23; Grinbergs Decl. ¶ 24; McDevitt Decl. ¶ 21.

In response to plaintiff's transfer request, Ms. Grinbergs informed him that the Division of Health Services had investigated his concerns, and concluded that plaintiff's health needs could be met at Upstate. Grinbergs Decl. ¶ 23. Mr. McDevitt also informed plaintiff that the Division of Health Services had investigated his concerns, and plaintiff's medical record demonstrated "a pattern of refusals related to medical appointments, and medication administration, it also revealed that he had an active medical care plan in place and had daily access to comprehensive primary, secondary and emergent health care services." McDevitt Decl. ¶ 22. Mr. Blair, Ms. Grinbergs, and Mr. McDevitt declared that plaintiff's inquiries and concerns were referred to the appropriate DOCCS staff and personnel to address his concerns. See Blair Decl. ¶¶ 27-29; Grinbergs Decl. ¶¶ 26-28; McDevitt Decl. ¶¶ 24-25.

To the extent that plaintiff seeks to establish Mr. Blair, Ms. Grinbergs, and Mr. McDevitt's personal involvement through sending letters, this argument must fail. It is well-settled that merely writing letters and grievances to a defendant is insufficient to establish personal involvement. See Smith v. Goord, 441 F. Supp. 2d 631, 643 (S.D.N.Y. 2006) ("Commissioner ... cannot be held liable on the sole basis that he did not act in response to letters of protest sent by [plaintiff]...."); Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold the official liable for the alleged violation.") (quotations omitted). Similarly, receipt of a letter or grievance, without personally investigating or acting on the letter or grievance, is insufficient to establish personal involvement. See, e.g., Rivera v. Fischer, 655 F. Supp. 2d 235, 238 (W.D.N.Y. 2009) ("Numerous courts have held that merely writing a letter of complaint does not provide personal involvement necessary to maintain a § 1983 claim.") (citing cases). There is no indication in the record that Mr. Blair, Ms. Grinsberg, or Mr. McDevitt personally investigated plaintiff's claims; in fact, defendants declared that they advised plaintiff that the Division of Health Services had investigated his concerns. See Blair Decl. ¶¶ 22-23; Grinbergs Decl. ¶ 24; McDevitt Decl. ¶ 21. Thus, plaintiff has failed to establish that Mr. Blair, Ms. Grinbergs, or Mr. McDevitt were personally involved in any alleged Eighth Amendment violation.

Even if a reasonable factfinder could determine that, based on plaintiff's continuous complaints, Mr. Blair, Ms. Grinbergs, and Mr. McDevitt had some "reason to suspect that the facility medical staff was not treating plaintiff appropriately," Hardy v. Diaz, No. 9:08-CV-1352 (GLS/ATB), 2010 WL 1633379, at \*8 (N.D.N.Y. Mar. 30, 2010) report-recommendation and order adopted, 2010 WL 1633390 (N.D.N.Y. Apr. 21, 2010). (concluding that the defendant Regional Health Services Administrator's limited involvement was insufficient to establish liability under section 1983), as discussed infra, there is no evidence in the record that defendants were deliberately indifferent to plaintiff's medical needs. See subsection II.C. infra, at 39-54; Gathers v. Tan, No. 10-CV-0475S(Sr), 2014 WL 12648666, at \*11 (W.D.N.Y. Aug. 21, 2014) ("While RHSA Blaise's investigation of plaintiff's complaint of inadequate medical care is sufficient to establish personal involvement

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 69 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

of a supervisory official, there is no question but that at the time of her investigation, there was no evidence of deliberate indifference to plaintiff's medical needs for RHSA Blaise to remedy because plaintiff was scheduled for the MRI he was requesting."), affirmed 619 F. App'x 19 (2d Cir. 2015) (summary order). Thus, because there is no underlying deliberate indifference claim that Mr. Blair, Ms. Grinbergs, and Mr. McDevitt failed to remedy, it is recommended that defendants' motion on this ground be granted.

### 2. Supt. Uhler

**\*15** Plaintiff contends that Supt. Uhler was aware of his complaints and grievances concerning defendants' alleged inadequate medical care, and failed, in his supervisory capacity, to "ensure that subordinates directed to address them[,] enforce the applicable laws." Am Compl. ¶ 36, at 12. Defendants argue that Supt. Uhler's involvement in plaintiff's claims "was limited to rendering dispositions at the conclusion of the investigations of a number of grievances plaintiff brought." Def. Mem. of Law at 12. "[I]t is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement." Perilla v. Fischer, No. 13-CV-398M, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) (citing inter alia Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (citation omitted) ). "[W]hile personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." Molano v. Bezio, No. 10-CV-6481, 2012 WL 1252630, at *5 (W.D.N.Y. Apr. 13, 2012) (citing Collins v. Ferguson, 804 F. Supp. 2d 134, 140 (W.D.N.Y. 2011), Black v. Coughlin, 76 F.3d 72, 74-75 (2d Cir. 1996) ).

Defendants proffer copies of the relevant grievances wherein plaintiff contends that he received inadequate medical care. See generally Dkt. No. 121-19. The record indicates that a majority of plaintiff's grievances were assigned to Acting Nurse Administrator Sturgen, Nurse Administrator Smith, or a member of the security staff for investigation, who, therein, concluded that plaintiff's allegations lacked merit. See id. at 199-217. Further, Supt. Uhler declared that he "routinely render[s] dispositions at the conclusion of grievance investigations and base[s] his dispositions solely on the investigations completed and the information provided from other DOCCS personnel and their respective findings

after such investigations." Dkt. No. 121-18 ("Uhler Decl.") ¶ 25. Although Supt. Uhler's dispositions often provided a recitation of the respective personnel's conclusions, there is no indication that he denied plaintiff's grievances based on his own investigation of plaintiff's complaints. See Dkt. No. 121-19 at 199-217. Moreover, " '[t]here is nothing whatsoever in the record to indicate that [the] investigation[s] w[ere] flawed or biased and even if they were, there is nothing to suggest that [Uhler] knew or should have known that fact.' " Brooks v. Chappius, 450 F. Supp. 2d 220, 226 (W.D.N.Y. 2006) (quoting Sprau v. Coughlin, 997 F. Supp. 390, 394 (W.D.N.Y. 1998) ).

Even assuming that Supt. Uhler's level of participation was sufficient to render him personally involved, plaintiff's supervisory claims still must fail. Absent an underlying constitutional violation by a subordinate, there can be no supervisory liability. See Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Elek v. Inc. Vill. of Monroe, 815 F. Supp. 2d 801, 808 (S.D.N.Y. 2011) (collecting cases for the proposition that "because plaintiff has not established any underlying constitutional violation, she cannot state a claim for 1983 supervisory liability"). As discussed infra, plaintiff has failed to raise an issue of material fact with respect to his Eighth Amendment deliberate indifference claim or his Fourteenth Amendment due process claim. See subsection II.C., II.E infra, at 39-54, 59-69.

Finally, to the extent that plaintiff contends that Supt. Uhler should be held liable for his failure to supervise his subordinates, it has been held that a "Superintendent cannot be liable under Section 1983 for failure to supervise the prison medical staff, because he lacks the medical training and authority to do so." Hardy, 2010 WL 1633379, at *7, As Supt. Uhler lacks the requisite medical training, he cannot be held liable under section 1983.

Accordingly, it is recommended that defendants' motion on this ground be granted.

### 3. Ms. Robertson

**\*16** Plaintiff contends that Ms. Robertson refused him regular treatment and therapy for his diabetes by making false entries into his medical chart during a podiatry consultation on March 21, 2014. See Am. Compl. ¶¶ 22, 26. Defendants

do not address plaintiff's claims against Ms. Robertson. Ms. Robertson declared that, in her role as a radiologic technologist, she does not have the authority to

> (1) prescribe or discontinue an inmate's medication (including insulin), dietary plans or special diabetic diets; (2) refer an inmate for physician approved testing procedures such as a colonoscopy, endoscopy, CT scan, MRI, EEG, EKG or a consultation with a specialist such as a podiatrist, opthamologist or endocrinologist; or (3) request special issue medical boots or shoes, including insoles.

Dkt. No. 121-37 ("Robertson Decl.") ¶ 13. Instead, she may only provide an inmate with the x-ray testing procedures prescribed by the inmate's health care provider. Id. ¶ 14.

The undersigned concludes that there is no indication in the record that Ms. Robertson was personally involved in plaintiff's alleged inadequate medical care. Ms. Robertson declared that she did not make an entry in plaintiff's medical records on March 21, 2014, nor did she have the authority to make an entry. Id. ¶¶ 17-18; see Dkt. No. 121-38 at 2 (depicting the March 21, 2014 AHR entry, which states, "non-compliant and argumentative at podiatry clinic[.] not seen constitutes a refusal"). Moreover, non-party nurse Kelly Rabideau declared that she made the March 21, 2014 entry in plaintiff's medical records based on her observations of plaintiff while in the podiatry clinic. Dkt. No. 121-46 ("Rabideau Decl.") ¶¶ 14-16. As defendants have presented facts establishing that Ms. Robertson did not make the entry in plaintiff's medical records, plaintiff's Eighth Amendment claim against her must fail. As such, it is recommended that plaintiff's Eighth Amendment claim against Ms. Robertson be dismissed.

### C. Eighth Amendment

Plaintiff contends that Dr. Mandalaywama; Dr. Schroyer; P.A. Kowalchuk; and nurses Atkinson, Bergeron, Wilson, and Sturgen were deliberately indifferent to his serious medical needs by failing to properly treat his diabetes mellitus and

other medical issues. See generally Am. Compl. Defendants argue that insufficient evidence exists in the record to support plaintiff's medical indifference claim. See Dkt. No. 121-3 ("Def. Mem. of Law") at 5-11.

The Eighth Amendment forbids the infliction of "cruel and unusual punishments" on those convicted of crimes, "which includes punishments that involve the unnecessary and wanton infliction of pain." U.S. CONST. amend. VIII; Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citing Gregg v. Georgia, 428 U.S. 153, 173 (1976) ). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976) ). The deliberate indifference standard consists of both an objective and subjective component. Hathaway, 37 F.3d at 66. The objective component requires the plaintiff to demonstrate that his alleged medical need is "sufficiently serious." Id. The subjective component requires a showing that the defendant has acted with a "sufficiently culpable state of mind." Id.

**\*17** For an inmate to state a cognizable claim of deliberate indifference, he must make a showing of serious illness or injury. See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003). Deprivation of medical treatment is "sufficiently serious" if the injury or illness is one where there is "a condition of urgency, one that may produce death, degeneration, or extreme pain." Hathaway, 37 F.3d at 66 (internal citation omitted). "Determining whether a deprivation is an objectively serious deprivation entails two inquiries." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). First, the Court must determine "whether the prisoner was actually deprived of adequate medical care." Kucharczyk v. Westchester Cnty., 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) (citation and internal quotation marks omitted). "Prison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is reasonable." Jones v. Westchester Cnty. Dep't of Corrs., 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008). However, a prison official may be held liable "if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 71 of 105

reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). Second, the Court must determine "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin,* 467 F.3d at 280

> [I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious. Factors relevant to the seriousness of a medical condition include whether a reasonable doctor or patient would find [it] important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain. In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower. For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone. Thus, although we sometimes speak of a "serious medical condition" as the basis for an Eighth Amendment claim, such a condition is only one factor in determining whether a deprivation of adequate medical care is sufficiently grave to establish constitutional liability.

*Id.* (internal citation and quotation marks omitted).

As to the subjective component, a prison official acts with a sufficiently culpable state of mind when "the official knows of and disregards an excessive risk to inmate health or safety;

the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837. "Deliberate indifference is a mental state equivalent to subjective recklessness" which "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Salahuddin,* 467 F.3d at 280 (quotation marks omitted). A defendant "may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was 'insubstantial or non-existent.' " *Wright v. Genovese,* 694 F. Supp. 2d 137, 154 (N.D.N.Y. 2010) (citing *Farmer,* 511 U.S. at 844). Therefore, "the defendant's belief that his conduct posed no risk of serious harm need not be sound so long as it is sincere, and even if objectively unreasonable, a defendant's mental state may be nonculpable." *Id.* at 154-155 (quoting *Salahuddin,* 467 F.3d at 281) (internal quotation marks omitted).

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." *Chance,* 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a *Section 1983* claim." *Randle v. Alexander,* 960 F. Supp. 2d 457, 481 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

**\*18** The crux of plaintiff's medical indifference claim centers on defendants' alleged deficiency in managing his diabetes mellitus. See generally Am. Compl. However, the undersigned finds that plaintiff has failed to provide evidence from which a fact-finder could reasonably conclude that defendants' alleged failures constitute deliberate indifference to plaintiff's sufficiently serious medical condition. See *Salahuddin,* 467 F.3d at 279. There is no indication in the record that defendants provided plaintiff with inadequate treatment; in fact, the record establishes the opposite.

**1. Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk**

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 72 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

### a. Objective Component

Dr. Mandalaywala declared that he met with plaintiff and/or reviewed plaintiff's medical chart on eleven occasions during his confinement at Upstate. Dkt. No. 121-24 ("Mandalaywala Decl.") ¶ 18. During that time frame, Dr. Mandalaywala approved referrals for plaintiff's endocrinology, podiatry, and ophthalmology consultations to address his diabetes, xerosis, and heel pain; transferred plaintiff to the infirmary to monitor his diabetes symptoms; and adjusted plaintiff's prescriptions for Lantus insulin, Metformin, Enapril, and Zantac to treat his fluctuating blood sugar levels on at least six occasions. Id. ¶¶ 23, 30, 46, 47, 55, 57, 59.

Dr. Schroyer declared that he treated plaintiff and/or reviewed his medical chart on "several occasions." Dkt. No. 121-29 ("Schroyer Decl.") ¶ 16. On March 17, 2014, Dr. Schroyer adjusted plaintiff's Lantus prescription as he felt that "the best way to try and get [plaintiff's] blood sugar up to a normal level would be to stop prescribing him regular insulin and adjust his prescription for Lantus insulin." Id. ¶¶ 25, 30. On March 24, 2014, Dr. Schroyer elected not to adjust plaintiff's Lantus prescription because he felt that "a long lasting medication such as Lantus was the most suitable way to try and regain control over plaintiff's blood sugar." Id. ¶¶ 44, 45. On April 24, 2014, Dr. Schroyer discontinued plaintiff's Metformin prescription as plaintiff refused the medication. Id. ¶ 48. On May 18, 2014, Dr. Schroyer examined plaintiff's feet for complications associated with his diabetes, and found that plaintiff's feet were normal. Id. ¶ 62. Plaintiff's heart rate and neurological examination results were also normal. Id. ¶¶ 63, 64. Dr. Schroyer reviewed plaintiff's blood sugar results with him, and provided a treatment plan that included a prescription medicine for blood pressure, and an additional four units of regular insulin each morning and evening in addition to what he had already been prescribed. Id. ¶ 65. Dr. Schroyer met with plaintiff the next day and recommended he continued with the same sliding scale medication and Lantus medication as prescribed. Id. ¶ 66.

On July 14, 2014, Dr. Schroyer attempted to refine plaintiff's insulin coverage by prescribing an increase in his regular insulin if his blood sugar measured high. Schroyer Decl. ¶ 78. On August 4, 2014, Dr. Schroyer referred plaintiff for a podiatry consultation to address an in-grown toe nail, and provided him Eucerin cream for his feet. Id. ¶ 79. On August 10, 2014, Dr. Schroyer offered to admit plaintiff to the infirmary to help better control his blood sugar level but

he refused. Id. ¶ 80. Dr. Schroyer offered plaintiff treatment on at least five other occasions, and he refused. Id. ¶¶ 82, 83, 85, 86, 87.

P.A. Kowalchuk declared that she met with plaintiff and/or reviewed his chart on at least twenty occasions during his confinement at Upstate. Dkt. No. 121-33 ¶ 16. P.A. Kowalchuk first met with plaintiff the day after his transfer to Upstate. Id. ¶ 17. As was the customary practice, she reviewed plaintiff's prior medical care plan; in an effort to control his irregular blood sugar readings, P.A. Kowalchuk discontinued plaintiff's regular insulin coverage, except for the sliding scale, and increased his Lantus insulin from twenty-four units to twenty-six units in the morning. Id. ¶¶ 24, 25. She referred plaintiff to endocrinology for further evaluation to determine what the appropriate treatment recommendations would be to better control his blood sugars. Id. ¶ 25. P.A. Kowalchuk chose not to provide plaintiff with Eucerin cream for his feet because she did not believe it was medically necessary at that time. Id. ¶ 29. At the February 25, 2014 appointment, P.A. Kowalchuk also referred plaintiff for a podiatry consultation, and ordered standard tests used in treating diabetes, including an HAIC blood test; a comprehensive metabolic panel to check for blood sugar, liver, kidney function, and electrolyte levels; a complete blood count with a differential; a urinalysis for random protein and microalbumin; and a regular urinalysis for proper hydration and diet monitoring and control. Id. ¶ 31. P.A. Kowalchuk ordered plaintiff's prescriptions for Enalapril, to treat high blood pressure and diabetic kidney disease, and Zantac, to treat his acid reflux. Id. ¶ 32.

**\*19** P.A. Kowalchuk next met with plaintiff on February 27, 2014, wherein plaintiff complained that he had not received his diabetic diet with an evening snack. Kowalchuk Decl. ¶ 34. P.A. Kowalchuk recommended that plaintiff receive the diabetic diet meal and ensured that the mess hall and security staff were notified that plaintiff was to start this meal immediately. Id. ¶¶ 35, 36. P.A. Kowalchuk noted plaintiff's blood sugar levels, and provided him with a tube of glucose gel to use if needed. Id. ¶¶ 45, 46.

On April 14, 2014, P.A. Kowalchuk discontinued plaintiff's physical therapy for his hand after twelve visits because plaintiff was able to perform the physical therapy exercises in his cell. Kowalchuk Decl. ¶¶ 50, 51. She also prescribed plaintiff a warm pack to apply to his hands, and rescheduled plaintiff's appointment for a urine specimen. Id. ¶¶ 52, 53. Two days later, P.A. Kowalchuk restarted plaintiff's

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 73 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Metformin prescription at 500mg twice a day, and decreased his Lantus insulin to ten units daily at nighttime with a finger stick. Id. ¶ 54. On July 2, 2014, after reviewing nurse Atkinson's notes, P.A. Kowalchuk recommended holding to sliding scale and regular insulin between 6 a.m. through 4 p.m., and to continue plaintiff's Lantus insulin and blood sugar checks at nighttime. Id. ¶ 57. She also ordered that nurses administer plaintiff ten units of Lantus insulin via subcutaneous shot at nighttime. Id. ¶ 58. In June 2014, P.A. Kowalchuk advised plaintiff of the consequences of a Ramadan diet for diabetic patients. Id. ¶¶ 59, 62.

Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's statements are consistent with plaintiff's medical records and his "Referral History," which establish that defendants routinely attempted to regulate plaintiff's fluctuating blood sugar levels with a treatment plan that included standard medications and referrals to specialized providers. See Dkt. Nos. 121-25, 121-30, 121-34 ("Pl. Med. Rec.") at 5, 9-10, 26, 32, 37, 41, 45, 47, 49, 53, 55, 58, 60-61, 63-64, 66-68, 71, 73-74, 77-78, 81, 85, 87-90, 92, 94, 96-97, 101, 102, 104, 106-08 (detailing plaintiff's medical history from these doctors); see generally Dkt. Nos. 121-26, 121-31 (detailing plaintiff's consultation report records). Moreover, the record indicates that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk scheduled plaintiff for endocrinology and podiatry consultations, and attempted to adjust his medication to meet his diabetic needs, and that plaintiff ultimately refused this treatment. See Pl. Med. Rec. at 5, 9, 16, 26, 32, 40, 42, 48-49, 66-67, 71, 73-74, 77-79, 81, 85, 88-92, 102, 104 (detailing plaintiff's medication and referral refusals); see also Dkt. No. 121-27 at 3-69 (compiling plaintiff's Refusal of Medical Examination and/or Treatment forms); Dkt. No. 121-26 at 30-31 (detailing plaintiff's cancelled consultations). There is no indication in the record that Dr. Mandalaywala discontinued plaintiff's xerosis treatment.

To the extent that plaintiff believed that different treatment would remedy his diabetes symptoms, this belief does not amount to inadequate medical care as plaintiff's concerns constitute nothing more than a mere disagreement with Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's treatment plans, which is not actionable under the Eighth Amendment.

See Randle, 960 F. Supp. 2d at 481 (quoting Alston v. Bendheim, 672 F. Supp. 2d 378, 385 (S.D.N.Y. 2009) ) ("Indeed, '[a]n inmate's disagreement with his treatment or a difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.' "). Accordingly, plaintiff has failed to establish that Dr.

Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk deprived him of adequate medical care under the objective prong of the deliberate indifference analysis.

#### b. Subjective Component

**\*20** Although plaintiff fails to establish the objective component of the deliberate indifference test, and plaintiff must demonstrate both prongs to state a deliberate indifference claim, Hathaway, 37 F.3d at 66, for the sake of a complete analysis, the undersigned addresses the subjective component. Plaintiff fails to establish that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk knew of and disregarded an "excessive risk" to his health under the subjective component. Farmer, 511 U.S. at 837. The record demonstrates that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk addressed plaintiff's diabetes symptoms through medication, as well referrals for endocrinology and podiatry consultations. See subsection II.C.1.a. supra, at 42-47. Based on their own assessments of plaintiff's medical records, as well as the blood sugar tests conducted at Upstate, Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk determined a combination of regular insulin, sliding scale, Metformin, and Lantus insulin was the appropriate plan to treat plaintiff's diabetes. See Mandalaywala Decl. ¶ 62; Schroyer Decl. ¶ 88; Kowalchuk Decl. ¶¶ 65-66. In response to plaintiff's noncompliance with the treatment plan, Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk attempted to adjust plaintiff's medication with the hope that he would be able to abide by the plan. See Mandalaywala Decl. ¶ 65; Schroyer Decl. ¶ 91; Kowalchuk Decl. ¶ 68. Inmates do not have a constitutional right to the treatment of their choice.

See Wright, 694 F. Supp. 2d at 155 (citing Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986) ) ("[That the plaintiff] preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation."). That plaintiff believed his diabetes required more or different treatment does not render Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's denial of that treatment an Eighth Amendment violation. See Randle, 960 F. Supp. 2d at 481 ("[A] difference of opinion over the type or course of treatment [does] not support a claim of cruel and unusual punishment.") (internal citations and quotation marks omitted).

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 74 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Further, to the extent that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's treatment plan to manage his diabetes differed from that of other medical providers at previous facilities, this allegation does not amount to a constitutional violation. See Chance, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim.") (internal citation omitted). To the extent that plaintiff contends that P.A. Kowalchuk discontinued his physical therapy, P.A. Kowalchuk declared she did so after plaintiff had attended twelve physical therapy sessions, and believed that it was appropriate because plaintiff could engage in the physical therapy exercises in his cell. Kowalchuk Decl. ¶ 50. She also provided plaintiff warm packs to apply to his hands. Id. Thus, it was P.A. Kowalchuk's professional medical opinion that plaintiff's physical therapy visits could be terminated; that plaintiff disagreed amounts to nothing more than mere disagreement, which is not actionable under the Eighth Amendment. See Chance, 143 F.3d at 703.

Moreover, to the extent that plaintiff refused his medication, scheduled endoscopy and podiatry consultations, and other treatment offered by defendants, see Pl. Med. Rec. at 5, 9, 16, 26, 32, 40, 42, 48-49, 66-67, 71, 73-74, 77-79, 81, 85, 88-92, 102, 104, it is well-settled that "[a]n inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not deliberately indifferent to the inmate's medical needs." Nelson v. Deming, 140 F. Supp. 3d 248, 261 (W.D.N.Y. 2015) (citing Jones v. Smith, 784 F.2d 149, 152 (2d Cir. 1986) ).

Even if Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk's decisions caused plaintiff unintended harm, negligence [13] is not actionable under section 1983. See Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted); see Daniels v. Williams, 474 U.S. 327 (1986) (concluding that negligence is not a cognizable claim under section 1983); Kucharczyk, 95 F. Supp. 3d at 537 ("[M]ere negligence is not enough to state a claim for deliberate indifference."). Thus, plaintiff has not demonstrated the existence of a material question of fact whether Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk knew of and disregarded an excessive risk to his health or safety. See Farmer, 511 U.S. 837. Plaintiff fails to establish that Dr. Mandalaywala, Dr. Schroyer, or P.A. Kowalchuk knew of and disregarded an "excessive risk" to his health" under the second prong of the deliberate indifference test.

**\*21** Accordingly, plaintiff has failed to demonstrate that Dr. Mandalaywala, Dr. Schroyer, and P.A. Kowalchuk were deliberately indifferent to a serious medical condition, and it is recommended that defendant's motion on this ground be granted.

### 2. Nurses Atkinson, Bergeron, Wilson, and Sturgen

#### a. Objective Component

Plaintiff has not demonstrated that Ms. Atkinson, Ms. Bergeron, Ms. Wilson or Ms. Sturgen deprived him of adequate medical care. As a preliminary matter, it is well-established that registered nurses have

> no authority to: (1) prescribe or discontinue an inmate's medication (including insulin), dietary plans or special dietary diets; (2) refer an inmate for physician approved testing procedures such as a colonoscopy, endoscopy, CT scan, MRI, EEG, EKG or a consultation with a specialist such as a podiatrist, opthamologist or endocrinologist; or (3) request special issue medical boots or shoes, including insoles.

Dkt. No. 121-35 ("Sturgen Decl.") ¶ 12; Dkt. No. 121-39 ("Atkinson Decl.") ¶12; Dkt. No. 121-41 ("Bergeron Decl.") ¶ 14; Dkt No. 121-44 ("Wilson Decl.") ¶ 13. As to medical services, nurses may only administer the medications that the treating physician has prescribed for the inmate in the amounts and frequencies prescribed; nurses do not have the authority to modify or otherwise alter that prescription. Sturgen Decl. ¶ 15; Atkinson Decl. ¶ 13; Bergeron Decl. ¶ 15; Wilson Decl. ¶ 15. Nurses may provide certain over-

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 75 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

the-counter medications to inmates, including glucose gel, Aspirin, Tylenol, Ibuprofen, Antacid tablets, and Anti-Fungal creams and/or lotions. Sturgen Decl. ¶ 16; Atkinson Decl. ¶ 14; Bergeron Decl. ¶ 16; Wilson Decl. ¶ 16. Thus, to the extent that plaintiff may contend that Ms. Atkinson, Ms. Bergeron, Ms. Wilson or Ms. Sturgen denied him adequate medical care by failing to provide him with certain medications or changes in his insulin and refer him for outside procedures, his claims cannot stand as Nurses Atkinson, Bergeron, Wilson, and Sturgen lacked the authority to do so. See Alston v. Howard, 925 F. Supp. 1034, 1040 n.6 (S.D.N.Y. 1996) ("In addition, [the plaintiff] fails to state a claim against Nurse Howard, who had no authority to prescribe or deny him special footwear. As set forth above, prescriptions must be approved by the Facility Health Services director.").

As to plaintiff's remaining claims, the record indicates that Ms. Atkinson, Ms. Bergeron, and Ms. Wilson met with plaintiff on numerous occasions during sick call and routinely evaluated plaintiff's symptoms, administered insulin to regulate plaintiff's blood sugar levels, and provided plaintiff with over-the-counter medications, such as Eucerin and glucose gel, when necessary. See Atkinson Decl. ¶ 18; Bergeron Decl. ¶ 19; Wilson Decl. ¶ 19; see, e.g., Pl. Med. Rec. at 7, 9-12, 14-16, 18-20, 23-24, 26-27, 29, 31-37, 39-43, 45-47, 49-53, 55-56, 58-69, 71-72, 76-93, 95-102, 108 (demonstrating examples of Ms. Atkinson, Ms. Bergeron, and Ms. Wilson's treatment of plaintiff). The record demonstrates that Ms. Sturgen only met with plaintiff on two occasions: (1) on September 26, 2015, she noted that plaintiff had been seen by podiatry for treatment and removal of bilateral ingrown toenails; and (2) on December 11, 2014, she noted that plaintiff had been seen by optometry, had no prescription for eyeglasses, and was to follow-up in one year. See Sturgen Decl. ¶¶ 18-20; see also Pl. Med. Rec. at 9, 29. Where Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, and Ms. Wilson did not have the authority to meet plaintiff's needs, they included his request for referrals to specialists and other concerns in his medical chart so that plaintiff's treating provider could evaluate the need for those treatments. See, e.g., Pl. Med. Rec. at 41 ("Requesting lotion for feet ... has [primary care provider] appt sched. soon"); see also Sturgen Decl. ¶ 31; Atkinson Decl. ¶ 33; Bergeron Decl. ¶ 45; Wilson Decl. ¶ 30 (establishing the nurses policy of writing down plaintiff's complaints to be addressed by his primary care provider). Accordingly, plaintiff has failed to establish that Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, or Ms. Wilson deprived him of adequate medical care under the objective prong of the deliberate indifference analysis.

### b. Subjective Component

**\*22** Although plaintiff fails to establish the objective component, for the sake of a complete analysis, the undersigned addresses the subjective component. Plaintiff fails to establish that Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, or Ms. Wilson knew of and disregarded an "excessive risk" to his health" under the second prong. Farmer, 511 U.S. at 837. The record demonstrates that Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, and Ms. Wilson addressed plaintiff's complaints to the extent they had the authority. See subsection II.C.2.a. supra, at 50-52. Insofar as plaintiff refused sick call or refused to comply with the treatment and medications prescribed to him, see Atkinson Decl. ¶ 19, 21, 23, 24, 25, 27, 28, 29, 30; Bergeron Decl. ¶¶ 20, 21, 22, 35, 37; Wilson Decl. ¶ 24, 27, it is well-settled that "[a]n inmate's refusal to receive treatment indicates that the inmate's treating doctors and nurses were not deliberately indifferent to the inmate's medical needs." Nelson, 140 F. Supp. 3d at 261 (citing Jones, 784 F.2d at 152). As to plaintiff's allegation that Ms. Sturgen, as Acting Nurse Administrator, "deliberate[ly] prepar[ed] [ ] subjective/subversive investigation reports for ... plaintiff's medical grievance," Am. Compl. ¶ 39, Ms. Sturgen declared that she authored an investigative report dated April 11, 2014, which addressed plaintiff's claims that he had received inadequate medical care for his diabetes. Sturgen Decl. ¶¶ 26, 27. Ms. Sturgen declared that he "appeared to [her] that plaintiff was receiving appropriate medical care for his diabetes in accordance with Dr. Mandalaywala's prescribed treatment[,]" and such treatment was in keeping with the community standard of care. Id. ¶ 29. Thus, there is no indication that, in authoring the report, Ms. Sturgen was "actually aware of a substantial risk that serious inmate harm will result," as she declared that she believed Dr. Mandalaywala followed the community standard of care. Farmer, 511 U.S. at 837.

Insofar as plaintiff takes issue that Ms. Bergeron required him to state his Department Identification number, or DIN number, prior to receiving his medications, see Am. Compl. ¶ 33, Ms. Bergeron declared that inmates at Upstate are required to state their DIN numbers prior to receiving their medications to "ensure that the medications that are administered to each inmate are in fact [the] medications that have been ordered for that inmate." Bergeron Decl. ¶¶ 29, 30. She further declared that an inmate's refusal to state his or her DIN prior to

Case 9:20-cv-00179-GLS-TWD Document 15 Filed 01/08/21 Page 76 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

receiving medication constituted a refusal of that medication. Id. ¶ 31. Thus, plaintiff's refusal to state his DIN number represented a refusal of his medication, and indicates that Ms. Bergeron was not deliberately indifferent to his medical needs. See Nelson, 140 F. Supp. 3d at 261 (citing Jones, 784 F.2d at 152). Further, to the extent that plaintiff suggests that Ms. Bergeron "posted [a] food restriction sign on the front of plaintiff's cell door which resulted in him being deprived of fast acting carbohydrates," Am. Compl. ¶ 33, Ms. Bergeron declared that she does not have the authority to order a dietary restriction for an inmate. Bergeron Decl. ¶ 25. Further, the Upstate Inmate Grievance Review Committee ("IGRC") found that Dr. Schroyer had placed a dietary restriction order for plaintiff on April 27, 2014 that requested plaintiff not be provided with jelly, sugar, or juice to combat his fluctuating blood sugar levels. See id. ¶¶ 26, 27; Schroyer Decl. ¶ 54 ("The decision to deny plaintiff jelly, juice, or sugar was a reasonable measure to try to treat plaintiff's diabetes."); see also Dkt. No. 121-32 at 3-13 (providing the grievance paperwork regarding the alleged denial of juice, sugar, and jelly).

Even if Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, or Ms. Wilson's decisions caused plaintiff unintended harm, negligence [14] is not actionable under section 1983. See Burroughs v. Petrone, 138 F. Supp. 3d 182, 211 (N.D.N.Y. 2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm.") (internal quotation marks and citation omitted). Thus, plaintiff has not demonstrated the existence of a material question of fact whether Ms. Sturgen, Ms. Atkinson, Ms. Bergeron, or Ms. Wilson knew of and disregarded an excessive risk to his health or safety. See Farmer, 511 U.S. 837. Accordingly, plaintiff has failed to demonstrate that defendants were deliberately indifferent to a serious medical condition, and it is recommended that defendant's motion on this ground be granted.

### D. First Amendment

Plaintiff claims that C.O. Richards "terminated [his] podiatry consultation from the outset for his invocation of [the] right to private medical consultation [15] ... and further act of retaliation [was] committed with misbehavior report proven to be fabricated, prepared against plaintiff." Am. Compl. at 10. Defendants argue that plaintiff has failed to introduce sufficient evidence to support his retaliation claim;

specifically, that plaintiff has failed to establish that he was engaged in a protected activity. Def. Mem. of Law at 12-15. Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506 (2002) ). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560).

**\*23** To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. Plaintiff seems to suggest that his request for a private medical consultation so that both of his feet could be examined amounted to protected conduct under the First Amendment. See Am. Compl. ¶ 19, at 10. The undersigned notes that plaintiff's allegation is "not the typical protected speech most commonly considered protected, i.e., bringing a lawsuit against a defendant or petitioning the government for redress of grievances." Maxwell v. City of New York, 272 F. Supp. 2d 285, 300 (S.D.N.Y. 2003), vacated in part on other grounds, 380 F.3d 106 (2d Cir. 2004) (citing Colon v. Coughlin, 58 F.3d 865, 871 (2d Cir. 1995) ). Moreover, neither party has proffered case law that suggests that plaintiff's request for a private medical consultation amounts to protected conduct. [16] To the extent that plaintiff contends that his demand that the doctor treat his left root constitutes protected conduct, the Second Circuit has not decided "whether the First Amendment confers on a prisoner the right to demand necessary medical attention[.]" Brown v. White, No. 9:08-CV-200 (GLS/ATB), 2010 WL 985184, at \*12 (N.D.N.Y. Mar. 15, 2010) (citing cases).

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 77 of 105

Even assuming for the purpose of this motion that plaintiff's request constitutes protected activity, plaintiff's retaliation still must fail. "[T]he mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to [a] level of constitutional significance." Reed v. Doe No. 1, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (citing Boddie, 105 F.3d at 862). However, a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation. Id. (citing Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 2008) ). In order to prove an adverse action, a plaintiff must show that the defendant's " 'retaliatory conduct ... would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.... Otherwise, the retaliatory act is simply de minimis, and therefore outside the ambit of constitutional protection.' " Roseboro v. Gillespie, 791 F. Supp. 2d 353, 366 (S.D.N.Y. 2011) (quoting Dawes, 239 F.3d at 292-93). The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002). "Types of circumstantial evidence that can show a causal connection between the protected conduct and the alleged retaliation include temporal proximity, prior good discipline, finding of not guilty at the disciplinary hearing, and statements by defendants as to their motives." Barclay v. N.Y., 477 F. Supp. 2d 546, 558 (N.D.N.Y. 2007). If the plaintiff meets this burden, the defendants must show, by a preponderance of the evidence, that they would have taken the adverse action against the plaintiff "even in the absence of the protected conduct." Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

The record demonstrates that on March 21, 2014, C.O. Richards escorted plaintiff to his podiatry consultation. See Dkt. No. 121-22 ("Richards Decl.") ¶¶ 4, 6-7. During the consultation, C.O. Richards instructed plaintiff to remove only his right boot and sock. Id. ¶ 9. Plaintiff attempted to also remove his left boot and sock, stating that he wanted the doctor to examine his left foot. Id. C.O. Richards issued "several direct orders" that plaintiff only remove his right boot and sock. Id. Plaintiff refused to comply with the direct order, and the consultation was terminated. Id. C.O. Richards therein issued plaintiff a misbehavior report. Id.

*24 The undersigned finds that plaintiff has failed to allege that his request for a private medical consultation was the substantial or motivating factor in C.O. Richard's issuance of the misbehavior report. See Gayle, 313 F.3d at 682. In fact, the record demonstrates that C.O. Richards issued plaintiff the misbehavior report because he failed to comply with his direct order to only remove his right boot and sock, and thus, interfered with the doctor's examination. See Richards Decl. ¶ 12; Dkt. No. 121-23 at 2-3 (C.O. Richards' misbehavior report). C.O. Richards declared that he was unaware of plaintiff's underlying medical condition, and did not know the details of his medical appointment. Richards Decl. ¶ 12. Plaintiff has failed to proffer evidence suggesting otherwise. Moreover, plaintiff testified that, at the podiatry consultation, C.O. Richards instructed him to remove only his right boot and sock, but that he insisted on removing both his left and right boots and socks. See Pl. Dep. at 61-62. Thus, as plaintiff admits that he attempted to remove both of his boots and socks after C.O. Richards ordered him to only remove his right boot and sock, there is no dispute that plaintiff committed the conduct charged and that C.O. Richards had a non-retaliatory justification to issue the misbehavior report. See Roseboro, 791 F. Supp. 2d at 373 (citing inter alia Chavis v. Goord, 333 F. App'x 641, 644 (2d Cir. 2009) ) (summary order) ("[T]he defendants were entitled to summary judgment because there were non-retaliatory reasons for their conduct, where [the plaintiff] did not dispute that he had disobeyed orders, which was, in part, the basis for the misbehavior reports.").

Accordingly, as plaintiff has failed to set forth a prima facie claim for retaliation, and defendants have demonstrated that, absent any alleged retaliatory motive, C.O. Richard would have issued plaintiff a misbehavior report, it is recommended that defendants' motion on this ground be granted.

### E. Fourteenth Amendment

Plaintiff contends that Lt. Trombly violated his right to procedural due process by "dishonestly suppress[ing] documentary evidence and den[ying] a witness necessary to disprove charges supposedly violated by plaintiff." Am. Compl. at 11. Plaintiff claims that Director Venettozzi violated his due process rights by affirming the disciplinary disposition on appeal. Id. at 14. Defendants argue that plaintiff's due process claims must fail. Def. Mem. of Law at 15-19. The Due Process Clause of the Fourteenth Amendment

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 78 of 105

states: "[n]o State shall ... deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV § 1. To state a prima facie due process claim, "a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." Giano v. Selsky, 238 F.3d 223, 225 (2d Cir. 2001) (citation and quotation marks omitted); see Mitchell v. Keane, 974 F. Supp. 332, 342 (S.D.N.Y. 1997) ("To state a procedural due process claim challenging a disciplinary action, a prisoner must allege *both* that he was deprived of a liberty interest cognizable under the Due Process Clause, and that he was deprived of that interest without the requisite [procedural due] process.") (emphasis added).

### 1. Liberty Interest

An inmate has a protected liberty interest in being free from segregated confinement but only where the alleged deprivation imposed amounts to an "atypical and significant hardship in relation to the ordinary incidents of prison life." Sandin v. Connor, 515 U.S. 472, 483-84 (1995). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " Davis v. Barrett, 576 F.3d 129, 133 (2d Cir. 2009) (quoting Sandin, 515 U.S. at 484); see Jenkins v. Haubert, 179 F.3d 19, 28 (2d Cir. 1999) (quoting Sandin, 515 U.S. at 486) ("Although there is no bright-line rule regarding the length or type of sanction that would give rise to an 'atypical and significant hardship,' this standard will not be met unless the disciplinary and administrative sanctions are onerous."). The Second Circuit has held that SHU confinement "for fewer than 101 days under 'normal' SHU conditions does not amount to an atypical and significant hardship and thus does not implicate a liberty interest." Nieves v. Prack, 172 F. Supp. 3d 647, 651 (W.D.N.Y. 2016) (citing Ortiz v. McBride, 380 F.3d 649, 654-55 (2d Cir. 2004) ).

**\*25** Here, plaintiff's three month confinement in SHU "implicates a liberty interest only if it was under 'abnormal or unusual SHU conditions.' " Nieves, 172 F. Supp. 3d at 652 (quoting Ortiz, 380 F.3d at 654). Plaintiff contends that he suffered "atypical hardship," including "filthy cells, unlawful deprivation of publications (i.e., Hip Hop Weekly magazines); haircut services administered by uncertified barbers; law library request[s] being process[ed] by unskilled clerks; deprivation of photo services and semi-contact during visits; insufficient quantity of meals served...." Am. Compl. ¶ 47. The undersigned finds that plaintiff's claims concerning publications, haircuts, law library requests, photo services, and contact visits fail to amount to an atypical hardship. See Carter v. Carriero, 905 F. Supp. 99, 103-04 (W.D.N.Y. 1995) (holding that limited law library access due to SHU disciplinary segregation does not result in an atypical, significant deprivation); Zappulla v. Fischer, No. 11 Civ. 6733(JMF), 2013 WL 1387033, at \*7 (S.D.N.Y. Apr. 5, 2013) (concluding that a denial of a haircut, which is more severe than plaintiff's allegation, is insufficient to raise a due process claim); White v. Fischer, No. 9:09-CV-240, 2010 WL 624081, at \*6 n.8 (N.D.N.Y. Feb. 18, 2010) (determining that the plaintiff's allegations that he was not permitted to take photographs or have the same opportunities for social interaction does not implicate his liberty interest); Hernandez v. Sposato, No. 14-CV-4593 (JFB)(ARL), 2015 WL 4097784, at \*4 (E.D.N.Y. July 8, 2015) ("With respect to the contact visits at issue in this case, courts in the Second Circuit have consistently held that [ ] the Due Process Clause ... [does not] create a protected liberty interest for inmates with respect to contact visits.") (citation omitted); Fox v. Lee, No. 9:15-CV-0390 (TJM/CFH), 2018 WL 1211111, \*18 (N.D.N.Y. Feb. 5, 2018) (concluding that "inmates do not have a constitutional right to privileges such as reading materials.") (citing Montalvo v. Lamy, 139 F.Supp.3d 597, 605 (W.D.N.Y. 2015) ("[P]risoners have no constitutional right to access a commissary."); Rosales v. LaValley, No. 9:11-CV-106 (MAD/CFH), 2014 WL 991865, at \*11 (N.D.N.Y. Mar. 13, 2014) ("It is well established that prison inmates do not have a constitutional right to watch television because the amenity is not considered a necessity for inmates.") ).

To the extent that plaintiff contends that he was exposed to "filthy cell" conditions, the undersigned concludes that this claim cannot stand. Although courts have held that exposure to unclean cells may constitute a deprivation of a liberty interest, whether a liberty interest is implicated depends on the level and duration of the exposure. Compare Florio v. Canty, 954 F. Supp. 2d 227, 235 (S.D.N.Y. 2003) (concluding that the plaintiff's exposure to waste in his cell was "only for brief periods" totaling "less than a few hours," and, therefore,

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 79 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

"simply too minor to" constitute atypical and significant conditions) with Gaston v. Coughlin, 249 F.3d 156, 165-66 (2d Cir. 2001) (holding that the plaintiff's exposure to "human feces, urine, and sewage water" for "several consecutive days" constituted an atypical and significant condition). Plaintiff does not specify what constituted a "filthy cell," nor does he allege how long the exposure occurred. As plaintiff as failed to establish that his alleged "filthy cell" conditions amounted to a deprivation of a liberty interest, the undersigned concludes that his claim does not amount to an atypical hardship.

Insofar as plaintiff contends that he received an "insufficient quantity of meals served-in an inappropriate condition at times," Am. Compl. ¶ 47, the undersigned notes that plaintiff does not allege that he was outright deprived of food, which may constitute a liberty interest. See Brooks v. Chappius, 450 F. Supp. 2d 220, 224 (W.D.N.Y. 2006) ("Deprivation of food, even for relatively brief periods, can therefore give rise to a liberty interest."). Rather, plaintiff claims that he was sometimes provided "insufficient quantity of meals" in an "inappropriate condition." Am. Compl. ¶ 47. Although a plaintiff's dislike of food or the occasional presence of spoiled food generally does not result in an atypical confinement, if a plaintiff alleged that his meals were regularly spoiled or improperly prepared, and as a result, he or she became sick, this would result in an atypical or significant hardship. See Lunney v. Brureton, No. 04 Civ. 2438 LAK GWG, 2005 WL 121720, at *6 (S.D.N.Y. Jan. 21, 2006) ("Insofar as [the plaintiff] alleges that the food in prison was merely cold, or that spoiled food was only served on a few occasions, he fails to state a case of action.... Here, however [the plaintiff] alleges that his meals were regularly spoiled and/or improper prepared ... [and] eating the meals caused him to get sick...."). Nor does plaintiff suggest that the meals provided to him while housed in SHU affected his health or his diabetes management. Plaintiff has failed to demonstrate that his alleged inappropriately prepared meals amounted to a deprivation of a liberty interest, and, therefore, do not constitute an atypical hardship.

 **\*26**  Finally, to the extent that plaintiff contends that he was provided "discriminatory/inadequate medical care as well as invasion of privacy during medical consultations," Am. Compl. ¶ 47, the undersigned has already concluded that plaintiff has failed to establish that defendants provided him with inadequate medical care. See subsection II.C. supra, at 39-54.

Even though plaintiff's conditions of his confinement "were less than ideal, he has not shown that they were so atypical compared to ordinary prison life as to give rise to a protected liberty interest." Allah v. Poole, 506 F. Supp. 2d 174, 191 (W.D.N.Y. 2007). As such, it is recommended that defendants' motion on this ground be granted.

### 2. Procedural Due Process

Even assuming that plaintiff had adequately pleaded a liberty interest, his claims still must fail as plaintiff fails to demonstrate that he was deprived of that interest due to insufficient process. See Giano, 238 F.3d at 225. Although inmates retain their constitutional right to due process protections, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due a defendant in such proceedings does not apply." Wolff v. McDonnell, 418 U.S. 539, 556 (1974).

> Certain due process protections therefore apply where disciplinary proceedings may lead to the loss of good time credit or would subject an inmate to solitary confinement in the SHU. Inmates are entitled to advance written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call witnesses and present documentary evidence; and a written statement of the disposition, including supporting facts and reasons for the action taken.

Luna v. Pico, 356 F.3d 481, 487 (2d Cir. 2004) (citations omitted).

Plaintiff's due process claims center on his inability to call witnesses and present documentary evidence at the April 1, 2014 disciplinary hearing. See Am. Compl. at 11.

As to plaintiff's alleged inability to call witnesses, the record demonstrates that Lt. Trombly called C.O. Richards to testify at the disciplinary hearing, and afforded plaintiff the opportunity to ask him questions. Dkt. No. 121-23 at

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 80 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

9-16. C.O. Richards testified that he escorted plaintiff to his podiatry call out on March 21, 2014. Id. at 10. C.O. Richards asked the nurse and the doctor what restraints and/ or clothing items needed to be removed for the doctor's examination. Id. The doctor stated that only plaintiff only needed to remove his right shoe. C.O. Richards instructed plaintiff to remove his right shoe, and plaintiff complied. Id. Plaintiff then attempted to remove his left shoe. Id. C.O. Richards instructed plaintiff only to remove his right shoe. Id. C.O. Richards again confirmed with the doctor that only the right shoe needed to be removed. Id. Plaintiff continued to attempt to take off his left shoe, and C.O. Richards terminated the call out. Id. When plaintiff requested the names of the doctor and nurse in the room, C.O. Richards informed him that he did not know the name of the podiatrist because he was an outside specialist, but that he believed the nurses name was "Robertson." Id. at 11-12.

Plaintiff then requested the following witnesses: (1) any inmates on call out; (2) the doctor; and (3) the nurse. See Dkt. No. 121-23 at 17. [17] Lt. Trombly produced Ms. Robertson, [18] and afforded plaintiff the opportunity to ask her questions. See id. at 18-24. Ms. Robertson testified that "[i]f a consult is written for your right foot, you're there for your right foot. The doctor is not going to examine your left foot, if the consult is written for your right foot." Id. at 20. When questioned whether she heard the direction that the doctor gave C.O. Richards with regard to how he wanted plaintiff to prepare for the examination, Ms. Robertson testified that the doctor requested that plaintiff remove his right boot. Id. at 23. Plaintiff then requested that the doctor be called as a witness. Id. at 24. [19] Lt. Trombly denied plaintiff's request because his testimony would be "a repetition of what the nurse just testified to." Id. When plaintiff continued to request the doctor to determine whether he directed plaintiff to remove only his right boot, Lt. Trombly stated that "the nurse who acted as a witness said she heard the doctor give him that direction. That's adequate I don't need repitition." Id. at 25.

**\*27** Based on the abovementioned facts, the undersigned concludes that Lt. Trombly's denial of plaintiff's request to call the doctor as a witness does not amount to a due process violation. Although it is well-established that inmates are entitled to a reasonable opportunity to call witnesses, see Luna, 356 F.3d at 487, "this right is not unfettered ... [and] may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity." Brooks v. Rock, No. 9:11-CV-1171 (GLS/ATB),

2014 WL 1292232, at \*28 (N.D.N.Y. Mar. 28, 2014) (citations omitted). "While inmates are entitled to call witnesses at disciplinary hearings, hearing officers may deny witness testimony as irrelevant or redundant." Richard v. Fischer, 38 F. Supp. 3d 340, 359 (W.D.N.Y. 2014) (citation omitted). The Second Circuit has held that it is the prison official's burden to establish the rationality of declining an inmate's witness request. See Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 (2d Cir. 1991). To satisfy this burden, the prison official must provide "some explanation" during or after the hearing as to why he or she declined the witness. See Russell v. Selsky, 35 F.3d 55, 58 (2d Cir. 1994). "While prison officials need not put their reasons for refusing the inmate's request in writing or into the administrative record of the disciplinary hearing, due process does require that prison officials 'at some point' state their reasons for refusing the inmate's request." Gonzalez v. Chalk, No. 13 Civ. 5486(PKC), 2014 WL 1316557, at \*5 (S.D.N.Y. Apr. 1, 2014) (citing Ponte v. Real, 471 U.S. 491, 492 (1985) ).

It is clear from the disciplinary hearing transcript that Lt. Trombly provided plaintiff with "some explanation" as to why he denied the doctor as a witness; he instructed plaintiff on two occasions that he found the doctor's potential testimony to be repetitive of testimony already provided by Ms. Robertson. Dkt. No. 121-23 at 23, 25. As it is within the hearing officer's purview to deny a witness based on irrelevance or lack of necessity, see Kingsley, 937 F.2d at 30, and because the pleadings demonstrate that Lt. Trombly offered "some explanation" as to why he denied the request, the undersigned finds that Lt. Trombly has "adequately demonstrated the rationality of declining to call" the doctor. Gonzalez, 2014 WL 1316557, at \*5. As such, it is recommended that defendants' motion on this ground be granted.

As to plaintiff's request for certain documentary evidence, including the podiatrist call out sheet, the infirmary "escort officer job description and disposition guidelines," and the "consultation report and patient Bill of Rights," plaintiff's Assistant Form demonstrates that the inmate assistant informed plaintiff that he could access a majority of the documents through the Freedom of Information Law ("FOIL"). Dkt. No. 121-21 at 31. The inmate assistant denied plaintiff's request for the escort officer job description. Id. Plaintiff again requested this documentary evidence at the April 1, 2014 disciplinary hearing, and Lt. Trombly informed him that the inmate job description request had been denied

because it was not relevant to the underlying charges at the hearing, and that the inmate assistant had instructed plaintiff to FOIL the remaining documents. See Dkt. No. 121-23 at 9.

"Prison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal and undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." Wolff, 418 U.S. at 566. Plaintiff has not proffered evidence that he filed a FOIL request in relation to the documents he requested for the April 1, 2014 disciplinary hearing. Moreover, Lt. Trombly advised plaintiff at the disciplinary hearing that the job description request had been denied because it was irrelevant to the hearing. See Dkt. No. 121-23 at 9. As plaintiff failed to provide evidence establishing that he attempted to FOIL the requested documents, and because Lt. Trombly apprised plaintiff as to why the job description request had been denied, it is recommended that defendants' motion on this ground be granted.

**28** In sum, the record demonstrates that Lt. Trombly's determination of guilt was based on "some evidence" as set forth in Superintendent, Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455-56 (1985) (concluding that the "some evidence" standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any evidence* in the record that could support the conclusion reached by the disciplinary board."). The transcript demonstrates that Lt. Trombly stated, on-the-record, that in finding plaintiff guilty of failure to obey a direct order (106.10), he relied on plaintiff's "own testimony admitting that he failed to follow direction, the testimony of the author, C.O. Richards, and the testimony from the Tech [Robertson] who was a witness to the incident." Dkt. No. 121-23 at 29. Thus, the record indicates that Lt. Trombly's disciplinary disposition was supported by some evidence.

The undersigned notes that the only claim against Director Venettozzi is that he upheld Lt. Trombly's disciplinary determination on appeal when he had "specific acquisition and knowledge of the clear and obvious due process violations, which after being informed of the violations he failed to remedy the wrong" and allowed plaintiff's continued confinement. Am. Compl. at 14. As the undersigned recommends dismissal of plaintiff's due process claim against Lt. Trombly because he fails to establish a constitutional

violation, it is similarly recommended that plaintiff's due process claim against Director Venettozzi be dismissed.

Accordingly, it is recommended that defendants' motion be granted.

### F. Qualified Immunity

Defendants argue that, even if plaintiff's claims are substantiated, they are entitled to qualified immunity. Def. Mem. of Law at 19-20. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if the plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights were clearly established at the time of the alleged violation. See Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See subsection II.B.-E. supra, at 30-69. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F. Supp. 2d at 230. Accordingly, it is recommended that defendants' motion on this ground be granted.

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 82 of 105

### G. State Law Claims

Defendants argue that plaintiff's state law claims for negligence and medical malpractice are barred by 🚩 N.Y. Correction Law § 24. See Def. Mem. of Law at 20-21. This Court previously dismissed plaintiff's state law claims of "ministerial negligence" and breach of duty against DOCCS in its July 15, 2015 Decision and Order. See Dkt. No. 15 at 16. However, to the extent that any state law claims remain against the individual defendants, these claims must be dismissed.

**\*29** The undersigned recommends dismissal of plaintiff's state law claims concerning negligence and medical malpractice in light of the recommendation of dismissal of the federal Eighth Amendment claims pertaining to the same set of facts. See 🚩 28 U.S.C. § 1367(c)(3) (stating that the district court may decline to exercise supplemental jurisdiction over a claim if all other claims over which the court has original jurisdiction have been dismissed); City of Chicago v. Int'l College of Surgeons, 522 U.S. 156, 172 (1997); Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir. 1994).

Even if the underlying federal cause of action survived, plaintiff's state law claim is still subject to 🚩 New York Correction Law § 24. Pursuant to 🚩 Correction Law § 24(1):

> No civil action shall be brought in any court of the state, except by the attorney general on behalf of the state, against any officer or employee of the department, which for purposes of this section shall include members of the state board of parole, in his or her personal capacity, for damages arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee.

🚩 N.Y. CORR. LAW § 24(1). Courts look at the following factors to determine whether a defendant's action is within the scope of employment:

the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in the actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could have reasonably anticipated.

🚩 Ierardi v. Sisco, 119 F.3d 183, 187 (2d Cir. 1997) (quotations and citations omitted) (holding that the defendant's alleged sexual harassment was not undertaken in the discharge of his duties and beyond the protection afforded to officers under 🚩 § 24).

The test to determine whether the defendants' actions fall within the scope of their employment is "whether the act was done while the servant was doing his master's work no matter how irregularly, or with what disregard of the instructions." Cruz v. New York, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (citing Cepeda v. Coughlin, 128 A.D.2d 995, 996 (N.Y. App. Div. 1987) ). Conduct that is "purely for personal reasons unrelated to the employer's interests, ... which is a substantial departure from the normal methods of performing the officer's duties is not considered within the scope of employment." Johnson v. New York State Dep't of Corr. Servs. & Cmty. Supervision, No. 11-CV-079S, 2013 WL 5347468, at \*2 (W.D.N.Y. Sept. 23, 2013) (quoting Gore v. Kuhlman, 217 A.D.2d 890, 891 (N.Y. App. Div. 1995) ).

Plaintiff's complaint demonstrates that defendants were on duty in the correctional facility at the time of the alleged constitutional violations, and that their alleged acts were not significant departures beyond the scope of their employment. Accordingly, the undersigned recommends dismissal of plaintiff's state law claims.

### H. Revocation of Plaintiff's *In Forma Pauperis* Status

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 83 of 105

As an alternative to dismissal on the merits, defendants seek revocation of plaintiff's in forma pauperis ("IFP") status under ⚑ 28 U.S.C. § 1915(g), which bars prisoners from proceeding IFP after three or more previous claims have been dismissed as frivolous, malicious, or for failing to state a claim. See ⚑ 28 U.S.C. § 1915(g) (2006). [20] See Def. Mem. of Law at 21-24. Plaintiff does not address this argument. Frivolous claims "lack[ ] an arguable basis either in law or in fact." ⚑ Tafari v. Hues, 473 F.3d 440, 442 (2d Cir. 2007) (quoting ⚑ Neitzke v. Williams, 490 U.S. 319, 325 (1989) ). Malicious claims are filed with the intent to hurt or harm another. Id. (citations omitted). The failure to state a claim applies a parallel definition from Fed. R. Civ. P. 12(b)(6), but "it does not follow that a complaint which falls afoul of the [12(b)(6) motion to dismiss] standard will invariably fall afoul of the [ § 1915(g) standard]." Neitzke, 490 U.S. at 326; see also ⚑ Tafari, 473 F.3d at 442 (citations omitted).

**\*30** This "three-strikes" provision contains a narrow exception which permits suits, notwithstanding prior dismissals, when the prisoner is "under imminent danger of serious physical injury." ⚑ 28 U.S.C. § 1915(g); see also ⚑ Lewis v. Sullivan, 279 F.3d 526, 531 (7th Cir. 2002) (applying imminent danger exception "[w]hen a threat or prison condition is real and proximate, and when the potential consequence is 'serious physical injury.' ") In determining whether the imminent danger provision applies, the court must evaluate whether the claimed danger was still in existence when a complaint was filed and whether such danger was sufficiently serious in light of the liberal standards accorded to pro se plaintiffs to require protection. ⚑ Chavis v. Chappius, 618 F.3d 162, 169-70 (2d Cir. 2010) (citations omitted). Thus, vague, conclusory, non-specific or implausible allegations of imminent danger are insufficient to circumvent the three-strikes bar. ⚑ Id. at 170 (citations omitted). Additionally, dismissal is not precluded by the fact that plaintiff has already been granted IFP status in this action. Dkt No. 10. When a court becomes aware of three prior strikes only after granting IFP status, it is appropriate to revoke that status and bar the complaint under ⚑ § 1915(g). See McFadden v. Parpan, 16 F. Supp. 2d 246, 247 (E.D.N.Y. 1998).

As noted in the undersigned's October 31, 2016 Report-Recommendation and Order, Judge Sannes previously reviewed plaintiff's litigation history and determined that plaintiff had accrued three strikes. Dkt. No. 63 at 5 (citing Dkt. No. 10 at 3 n.4). In the October 31, 2016 Report-Recommendation, the undersigned did not recommend revoking plaintiff's IFP status, as defendants failed to present the Court with evidence to disturb Judge Sannes' preliminary finding regarding the imminent danger exception, and, such a detailed inquiry by the magistrate judge into whether the allegations in plaintiff's complaint qualified for the imminent danger exception would have been in contravention of Second Circuit precedent. See id. at 5-7. This recommendation was without prejudice to renew. Id. at 7. Judge Sannes adopted the Report-Recommendation in its entirety. Dkt. No. 67. Thus, the undersigned now addresses whether plaintiff has sufficiently pled a condition which satisfies the imminent danger exception.

In initially granting plaintiff IFP, this Court relied on plaintiff's allegations of inadequate medical care concerning his diabetes to satisfy the imminent danger exception. See Dkt. No. 10 at 5-6; Dkt. No. 63 at 6 (citing ⚑ Vandiver v. Vasbinder, 416 F. App'x 560, 562-63 (6th Cir. 2011) (summary order) (finding that the imminent danger exception was satisfied where the plaintiff suffered from Hepatitis C and alleged that he was denied healthcare); Day v. Bannish, No. 3:09-CV-254 (RNC), 2009 WL 2589556, at *2 (D. Conn. Aug. 21, 2009) (finding that the imminent danger exception was satisfied where the plaintiff alleged that a denial of medical care had worsened his diabetes and heart condition, and caused a chronic infection) ). The record currently before the Court demonstrates that defendants provided plaintiff with consistent medical care and treatment of his diabetes throughout his incarceration at Upstate. See subsection II.C. supra, 39-54 (detailing plaintiff's medical treatment; Pl. Med. Rec. at 5, 9-10, 26, 32, 37, 41, 45, 47, 49, 53, 55, 58, 60-61, 63-64, 66-68, 71, 73-74, 77-78, 81, 85, 87-90, 92, 94, 96-97, 101, 102, 104, 106-08 (detailing plaintiff's medical history from Dr. Schroyer, Dr. Mandalaywala, and P.A. Kowalchuk); see generally Dkt. Nos. 121-26, 121-31 (detailing plaintiff's consultation report records). Moreover, plaintiff's medical records show that he routinely refused treatment while at Upstate. See Pl. Med. Rec. at 5, 9, 16, 26, 32, 40, 42, 48-49, 66-67, 71, 73-74, 77-79, 81, 85, 88-92, 102, 104 (detailing plaintiff's medication and referral refusals); see also Dkt. No. 121-27 at 3-69 (compiling plaintiff's Refusal of Medical Examination and/or Treatment forms); Dkt. No. 121-26 at 30-31 (detailing plaintiff's cancelled consultations). Moreover, as defendants note, on the day that plaintiff filed his initial complaint, he

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 84 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

refused consent for a Controlled B diet with an evening snack, that he requested on September 27, 2014, as well as a urine test scheduled by his primary care provider to determine whether had protein or microalbumin in his urine. See Dkt. No. Dkt. No. 121-7 at 181-82 (demonstrating plaintiff's refusal on October 6, 2014), 238 ("[inmate] demanding snack be provided by mess hall because his level may drop later on in evening."); Def. Mem. of Law at 23-24. As there is no indication in the record that plaintiff suffered from imminent danger at the time he filed his complaint, it is recommended that defendants' motion be granted and plaintiff's IFP status be revoked.

### III. Conclusion

 **\*31  WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendants' Motion for Summary Judgement (Dkt. No. 121) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's claims against defendant C.J. Koenigsmann be **DISMISSED** with prejudice; and it is further

**RECOMMENDED**, that plaintiff's amended complaint (Dkt. No. 16) be **DISMISSED** in its entirety, with prejudice, and it is further

**RECOMMENDED**, in the alternative, if the District Court Judge does not agree with the undersigned's recommendation on the merits, that defendants' motion pursuant to 28 U.S.C. § 1915(g) (Dkt. No. 121) be **GRANTED** and that:

(1) The order granting plaintiff's IFP status (Dkt. No. 10) be **VACATED**;

(2) The complaint be **DISMISSED** as to all claims unless plaintiff pays the filing fee of $ 400.00 within thirty (30) days of the entry of a final order by the district court; and

(3) Plaintiff be barred from filing any IFP complaints in this district unless he is under imminent danger of serious physical injury; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [21]

**All Citations**

Not Reported in Fed. Supp., 2018 WL 7917917

### Footnotes

[1]   This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2]   Plaintiff failed to serve defendant C.J. Koenigsmann, and the 120-day service time limit set forth in Fed. R. Civ. P. 4(m) has expired. See Dkt. No. 121-3 at 3. Defendants state that because defendant Koenigsmann was not served with the complaint, he is not represented by the Office of the Attorney General, and, therefore, his liability is not addressed in the impending motion. See id. at 3 n.1. As the statute of limitations has run, the undersigned recommends that plaintiff's claims against defendant C.J. Koenigsmann be dismissed with prejudice.

Case 9:20-cv-00179-GLS-TWD   Document 15   Filed 01/08/21   Page 85 of 105

Green v. Venettozzi, Not Reported in Fed. Supp. (2018)

3    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS. tit 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

4    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

5    Inmates are required to state their Department Identification Number ("DIN" or "DIN Number") before receiving medications to ensure that the correct medications are administered. Dkt. No. 121-2 ¶¶ 123-24.

6    Dr. Mandalaywala is commonly referred to by staff as "Dr. Kumar." Dkt. No. 121-2 ¶ 109.

7    Defendants note that defendant Jamie Bergeron is now known as Jamie Tavernier. Dkt. No. 121-2 at 25.

8    Mr. McDevitt currently holds the position of Assistant Director for Correctional Health Services at DOCCS' Central Office. Dkt. No. 121-2 ¶ 360. Plaintiff incorrectly names "R. McDewitt" in the caption.

9    Ms. Robertson was the other person in the examination room on March 21, 2014, whom plaintiff believed was a nurse. See Dkt. No. 121-2 ¶ 311-17.

10   All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

11   Defendants' memorandum of law does not address plaintiff's supervisory claims against Mr. Blair and Mr. McDevitt, but their declarations set forth similar arguments as Ms. Grinberg's declaration. See generally Blair Decl.; Grinbergs Decl; McDevitt Decl. As such, the undersigned will address whether Mr. Blair and Mr. McDevitt were personally involved in the alleged inadequate medical care in conjunction with the assessment of Ms. Grinbergs.

12   Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. 🚩Pearce v. Estate of Longo, 766 F. Supp. 2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., 🚩Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F. Supp. 2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); 🚩D'Olimpio v. Crisafi, 718 F. Supp 2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

13   The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

14   The undersigned makes no assessment as to whether plaintiff can state a claim as to negligence, a state-law claim not properly before this Court.

15   To the extent that plaintiff may attempt to set forth a right to privacy claim, the undersigned determines that it must fail. "There is a constitutional right of privacy that protects the individual interest against disclosure of personal matters such as one's medical condition." Shuler v. Brown, No. 07-CV-0937, 2009 WL 790973,

**Green v. Venettozzi, Not Reported in Fed. Supp. (2018)**

Case 9:20-cv-00179-GLS-TWD    Document 15    Filed 01/08/21    Page 86 of 105

at *5 (N.D.N.Y. Mar. 23, 2009) (citing 📄 Whalen v. Roe, 429 U.S. 589, 598-600 (1977) ). This protection has been extended to prisoners. See id. (citation omitted). There is no absolute right to privacy regarding an inmate's medical condition; instead, the privacy interest is determined on the prisoner's medical condition. See id. (citation omitted). "This privacy interest is at its zenith when the prisoner suffers from an 'unusual' condition, such as HIV or transsexualism, that is 'likely to provoke an intense desire to preserve one's medical confidentiality, as well as hostility and intolerance from others.' " Id. (quoting 📄 Powell v. Schriver, 175 F.3d 107, 111 (2d Cir. 1999) ). Here, there is no indication that plaintiff's diabetic condition is "unusual" in the same vein as HIV or transsexualism, or that it is "likely to provoke an intense desire to preserve one's medical confidential," or cause hostility or intolerance from others. Id. As such, plaintiff fails to set forth a right to privacy claim.

16    Plaintiff offers case law pertaining to his right to privacy, which is inapplicable to his retaliation claim.

17    Plaintiff does not challenge that Lt. Trombly failed to call the inmate witnesses.

18    Plaintiff incorrectly referred to Ms. Robertson as a nurse; she is a senior x-ray technician. See Robertson Decl. ¶ 5-9.

19    There is some discrepancy in the record as to the name of the doctor requested. Plaintiff's amended complaint contends that he requested the testimony of Dr. Lentini. Am. Compl. ¶¶ 24-25. However, Lt. Trombly's declaration seems to suggest that the podiatrist's name was Dr. Langstein. See Dkt. No. 121-20 ("Trombly Decl.") ¶¶ 52-53.

20    📄 28 U.S.C. § 1915(g) provides:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

Judge Sannes found that plaintiff had accrued three strikes under 📄 section 1915(g), but also made a preliminary finding that plaintiff faced imminent danger of serious physical injury, therefore allowing plaintiff to proceed IFP. Dkt. No. 10 at 6.

21    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

---

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 2003792
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Prince PILGRIM, Plaintiff,

v.

P. BRUCE, Correction Officer, Great Meadow
C.F.; Murphy, Sergeant, Great Meadow C.F.;
Harvey, Hearing Officer, Great Meadow C.F.;
Gary Greene, Superintendent, Great Meadow
C.F.; Glenn Goord, Commissioner of Docs;
and Donald Selsky, Director of Docs Special
Housing/Inmate Discipline Program, Defendants.

Civil Action No. 9:05-cv-198 (GLS/GHL).
|
May 7, 2008.

**Attorneys and Law Firms**

Prince Pilgrim, Dannemora, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the State of
New York, Steven H. Schwartz, Assistant Attorney General,
of Counsel, Albany, NY, for Defendants.

### ORDER

GARY L. SHARPE, District Judge.

 *1 The above-captioned matter comes to this court
following a Report-Recommendation by Magistrate Judge
George H. Lowe, duly filed February 21, 2008. Following
ten days from the service thereof, the Clerk has sent the file,
including any and all objections filed by the parties herein.

No objections having been filed, and the court having
reviewed the Magistrate Judge's Report-Recommendation for
clear error, it is hereby

ORDERED, that the Report-Recommendation of Magistrate
Judge George H. Lowe filed February 21, 2008 is
ACCEPTED in its entirety for the reasons state therein, and
it is further

ORDERED, that Plaintiff's cross-motion (Dkt. No. 41) is
DENIED to the extent that it requests relief that is dispositive

in nature such as the voluntary dismissal without prejudice of
plaintiff's "defamation of character" and "[loss of] religious
services" claims, and it is further

ORDERED, that Defendants' motion for summary judgment
(dkt.No.38) is GRANTED and that all of the claims
asserted in Plaintiff's Amended Complaint (Dkt. No. 9) is
DISMISSED with prejudice, and it is further

ORDERED, that the court certifies in writing, for the
purposes of 28 U.S.C. § 1915(a)(3), that any appeal taken
from this order in this action would not be taken in good faith,
and it is further

ORDERED, that the Clerk enter judgment in favor of the
defendants against the plaintiff.

IT IS SO ORDERED

### ORDER and REPORT-RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action has been referred
to the undersigned for Report and Recommendation by
the Honorable Gary L. Sharpe, United States District
Judge, pursuant to 28 U.S.C. § 636(b) and Local
Rule 72.3(c) of the Local Rules of Practice for this
Court. Currently pending before the Court is Defendants'
motion for summary judgment, and Plaintiff's cross-motion
for an Order (1) reopening the discovery period in
this action so that Plaintiff may serve interrogatories on
Defendants, (2) adjourning the Court's decision regarding
Defendants' motion, pending Plaintiff's receipt their responses
to his referenced interrogatories, as well as responses
to various outstanding discovery demands, (3) imposing
sanctions against Defendants for intentionally failing to
provide Plaintiff with the discovery mandated by the
Court's discovery order of March 14, 2007, and (4)
permitting Plaintiff to withdraw his claims of defamation and
interference with his right to participate in religious services.
(*Id.*) (Dkt.Nos.38, 41.) For the reasons set forth below, I deny
Plaintiff's cross-motion to the extent that it requests non-
dispositive relief, I recommend that the Court deny Plaintiff's
cross-motion to the extent that it requests dispositive relief,
and I recommend that the Court grant Defendants' motion for
summary judgment with regard to all of the claims asserted
in Plaintiff's Amended Complaint.

## I. BACKGROUND

### A. Plaintiff's Claims

**\*2**  Prince Pilgrim ("Plaintiff") filed his Complaint in this action on February 14, 2005, and his Amended Complaint on July 18, 2005. (Dkt.Nos.1, 9.) Generally, in his Amended Complaint, Plaintiff alleges that, while he was incarcerated at Great Meadow Correctional Facility ("Great Meadow C.F.") between December of 2003 and June of 2004, six employees of the New York State Department of Correctional Services ("DOCS") [1] violated his constitutional rights in a variety of ways, all revolving around a false and retaliatory misbehavior report that was filed against Plaintiff which, after an allegedly procedurally defective disciplinary hearing, resulted in a disciplinary conviction and punishment. (*See generally* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.].)

More specifically, Plaintiff alleges as follows:

(1) **Defendant Phillip Bruce** (a correctional officer) violated Plaintiff's rights under the First, Fifth, Eighth and Fourteenth Amendments by (1) refusing to permit Plaintiff "to go to [a] notary" on December 23, 2003, (2) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004, (3) "conspir[ing]" with and "instruct[ing] a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004, (4) "singl[ing]" him out of a group of inmates going to mess hall in order to subject him to a harassing and retaliatory pat-frisk on March 11, 2004, and (5) filing a false misbehavior report against Plaintiff on March 11, 2004, in retaliation against him for having filed grievances against Defendant Bruce on December 23, 2003, February 22, 2004, and March 10, 2004 (*id.* at ¶¶ 1, 5, 8-11, 13, 27);

(2) **Defendant B. Murray** (a correctional sergeant, misidentified by Plaintiff as Sergeant "Murphy") violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by deliberately failing to provide Plaintiff with adequate legal assistance before, and during, Plaintiff's disciplinary hearing on March 22, 2004, and March 26, 2004 (*id.* at ¶¶ 13-16, 19-20, 29);

(3) **Defendant Andrew Harvey** (a hearing officer) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) failing to ensure that Defendants provided Plaintiff with all documents necessary to marshal a defense at his disciplinary hearing, (b) failing to grant him an extension of time to prepare for the hearing, (c) failing

to dismiss the charges against Plaintiff due to the lack of legal assistance he had received, (d) failing to conduct a hearing within seven days of the incident, (e) fabricating an "extension request," which falsely stated that Plaintiff had requested an extension of time before the hearing so that he could meet with his legal assistant, (f) failing to conduct a fair and impartial hearing on March 22, 2004, and March 26, 2004, (g) failing to sustain Plaintiff's objection to the use of Defendant Bruce as a witness at the hearing, (h) wrongfully convicting Plaintiff of the offenses with which he had been charged, and (i) imposing on Plaintiff an overly harsh disciplinary sentence (*id.* at ¶¶ 19-20, 22-24, 31);

**\*3**  (4) **Defendant Gary Greene** (the Great Meadow C.F. Sperintendent) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) "refus[ing] to intervene" in the "foreseeable conflict" between Defendant Bruce and Plaintiff, despite knowing of some or all of Plaintiff's grievances against Defendant Bruce, (b) failing to protect Plaintiff from the filing of a false and retaliatory misbehavior report by Defendant Bruce, and (c) "engaging [in] and influencing a predetermination of guilt[ ]" with respect to disciplinary charges pending against Plaintiff by "moving [him] unlawfully to long term keep lock housing" on March 19, 2004 (three days before his disciplinary hearing commenced), or at least failing to rectify that unjustified transfer after learning about it through a letter from Plaintiff (*id.* at ¶¶ 1-2, 6-7, 12, 16-19, 21, 33);

(5) **Defendant Glenn Goord** (the DOCS Commissioner) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by (a) "refus[ing] to intervene" in the "foreseeable conflict" between Defendant Bruce and Plaintiff, despite knowing of some or all of Plaintiff's grievances against Defendant Bruce, (b) failing to protect Plaintiff from the filing of a false and retaliatory misbehavior report by Defendant Bruce, and (c) failing to reverse Plaintiff's disciplinary conviction on appeal (*id.* at ¶¶ 5, 8, 12, 25, 35); and

(6) **Defendant Donald Selsky** (the Director of the DOCS Special Housing/Inmate Grievance Program) violated Plaintiff's rights under the Fifth, Eighth and Fourteenth Amendments by failing to reverse Plaintiff's disciplinary conviction on appeal (*id.* at ¶¶ 25, 37).

Finally, Plaintiff alleges that each of the six Defendants, through their various forms of misconduct, caused Plaintiff

to suffer, *inter alia,* "defamation of character" and "[loss of] religious services." (*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

**B. Defendants' Motion and Plaintiff's Cross-Motion**

Defendants filed their motion for summary judgment on August 30, 2007. (Dkt. No. 38.) Generally, Defendants' motion for summary judgment is premised on eight grounds: (1) Plaintiff's asserted failure to exhaust his available administrative remedies with regard to various of his claims prior to filing this action in federal court; (2) Plaintiff's asserted failure to state an actionable claim of defamation; (3) Plaintiff's asserted failure to state an actionable claim of the denial of his right to participate in religious services; (4) Plaintiff's asserted failure to state an actionable claim of conspiracy; (5) Plaintiff's asserted failure to allege facts plausibly suggesting, or adduce evidence establishing, the personal involvement of Defendant Greene (a supervisor) in any of the constitutional violations alleged; (6) the protection from liability that Defendants Goord, Greene, Selsky, Harvey and Murphy assertedly enjoy under the circumstances, pursuant to the doctrine of qualified immunity; (7) Plaintiff's asserted failure to state an actionable due process claim due to his failure to allege facts plausibly suggesting that he enjoyed a protected liberty interest in remaining free from the disciplinary confinement alleged; and (8) Plaintiff's asserted failure to adduce evidence establishing a claim of retaliation by Defendant Bruce. (Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].)

**\*4** Defendants' motion included a detailed notification of the consequences of failing to respond to their motion. (Dkt. No. 38, Part 1.) Plaintiff clearly read, and understood, this notification since he requested (and was granted) a liberal extension of the deadline by which he had to respond to Defendants' motion. (Dkt. No. 40 [Request and Order granting Plf. a 54-day extension of the response deadline].) Moreover, Plaintiff, who is no stranger to the court system, had (when he filed his response papers in this action) previously faced at least five motions for summary judgment, and responded to at least four of those motions, in other prisoner civil rights cases. [2] Moreover, when Plaintiff received a copy of Defendants' motion for summary judgment, he was (and is still) incarcerated in a New York State correctional facility whose law library contains a copy of both the Local Rules of Practice for this Court and this District's *Pro Se* Manual, both of which advise *pro se* prisoner-plaintiffs of the consequences of failing to properly oppose a defendant's motion for summary judgment.

Despite having received this detailed notice and liberal deadline-extension, Plaintiff failed to respond to the substance of Defendants' motion for summary judgment. Rather, on November 41, 2007, Plaintiff filed "response" papers that contained a cross-motion. (Dkt. No. 41.) The cross-motion requested four types of relief from the Court: (1) the reopening of the discovery period in this action so that Plaintiff may serve interrogatories on Defendants; (2) an adjournment of the Court's decision regarding Defendants' motion, pending Plaintiff's receipt of their responses to his referenced interrogatories, as well as responses to various outstanding discovery demands; (3) the imposition of sanctions against Defendants for intentionally failing to provide Plaintiff with the discovery mandated by the Court's discovery order of March 14, 2007; and (4) the withdrawal of his claims of defamation and interference with his right to participate in religious services. (*Id.*)

**II. ANALYSIS**

**A. Plaintiff's Cross-Motion**

**1. Request for Reopening of Discovery**

Plaintiff requests to reopen discovery in this action so that he can file various interrogatories. (Dkt. No. 41.) I deny that request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 7, 16, 26 and/or 33.

Among other things, Plaintiff has not identified (1) what information he would attempt to elicit from Defendants through his interrogatories (*see* Dkt. No. 41), (2) why he needs that information (*id.*), or (3) why he delayed in making a motion to reopen discovery until now-approximately *ten months* after the close of discovery in this action, which occurred on April 14, 2007 (*see* Dkt. No. 26 [Order filed 10/30/06, resetting deadline for close of discovery as 1/17/07]; Dkt. No. 32[Order filed 3/14/07, directing Defs. to respond to Plf.'s outstanding discovery requests by 4/14/07]; Dkt. No. 33 [Defs.' Status Report filed 4/12/07, attaching copies of discovery provided to Plf.] ).

**\*5** I note that the one-page letter that Plaintiff submitted to the Court on or about August 30, 2007, requesting an extension of 60 days by which to file a motion to compel Defendants to produce documents in response to Plaintiff's outstanding discovery demands did *not* constitute a motion to

reopen discovery in this action so that Plaintiff could serve interrogatories on Defendants. (Dkt. No. 39.)

### 2. Request for Stay of Decision Regarding Summary Judgment Motion

Plaintiff also requests an adjournment of the Court's decision regarding Defendants' motion for summary judgment pending Plaintiff's receipt of his outstanding discovery demands. (Dkt. No. 41.) I deny this request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 56(f).

Rule 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed.R.Civ.P. 56(f). "To request discovery under Rule 56(f), a party must file an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain them; and (4) why the affiant's efforts were unsuccessful." *Gualandi v. Adams,* 385 F.3d 236, 244 (2d Cir.2004) [citation omitted], *accord,* *Concourse Rehab. & Nursing Ctr. Inc. v. Whalen,* 249 F.3d 136, 146, n. 3 (2d Cir.2001) [citation omitted].

Here, Plaintiff has failed to satisfy the first, second, and third requirements. First, Plaintiff has failed to demonstrate precisely which of his discovery demands are allegedly outstanding. (*See* Dkt. No. 41) I have *sua sponte* compared Defendants' supplemental discovery responses and my discovery Order of March 14, 2007, and I am unable to find any reason to believe that Defendants' supplemental discovery responses were deficient in any regard. (*Compare* Dkt. No. 33, Parts 3-6 [Defs.' Status Report] *with* Dkt. No.

32 [Order].) I note that, taking into account the 89 pages of documents that Defendants provided to Plaintiff on April 12, 2007, Defendants have now provided Plaintiff with some 171 pages of documents in response to his discovery demands. (*See* Dkt. No. 33, Parts 4, 6.) Despite his possession of these documents, he has adduced no evidence in opposition to Defendants' motion for summary judgment.

Second, Plaintiff has not demonstrated how the (unidentified) information sought is reasonably expected to create a genuine issue of material fact on any of the issues presented by Defendants' on their motion. An opposing party's "mere hope" that further evidence may develop to create a genuine issue of fact is an insufficient basis upon which to justify the granting of such a stay. *Contemporary Mission, Inc. v. USPS,* 648 F.2d 97, 107 (2d Cir.1981) [citation omitted]; *accord, Sanders v. Quickstak, Inc.,* 889 F.Supp. 128, 132 (S.D.N.Y.1995); *Witter v. AbbellHowe Co.,* 765 F.Supp. 1144, 1150 (W.D.N.Y.1991); *Dixon v. Bowen,* 126 F.R.D. 483, 486 (S.D.N.Y.1989). Here, a "mere hope" of such further evidence is all that Plaintiff has offered.

**\*6** Moreover, I note that Defendants' motion-although it is submitted as a "motion for summary judgment" under Fed.R.Civ.P. 56-is almost entirely based on arguments that Plaintiff's Amended Complaint *fails to state a claim upon which relief may be granted* under Fed.R.Civ.P. 12(b) (6). (*See generally* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].) Of course, such arguments are entirely permissible under Fed.R.Civ.P. 56, [3] and the issues presented by such arguments are purely legal in nature and in no way evidentiary in nature (all material facts alleged in Plaintiff's Amended Complaint being accepted as true, and all reasonable inferences construed in Plaintiff's favor). [4] As a result, it would appear *extremely* unlikely that any further evidence developed by Plaintiff during discovery could defeat the vast majority of Defendants' arguments, which, again, are based on the factual assertions contained within the four corners of Plaintiff's Amended Complaint.

Third, Plaintiff has failed to explain why he delayed approximately four-and-a-half months in complaining about the discovery responses Defendants sent Plaintiff on April 12, 2007, causing Defendants to go to the effort and expense of preparing and filing a motion for summary judgment on August 30, 2007. (*See* Dkt. No. 41; *compare* Dkt. No. 33, Part 2 [Defs.' Status Report filed 4/12/07, attaching Declaration of Service.] *with* Dkt. No. 39 [Plf.'s Request dated

8/30/07, asking for an "extension" of the deadline by which he must file a motion to compel].) I note that the docket is conspicuously absent of any motion to compel, or motion for sanctions, by Plaintiff during the referenced four-and-a-half-month period. (*See generally* Docket Sheet.)

### 3. Request for Sanctions

Plaintiff also requests the imposition of sanctions against Defendants for intentionally failing to provide Plaintiff with the discovery mandated by the Court's discovery order of March 14, 2007. (Dkt. No. 41.) I deny this request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 16, 26, and/or 37. I note that, as explained above in Part II.A.2. of this Order and Report-Recommendation, Plaintiff has not even shown that Defendants indeed failed to provide Plaintiff with the discovery mandated by the Court's discovery order of March 14, 2007. He certainly has not shown that any such failure was willful. Under the circumstances, I find that this request is so lacking in merit as to be frivolous.

### 4. Request to Withdraw Two Claims

Finally, Plaintiff requests the withdrawal of his claims of defamation and interference with his right to participate in religious services. (Dkt. No. 41.) The relief requested in this portion of Plaintiff's cross-motion (i.e., dismissal) is dispositive in nature. However, the dismissal requested by Plaintiff is *voluntary* in nature. Authority exists for the proposition that a magistrate judge may decide such a request without issuing a report-recommendation.[5] However, out of an abundance of caution, I will express my conclusion with regard to this request as part of a recommendation to District Judge Sharpe, rather than as an Order.

**\*7** Plaintiff's request, which is more properly construed as one for voluntary dismissal of these two claims without prejudice, is governed by, or at least guided by, Fed.R.Civ.P. 41(a). I say "guided" because Fed.R.Civ.P. 41(a) speaks of the dismissal of "actions," not "claims." In any event, under the principles set forth by that Rule, since Defendants have already filed an Answer in this action, Plaintiff may not obtain the dismissal of the two claims without either (1) a stipulation of dismissal signed by all parties who have appeared in the action (which he has not filed), or (2) an Order of the Court issued "upon such terms and conditions as the court deems proper." Fed.R.Civ.P. 41(a)(1),(2).

Simply stated, I do not believe it would be at all proper to permit Plaintiff to expressly assert claims of "defamation of character" and interference with his right to "religious services,"[6] sit idly by as Defendants defend themselves against those claims,[7] and then snatch those claims from the jaws of Defendants' properly filed and facially meritorious motion for summary judgment, just so that this extremely litigious plaintiff may again assert them in another action. The claims have been litigated and should be decided.

For these reasons, I recommend that the Court deny that request based on the fact that Plaintiff has failed to show the sort of cause that is required to support the granting of such a request under Fed.R.Civ.P. 7(b) and 41(a)(2).

### B. Defendants' Motion for Summary Judgment

### 1. Legal Standard Governing Unopposed Motion for Summary Judgment

Under Fed.R.Civ.P. 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material[8] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[9]

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."[10] The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[11] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[12]

What this burden-shifting standard means when a plaintiff has failed to properly respond to a defendant's motion for summary judgment is that "[t]he fact that there has been no [such] response ... does not ... [by itself] mean that the motion is to be granted automatically."[13] Rather, practically speaking, the Court must (1) determine what material facts, if any, are *disputed* in the record presented on the defendants' motion, and (2) assure itself that, based on those *undisputed*

material facts, the law indeed warrants judgment for the defendants. [14] However, the plaintiff's failure to respond to the defendant's motion for summary judgment lightens the defendant's burden on the motion.

 **\*8** More specifically, where a plaintiff has failed to respond to a defendant's statement of material fact contained in its Statement of Material Facts (a/k/a its "Rule 7.1 Statement"), the facts as set forth in that Rule 7.1 Statement will be accepted as true [15] to the extent that (1) those facts are supported by the evidence in the record, [16] and (2) the non-moving party, if he is proceeding *pro se,* has been specifically advised of the consequences of failing to respond to the movant's motion for summary judgment. [17]

Similarly, where a plaintiff has failed to respond to a defendant's properly filed and facially meritorious memorandum of law (submitted in support of its motion for summary judgment), the plaintiff is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court. [18] Stated another way, where a defendant has properly filed a memorandum of law (in support of a properly filed motion for summary judgment), and the plaintiff has failed to respond to that memorandum of law, the only remaining issue is whether the legal arguments advanced in the defendant's memorandum of law is *facially meritorious.* [19] A defendant's burden in making legal arguments that are facially meritorious has appropriately been characterized as "modest." [20]

Implied in the above-stated standard is the fact that, where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute, even if that non-movant is proceeding *pro se.* [21]

### 2. First Ground for Dismissal of Plaintiff's Amended Complaint: Facial Merit of Defendants' Unopposed Motion for Summary Judgment

As an initial matter, I find that Defendants' motion papers were "properly filed" for purposes of Local Rule 7.1(b)(3). N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as

consent to the granting or denial of the motion, as the case may be, unless good cause be shown."). For example, their Statement of Material Facts-to the extent one is even needed to decide Defendants' arguments that Plaintiff has failed to state a claim upon which relief may be granted-contains 16 assertions of fact, each of which is supported by an accurate record citation. (*See* Dkt. No. 38, Part 2 [Defs.' Rule 7.1 Statement].) Moreover, Defendants' motion is, as it must be, supported by a memorandum of law that contains a table of contents and citations to legal authorities, and that does not exceed 25 pages in length. (Dkt. No. 38, Part 15 [Defs.' Memo. of Law].)

Moreover, I find that Plaintiff was advised of the consequences of failing to properly respond to Defendants' motion for summary judgment and, clearly, he understood those consequences, for the reasons stated above in Part I.B. of this Order and Report-Recommendation. However, despite having received this detailed notice and liberal deadline-extension, Plaintiff failed to respond to the substance of Defendants' motion for summary judgment. (Dkt. No. 41.)

 **\*9** As a result, the only issue remaining before the Court is whether the legal arguments advanced in Defendants' Memorandum of Law are *facially meritorious.* [22] After reviewing these legal arguments, and the undisputed facts upon which they rely, I find that each of these legal arguments is, at the very least, facially meritorious, for the reasons stated by Defendants in their Memorandum of Law. (*See* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].) I note that several cases exist from this District granting summary judgment against a *pro se* litigant based on a similar facial analysis of Defendants' unopposed motion papers. [23]

For these reasons, I recommend that the Court grant Defendants' motion for summary judgment.

### 3. Alternative Ground for Dismissal of Plaintiff's Amended Complaint

Because I have already found that an adequate ground exists upon which to base a recommendation that Plaintiff's Amended Complaint be dismissed, I do not believe there is a need to proceed to a more in-depth analysis of Defendants' arguments in favor of dismissal. Furthermore, I recommend that the Court decline to *sua sponte* conduct such a detailed analysis, especially given the backlog of prisoner civil rights cases on its docket. [24] However, in the interest of aiding the Court should it decide to conduct such an analysis, I have

subjected Defendants' legal arguments to the more rigorous scrutiny that would be appropriate on a contested motion, and I find that I am persuaded by those legal arguments, which I list and discuss below. (*See* Dkt. No. 38, Part 15, at 2-25 [Defs.' Memo. of Law].)

### (i) Plaintiff's Asserted Failure to Exhaust His Available Administrative Remedies with Regard to Various of His Claims Prior to Filing this Action in Federal Court

Defendants accurately describe the Prison Litigation Reform Act's exhaustion requirement, and New York State DOCS' formal grievance process. (*See* Dkt. No. 38, Part 15, at 2-5 [Defs.' Memo. of Law] .) For the sake of brevity, I will not repeat these well-known points of law. I will only add that the Second Circuit has held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. [25] *First,* "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [26] *Second,* if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [27] *Third,* if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [28]

**\*10** Here, Defendants essentially argue that administrative remedies were available to Plaintiff, but he failed to pursue (and exhaust) them. (Dkt. No. 38, Part 15, at 6-8 [Defs.' Memo. of Law].) Defendants further argue that no special circumstances exist justifying this failure. (*Id.* at 8.)

Although I agree with the main thrust of this argument (i.e., that several of Plaintiff's claims should be dismissed due to Plaintiff's failure to exhaust his available administrative remedies before filing this action in federal court), I disagree somewhat with Defendants' reasoning. Specifically, I disagree with Defendants' argument to the extent that it is based simply on the allegations of Plaintiff's Amended Complaint (i.e., on a failure-to-state-a-claim analysis).

For some years now, it has been the majority rule (followed by the Second Circuit) that a prisoner's fulfillment of his duty to exhaust his available administrative remedies under the Prison Litigation Reform Act ("PLRA") is not a fact that the prisoner had to plead in order to state a claim under 42 U.S.C. § 1983 but a fact that may be challenged by a defendant through an affirmative defense (such as on a motion for summary judgment pursuant to Fed.R.Civ.P. 56, or a motion to dismiss for lack of subject-matter jurisdiction pursuant to Fed.R.Civ.P. 12[b][1] ) established by the PLRA. *See, e.g., Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999) ("Because, under the PLRA, a prisoner must exhaust administrative remedies before filing a § 1983 suit ..., a defendant in a prisoner § 1983 suit may also assert as an affirmative defense the plaintiff's failure to comply with the PLRA's requirements."); *Snider v. Melindez,* 199 F.3d 108, 114 (2d Cir.1999) ("A court may not dismiss for failure to exhaust administrative remedies unless the court determines that such remedies are available. Snider's answers [on a form complaint] cannot establish that.").

Last year, the Supreme Court upheld this interpretation of the exhaustion requirement, prohibiting circuits (such as the Sixth, Tenth and Eleventh Circuits) from using exhaustion as a heightened pleading requirement in prisoner civil rights case. *See Jones v. Block,* 549 U.S. 199, 127 S.Ct. 910, 914-915, 918-923, 166 L.Ed.2d 798 (2007). A prisoner has no independent *duty* to plead facts plausibly suggesting that he exhausted his available administrative remedies, in order to state an actionable claim under 42 U.S.C. § 1983. *Block,* 127 S.Ct. at 919-21. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id.* at 921. If a prisoner *chooses* to plead facts regarding exhaustion, and those facts plausibly suggest that he failed to exhaust his available administrative remedies, then his Complaint may be dismissed for failure to state a claim. *Id.* at 920-21.

Simply stated, if a prisoner says nothing or little about exhaustion in his *pro se* civil rights complaint, he is likely protected from a Fed.R.Civ.P. 12(b)(6) motion to dismiss premised on failure to exhaust. However, if he says too much about exhaustion in that complaint so that his non-exhaustion is readily apparent, he may "plead himself out of court," as

the saying goes. I find that this is *not* what has happened here. While Plaintiff alleges that he sent various officials letters of complaint about certain actions (allegedly) taken by Defendant Bruce, Plaintiff (an experienced litigant and drafter of pleadings) has remained reticent or outright silent about any efforts he did or did not take to appeal the denial of any grievance or complaint to CORC. (*See* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.].)

**\*11** Fortunately for Defendants, they also assert an argument based on the uncontroverted record evidence in this action (i.e., on a summary-judgment analysis). Specifically, they argue that the uncontroverted record evidence in this action establishes that Plaintiff never appealed to CORC the denial of any grievances regarding several of his claims against Defendant Bruce. (*See* Dkt. No. 38, Part 15, at 6-8 [Defs.' Memo. of Law].) In support of this argument, Defendants have adduced the Declaration of Karen R. Bellamy, the Director of the Inmate Grievance Program for the New York State DOCS. (Dkt. No. 38, Part 9 [Decl. of Bellamy].) Exhibit 1 to that Declaration attaches a computer printout demonstrating that Plaintiff never appealed to CORC the denial of any grievances regarding the following four claims: (1) Defendant Bruce's (alleged) refusal to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) Defendant Bruce's (alleged) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) defamation by any Defendant; and (4) interference, by any Defendant, with Plaintiff's right to participate in religious services. (*Id.* at ¶ 3 [citing, and attaching, Ex. 1 to Decl. of Bellamy].)[29]

I note that the computer printout establishes that, during the 2002-2003 period, the grievance procedure at Great Meadow C.F. was working properly so as to be *available* to Plaintiff. I note also that no record evidence (nor even a conclusory allegation) exists suggesting that any Defendant in this matter, through his own actions, inhibited Plaintiff's exhaustion of remedies so as to *estop* that Defendant from raising Plaintiff's failure to exhaust as a defense. Finally, I note also that no record evidence exists supporting a conclusion that any *special circumstances* existed that justified any attempts by Plaintiff to appeal the denial of any complaint to *Defendant Goord* rather than to *CORC*, as is required by 7 N.Y.C.R.R. §§ 701.5(d), 701.8(g),(h).[30]

Based on the current record, I find that the uncontroverted record evidence establishes that, before filing this action in federal court, Plaintiff failed to exhaust his available administrative remedies regarding the following four claims: (1) Defendant Bruce's (alleged) refusal to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) Defendant Bruce's (alleged) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) defamation by any Defendant; and (4) interference, by any Defendant, with Plaintiff's right to participate in religious services. As a result, I recommend that the Court dismiss those four claims with prejudice.

### (ii) Plaintiff's Asserted Failure to State an Actionable Claim of Defamation

Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts *plausibly suggesting*[31] that any Defendant in this action defamed Plaintiff during the relevant time period. (*See* Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].) Moreover, as Defendants argue, even if Plaintiff had stated a claim for defamation, no reason exists for the Court to assert supplemental jurisdiction over that claim, under the circumstances. (*See* Dkt. No. 38, Part 15, at 8-10 [Defs.' Memo. of Law].) As a result, I recommend that, in the alternative, the Court dismiss Plaintiff's defamation claim with prejudice.

### (iii) Plaintiff's Asserted Failure to State an Actionable Claim of the Denial of His Right to Participate in Religious Services

**\*12** Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts plausibly suggesting that any Defendant in this action interfered with Plaintiff's right to participate in religious services. (*See* Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].) As a result, I recommend that, in the alternative, the Court dismiss this claim with prejudice.

### (iv) Plaintiff's Asserted Failure to State an Actionable Claim of Conspiracy Against Defendant Bruce

As explained above in Part I.A. of this Order and Report-Recommendation, among Plaintiff's claims against Defendant Bruce is a claim that he "conspir[ed]" with and "instructed a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004, at Great Meadow C.F. (*See* Dkt. No. 9, Part 1, ¶ 8 [Plf.'s Am. Compl.].)

Defendants challenge the pleading sufficiency of this claim to the extent that it alleges a conspiracy by Defendant Bruce.

(See Dkt. No. 38, Part 15, at 11-12 [Defs.' Memo. of Law].) I agree. Under even the most liberal of constructions, Plaintiff's Amended Complaint has failed to allege facts plausibly suggesting that Defendant Bruce engaged in a conspiracy with the unidentified corrections officer to harass Plaintiff by subjecting him to a pat-frisk on March 10, 2004. (See Dkt. No. 9, Part 1, ¶ 8 [Plf.'s Am. Compl.].)

Moreover, I find that Plaintiff's claim fails to the extent he alleges that Defendant Bruce was personally involved in any constitutional violation that occurred with regard to the pat-frisk. As an initial matter, I note that, generally, prisoners retain only a limited Fourth Amendment privacy interest in being free from such searches when they walk through the prison doors. [32] Plaintiff does not allege that the pat-frisk violated his right to privacy under the Fourth Amendment. Rather, Plaintiff claims that the search was retaliatory in nature, and thus violated his First Amendment rights. The problem is that Plaintiff has alleged no facts in support of his conclusory allegation that Defendant Bruce "instructed" the unidentified corrections officer to perform the pat-frisk. Nor does Plaintiff alleges any facts plausibly suggesting that the pat-frisk (which occurred in a maximum-security correctional facility) would not have occurred even without such an instruction. Thus, Plaintiff fails to allege facts plausibly suggesting the second and third elements of a retaliation claim (i.e ., the taking of adverse action against the plaintiff *by the defendant,* and a *causal connection* between the plaintiff's protected speech or activity and the taking of the adverse action). [33]

I note that, under the circumstances, the Court has the power (and duty) to *sua sponte* address the pleading sufficiency of Plaintiff's other claims, under two authorities: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S .C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*13**  For these reasons, I recommend that the Court dismiss with prejudice both Plaintiff's conspiracy claim regarding the pat-frisk on March 11, 2004, and the retaliation claim regarding that pat-frisk.

### (v) Plaintiff's Asserted Failure to Allege Facts Plausibly Suggesting, or Adduce Evidence Establishing, the Personal Involvement of Defendant Greene (a Supervisor) in any of the Constitutional Violations Alleged

Defendants accurately recite the law regarding the personal involvement of supervisory officials in constitutional violations alleged in prisoner civil rights actions. (See Dkt. No. 38, Part 15, at 12-14 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat these well-known points of law.

In arguing that Defendant Greene was not personally involved in any of the constitutional violations alleged, Defendants employ alternative arguments: (1) Plaintiff has failed to allege facts plausibly suggesting that Defendant Greene was personally involved in any of the constitutional violations alleged; and (2) Plaintiff has failed to adduce any evidence establishing that Defendant Greene was personally involved in any of the constitutional violations alleged. (*Id.*)

I have some reservation accepting the first argument given Plaintiff's allegations in his Amended Complaint that he submitted written complaints to Defendant Greene on three occasions regarding various of the claims at issue in this action, and that Defendant Greene responded in writing to Plaintiff on four occasions. (*See* Dkt. No. 9, Part 1, ¶¶ 1, 2, 5, 6, 7, 12, 17, 18 [Plf.'s Am. Compl., alleging that he submitted written complaints to Def. Greene on or about 12/23/03, 2/22/04 and 3/19/04, and that Def. Greene sent written responses to Plf. on or about 12/26/03, 3/1/04, 3/8/04 and 3/19/04].)

However, I have no reservation accepting the second argument, given the undisputed record on Defendants' motion for summary judgment. More specifically, I find that no rational fact-finder could conclude from Plaintiff's written communications to Defendant Greene that Defendant Greene was notified that any constitutional violations were occurring. [34] Nor could a rational fact-finder conclude from Defendant Greene's (or his subordinates') written communications to Plaintiff that Defendant Greene's response was in any way reckless or even negligent. [35] It bears emphasizing that, following his receipt of Plaintiff's letters, Defendant Greene rather promptly assigned the matter to a subordinate officer for investigation, notified Plaintiff

of that assignment, and then relied on the results of that subordinate officer's investigation. Defendants have accurately cited authorities supporting the (correct) point of law that a superintendent's adoption of a recommendation by an investigating officer cannot by itself demonstrate that he failed to remedy misconduct. *Shabazz v. Lee,* 03-CV1520, 2007 WL 119429, at *7, n. 4 (N.D.N.Y. Jan.10, 2007) (Homer, M.J.) [citations omitted]. Finally, I note that the fact that Defendant Greene did not reverse Plaintiff's disciplinary conviction (a conviction, by the way, that was not subsequently overturned on appeal) [36] is not evidence of any constitutional violation by Defendant Greene.

**\*14**  For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant Greene based on his lack of personal involvement in any of the constitutional violations alleged.

### (vi) The Protection from Liability that Defendants Goord, Greene, Selsky, Harvey and Murphy Assertedly Enjoy Under the Circumstances, Pursuant to the Doctrine of Qualified Immunity

Defendants accurately recite the legal standard governing the application of the doctrine of qualified immunity. (*See* Dkt. No. 38, Part 15, at 14-17 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard.

Applying that legal standard to the record before the Court on Defendants' motion for summary judgment, I find that no rational fact-finder could conclude from the current record that Defendants Goord, Greene, Selsky, Harvey or Murphy violated a clearly established statutory or constitutional right of which a reasonable corrections officer would have known, for the reasons stated by Defendants in their Memorandum of Law. (*Id.* at 15-17.)

Stated more simply, "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996); *Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]. As the Supreme Court explained,

> [T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those

who knowingly violate the law .... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.

For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendants Goord, Greene, Selsky, Harvey and Murphy based on the doctrine of qualified immunity.

### (vii) Plaintiff's Asserted Failure to State an Actionable Due Process Claim Due to His Failure to Allege Facts Plausibly Suggesting that He Enjoyed a Protected Liberty Interest in Remaining Free from the Disciplinary Confinement Alleged

Defendants accurately recite the legal standard governing Plaintiff's due process claim regarding the manner in which his prison disciplinary hearing was conducted. (*See* Dkt. No. 38, Part 15, at 17-21 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard other than to emphasize that, in order to establish that he possessed a protected liberty in remaining free from the disciplinary confinement at issue, Plaintiff must establish that the confinement imposed on him *an atypical and significant hardship in relation to the ordinary incidents of prison life.*

Applying this legal standard to the allegations of Plaintiff's Amended Complaint, I agree with Defendants that Plaintiff has failed to allege facts plausibly suggesting that he enjoyed a protected liberty interest in remaining free from the disciplinary confinement alleged, for the reasons stated by Defendants in their Memorandum of Law. (*Id.* at 20-21.) Plaintiff alleges that his disciplinary conviction resulted in a sentence of sixty (60) days of keep-lock confinement and a corresponding loss of privileges. (*See* Dkt. No. 9, Part 1, ¶¶ 24 [Plf.'s Am. Compl.].) More specifically, Plaintiff alleges that the conditions of his keep-lock confinement subjected Plaintiff to the following:

**\*15**  [L]ost telephone privileges, commissary privileges, package privileges, special events privileges, regular visits, 23-hour confinement, one (1) Exercise period, three ten-minute showers weekly, deprivation of access to Law library, deprivation of Access to the Courts, Lost [sic] of Sao Shop Industry Program earnings [of] 42 cents an hour, deprivation of paying Court fees, deprivation of paying for copies of legal material, injuring eligibility for constructive transfer, defamation of character, [denial of] liberty interest and religious services, and that such lost [sic] was malicious, cruel and unusual punishment ....

(*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

Both the Supreme Court and Second Circuit have made clear that a "short" period of disciplinary confinement (i.e., under 101 days) under generally "normal" conditions (i.e., even if some of those conditions are harsher than those in disciplinary confinement or the general population) usually does not rise to the level of atypicality.[37] Here, setting aside the often-conclusory nature of Plaintiff's allegations, the allegations generally state the *ordinary* conditions of disciplinary confinement in a correctional facility within the New York State DOCS. *See* Colon v. Howard, 215 F.3d 227, 230 (2d Cir.2000) (describing the following conditions as "normal" conditions of SHU confinement in New York: "Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day ..., limited to two showers a week, and denied various privileges available to general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and duration was less than in general population. The number of books allowed in the cell was also limited. As to duration, Colon was required to serve 305 days of the 360-day sentence imposed.") (citing N.Y.C.R.R. §§ 304.1-304.14). For example, conspicuously missing from this litany are any allegations that, while in keeplock confinement,

Plaintiff was denied food, clothing, bedding, heat, running water, toiletries, or medicine. (*Id.* at ¶¶ 27, 29, 31, 33, 35, 37.)

For these reasons, I recommend that, in the alternative, the Court dismiss with prejudice Plaintiff's due process claims.

### (viii) Plaintiff's Asserted Failure to Adduce Evidence Establishing a Claim of Retaliation by Defendant Bruce

As explained above in Part I.A. of this Order and Report-Recommendation, Plaintiff asserts five discrete instances of retaliation by Defendant Bruce: (1) refusing to permit Plaintiff "to go to [a] notary" on December 23, 2003; (2) "singl[ing]" Plaintiff out of a group of inmates going to recreation on February 22, 2004; (3) "conspir[ing]" with and "instruct[ing]" a co-worker to harass Plaintiff through the disguise [sic] of a pat-frisk" on March 10, 2004; (4) "singl[ing]" Plaintiff out of a group of inmates going to mess hall in order to subject him to a harassing and retaliatory pat-frisk on March 11, 2004; and (5) filing a false misbehavior report against Plaintiff on March 11, 2004, in retaliation against him for having filed grievances against Defendant Bruce on December 23, 2003, February 22, 2004, and March 10, 2004. (*id.* Dkt. No. 9, Part 1, ¶¶ 1, 5, 8-11, 13, 27 [Plf.'s Am. Compl.].)[38]

**\*16**  Defendants accurately recite the legal standard governing Plaintiff's claim of retaliation by Defendant Bruce. (*See* Dkt. No. 38, Part 15, at 21-23 [Defs.' Memo. of Law].) For the sake of brevity, I will not repeat this well-known legal standard other than to emphasize two facts a plaintiff must prove by a preponderance of the evidence in order to prevail on a First Amendment claim. First, the plaintiff must prove that the defendant (as opposed to some third-person) took "adverse action" against the plaintiff[39] Second, the plaintiff must prove that there was a causal connection between the protected speech in which the plaintiff was engaging and the adverse action allegedly taken against him-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.[40] Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone.[41]

Applying that legal standard to the record before the Court on Defendants' motion for summary judgment, I find that no rational fact-finder could conclude from the current record that Defendant Bruce retaliated against Plaintiff, for the reasons stated by Defendants in their Memorandum of Law.

(*Id.* at 23-25.) In particular, Defendants have adduced record evidence establishing, among other things, that (1) no notary was on duty at Great Meadow C .F. on December 23, 2003, (2) Defendant Bruce was not present at Great Meadow C.F. when Plaintiff went to recreation at or after 2:30 p.m. on February 22, 2004, (3) Defendant Bruce (a correctional officer, not a correctional sergeant or lieutenant) possessed no authority to instruct a co-worker to pat-frisk Plaintiff on March 10, 2004 (or at any time), (4) Defendant Bruce's personal pat frisk of Plaintiff on March 11, 2004 would have occurred even without the improper motive alleged, and (5) Defendant Bruce would have filed a misbehavior report against Plaintiff on March 11, 2004, even without the improper motive alleged. (*Id.* at 23-24 [providing accurate citations to record evidence].) Furthermore, Plaintiff has failed to adduce evidence creating a genuine issue with regard to these facts.

For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's retaliation claim against Defendant Bruce.

### 4. Miscellaneous Issues

#### (i) Whether Any Claims Remain

I have carefully compared my detailed summary of the claims asserted in Plaintiff's Amended Complaint (*see, supra,* Part I.A. of this Order and Report-Recommendation) with Defendants' meritorious arguments in favor of dismissal (*see, supra,* Part II .B.3. of this Order and Report-Recommendation), and I report that, should the Court adopt this Report-Recommendation, all of the claims asserted in Plaintiff's Amended Complaint would be dismissed from this action. Indeed, several of those claims would be dismissed on two or more alternative grounds.

#### (ii) Whether Plaintiff Should Be Afforded Another Chance to Amend

**\*17** Generally, when addressing a *pro se* complaint, a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [42]

For the sake of brevity, I will set aside the fact that one of the reasons for this rule is that the *pro se* plaintiff should be afforded special leniency due to his lack of experience with the court system and litigation process, and here Plaintiff need be afforded no such special leniency because he is experienced with the court system and litigation process (having filed at least 11 other federal or state court actions or appeals regarding his imprisonment). [43]

Rather, the problem with applying this leave-to-amend rule to Plaintiff under the circumstances is that granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff has already been given a chance to amend his pleading. [44] Here, Plaintiff has already had such a chance to amend his pleading. (*See* Dkt. No. 9, Part 1 [Plf.'s Am. Compl.] .)

Moreover, even when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." [45] In particular, an opportunity to amend should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [46] Here, the problems with Plaintiff's causes of action are substantive, not merely formal. Simply stated, if Plaintiff (an experienced, prolific litigant) could have alleged sufficient facts to state viable claims, he would have done so.

For all of these reasons, I recommend that the dismissal of Plaintiff's Amended Complaint be *with prejudice.*

#### (iii) Whether the Court Should Permit Plaintiff to Supplement the Record on Any Appeal to District Court from this Report-Recommendation

In light of Plaintiff's prolific nature as a litigant, I anticipate that, during his likely objections to this Report-Recommendation, he will attempt to supplement the record on Defendants' Motion for Summary Judgment. I respectfully recommend that the Court, in exercising its discretion on the matter, decline to permit him to so supplement the record.

The Second Circuit recognizes that the decision of whether or not to accept such evidence as resting in the sound discretion of the district court: "Considerations of efficiency and fairness militate in favor of a full evidentiary submission for the Magistrate Judge's consideration, and we have upheld the exercise of the district court's discretion in refusing to allow supplementation of the record upon the district court's *de novo* review." *Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998) (affirming decision by Scullin, J., of the Northern District of New York) [citations omitted].

The Fifth Circuit has *suggested* four factors that a court might consider in deciding whether to accept additional evidence after a magistrate judge's recommendation has been issued:

> **\*18**  (1) the moving party's reasons for not originally submitting the evidence; (2) the importance of the omitted evidence to the moving party's case; (3) whether the evidence was previously available to the non-moving party when it responded to the summary judgment motion; and (4) the likelihood of unfair prejudice to the non-moving party if the evidence is accepted.

*Performance Autoplex II Ltd. v. Mid-Continent Cas. Co.,* 322 F.3d 847, 862 (5th Cir.2003) [citation omitted].

Here, I find that these four factors-particularly the third and fourth factors-weigh against permitting Plaintiff to supplement the record on Defendants' motion for summary judgment during any appeal to the District Court from this Report-Recommendation. This action has been pending now since February 14, 2005, past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was passed. [47]  Plaintiff has had a full and fair opportunity to be heard on his claims, including a full and fair opportunity to (1) conduct discovery in this matter, (2) object to any (allegedly) deficient responses to his discovery demands, and (3) respond with evidence and argument to Defendants' motion for summary judgment. For whatever reason, he chose not to do so, perhaps because he was too busy litigating other actions, or more probably because the evidence simply did not support his claims. In any event, Defendants are entitled to have their motion decided within a reasonable time frame and on a level playing field (based on evidence and arguments to which they could properly reply).

For these reasons, I recommend that the Court, in exercising its discretion on the issue, deny any request by Plaintiff to supplement the record on Defendants' motion for summary judgment, during any objections to this Report-Recommendation.

**ACCORDINGLY,** it is

**ORDERED** that Plaintiff's cross-motion (Dkt. No. 41) is **DENIED** to the extent that it requests relief that is non-dispositive in nature (i.e., the reopening of the discovery period in this action, the adjourning of the Court's decision regarding Defendants' motion, and the imposition of sanctions against Defendants); and it is further

**RECOMMENDED** that Plaintiff's cross-motion (Dkt. No. 41) be **DENIED** to the extent that it requests relief that is dispositive in nature (i.e., the voluntarily dismissal without prejudice of Plaintiff's "defamation of character" and "[loss of] religious services" claims); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 38) be **GRANTED,** and that all of the claims asserted in Plaintiff's Amended Complaint (Dkt. No. 9) be **DISMISSED** with prejudice; and it is further

**RECOMMENDED** that the Court **DENY** any request by Plaintiff to supplement the record on Defendants' motion for summary judgment during any appeal to the District Court from this Report-Recommendation; and it is further

**\*19  RECOMMENDED** that the Court certify in writing, for purposes of  28 U.S.C. § 1915(a)(3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.

Pursuant to  28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing  *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 [2d Cir.1989] );  28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 2003792

## Footnotes

1       These six employees are as follows: (1) Phillip Bruce, a correction officer at Great Meadow C.F., (2) B. Murray, a sergeant at Great Meadow C.F., misidentified by Plaintiff as Sergeant "Murphy," (3) Andrew Harvey, a hearing officer at Great Meadow C.F ., (4) Gary Greene, the Great Meadow C.F. Superintendent, (5) Glenn Goord, the DOCS Commissioner, and (6) Donald Selsky, the Director of the DOCS Special Housing/Inmate Grievance Program. (Dkt. No. 9, Part 1 [Plf.'s Am. Compl.]; Dkt. Nos. 16, 17, 19 [Acknowledgments of Service for Defs. Harvey, Murray, and Bruce].)

2       *See, e.g., Pilgrim v. Wright,* 01-CV-0098 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants' motion for summary judgment on 9/23/02); *Pilgrim v. Brown,* 01-CV-0700 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff had to, but failed to, respond to defendants' motion for summary judgment by 1/31/03); *Pilgrim v. Luther,* 01-CV-8995 (S.D .N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants' two motions for summary judgment on 5/24/02, 7/16/02, and 10/14/04); *Pilgrim v. Wolczyl,* 02-CV-0901 (N.D.N.Y.) (*pro se* civil rights action in which Plaintiff responded to defendants' motion for summary judgment on 4/29/05).

3       *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment.") [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

4       *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

5       *See* 28 U.S.C. § 636(b)(1)(A) (providing that a district judge "may designate a magistrate to hear and determine any pretrial matter," with certain enumerated exceptions-including a decision on a motion "to *involuntarily* dismiss an *action*" ).

6       In his Amended Complaint, filed on June 18, 2005, Plaintiff expressly alleges that each of six Defendants, through their various forms of misconduct, caused Plaintiff to suffer, *inter alia,* "defamation of character" and "[loss of] religious services." (Dkt. No. 9, Part 1, ¶¶ 27, 29, 31, 33, 35, 37 [Plf.'s Am. Compl.].)

7       I note that in their Answer, filed on February 16, 2006, Defendants interposed defenses regarding, *inter alia,* Plaintiff's Amended Complaint to the extent that it asserted "state law claims" and claims for "mental or emotional injury." (Dkt. No. 21, Part 1, ¶¶ 15, 23 [Defs.' Answer to Plf.'s Am. Compl.].) Even if Plaintiff did not appreciate the reasonable meaning of the words he expressly used in his Amended Complaint, these defenses should have alerted him as to the way in which Defendants were reasonably interpreting those words, and the effort and expense to which the words would put them during discovery. I note also that the discovery period in this action was more than a year long. (*Compare* Dkt. No. 23 [Pretrial Scheduling Order filed 4/10/06, initially setting discovery deadline as 10/30/06] *with* Dkt. No. 32 [Order filed 3/14/07, extending deadline by which Defs. had to respond to Plf.'s outstanding discovery demands to 4/14/07].)

8       A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

9       *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

10      Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading, but the [plaintiff's] response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the [plaintiff] does not so respond, summary judgment, if appropriate,

shall be entered against the [plaintiff].”); *see also* *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

11   Fed.R.Civ.P. 56(e) (“When a motion for summary judgment is made [by a defendant] and supported as provided in this rule, the [plaintiff] may not rest upon the mere allegations ... of the [plaintiff's] pleading ....”);

     *Matsushita,* 475 U.S. at 585-86; *see also* *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

12   *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) [internal quotations omitted] [emphasis added].

13   *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996).

14   *See* *Champion,* 76 F.3d at 486 (“Such a motion may properly be granted only if the facts as to which there is no genuine dispute show that ... the moving party is entitled to a judgment as a matter of law.”) [internal quotation marks and citation omitted]; *Allen v. Comprehensive Analytical Group, Inc.,* 140 F.Supp.2d 229, 232 (N.D.N.Y.2001) (Scullin, C.J.) (stating that, where a plaintiff has failed to respond to a defendant's motion for summary judgment, “[t]he Court must review the merits of Plaintiff's claims”). This requirement (that the Court determine, as a threshold matter, that the movant's motion has merit) is also recognized by Local Rule 7.1(b)(3) of the Local Rules of Practice for this Court, which provides that “the non-moving party's failure to file or serve ... [opposition] papers ... shall be deemed as consent to the granting ... of the motion ... unless good cause is shown,” *only where the motion has been “properly filed” and “the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein.”* N.D.N.Y. L.R. 7.1(b)(3) [emphasis added].

15   *See* N.D.N.Y. L.R. 7.1(a)(3) (*“Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.”* ) [emphasis in original].

16   *See* *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243 (2d Cir.2004) (“[W]here the non-movant party chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.... If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 Statement. It must be satisfied that the citation to evidence in the record supports the assertion.”) [internal quotation marks and citations omitted]; *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y.2003) (Sharpe, M.J.) (“In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a)(3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.”) [emphasis added]; *Adirondack Cycle & Marine, Inc. v. Am. Honda Motor Co., Inc.,* 00-CV-1619, 2002 U.S. Dist. LEXIS 4386, 2002 WL 449757 at *2-3 (N.D.N.Y. Mar. 18, 2002) (McAvoy, J.) (“Local Rule 7.1 requires a party opposing summary judgment to respond to the statement of undisputed material facts submitted by the movant. To the extent such facts are not controverted, *the properly supported facts* will be taken as true.”) [emphasis added; citation omitted]; *cf.* Fed.R.Civ.P. 83(a)(1) (“A local rule shall be consistent with ... Acts of Congress and rules adopted under 28 U.S.C. §§ 2072 and 2075 [which include the Federal Rules of Civil Procedure] ....”); Fed.R.Civ.P. 56(e) (requiring that, “if the non-movant does not ... respond [to a summary judgment motion], summary judgment, *if appropriate,* shall be entered against the non-movant,” and requiring that, as a threshold matter, the motion for summary judgment must be “made *and supported* as provided in this rule”) [emphasis added].

17   *See* *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996); *cf.* N.D.N.Y. L.R. 56.2 (imposing on movant duty to provide such notice to *pro se* opponent).

18    N.D.N.Y. L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause be shown ."); N.D.N.Y. L.R. 7.1(a) (requiring opposition to motion for summary judgment to contain, *inter alia,* a memorandum of law); *cf.* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's *response* ... must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so *respond,* summary judgment, if appropriate, shall be entered against the adverse party.") [emphasis added]; *see, e.g., Beers v. GMC,* 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.,* 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov.29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

19    *Hernandez v. Nash,* 00-CV-1564, 2003 U.S. Dist. LEXIS 16258, 2003 WL 22143709, at *7-8 (N.D.N.Y. Sept. 10, 2003) (Sharpe, M.J.) (before a motion to dismiss may be granted under Local Rule 7.1[b][3], "the court must review the motion to determine whether it is *facially meritorious"* ) [emphasis added; citations omitted];

*accord,* *Topliff v. Wal-Mart Stores East LP,* 04-CV-0297, 2007 U.S. Dist. LEXIS 20533, 2007 WL 911891, at *28 & n. 43 (N.D.N.Y. March 22, 2007) (Lowe, M.J.); *Hynes v. Kirkpatrick,* 05-CV-0380, 2007 U.S. Dist. LEXIS 24356, at *5-6 & n. 2 (N.D.N.Y. March 21, 2007) (Lowe, M.J.); *Sledge v. Kooi,* 04-CV-1311, 2007 U.S. Dist. LEXIS 26583, 2007 WL 951447, at *28-29 & n. 40 (N .D.N.Y. Feb. 12, 2007) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 22458 (N.D.N.Y. March 28, 2007) (McAvoy, J.); *Kele v. Pelkey,* 03-CV-0170, 2006 U.S. Dist. LEXIS 95065, 2006 WL 3940592, at *5 & n. 2 (N.D.N.Y. Dec. 19, 2006) (Lowe, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 4336 (N.D.N.Y. Jan. 22, 2007) (Kahn, J.).

20    *See Ciaprazi v. Goord,* 02-CV0915, 2005 WL 3531464, at *8 (N.D.N.Y. Dec.22, 2005) (Sharpe, J.; Peebles, M.J.) (characterizing defendants' threshold burden on a motion for summary judgment as "modest") [citing

    *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ]; *accord,*

    *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *9 & n. 60 (N.D.N.Y. Oct.18, 2006) (Hurd, J.,

    adopting Report-Recommendation of Lowe, M.J.), *Smith v. Woods,* 03-CV-0480, 2006 WL 1133247, at *17 & n. 109 (N.D.N.Y. Apr.24, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.); *cf. Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, J.) (applying prior version of Rule 7.1[b][3], but recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N.D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

21    *See Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432, 2004 WL 2309715 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N .Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, 2006 WL 395269, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295

(N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

22    *See, supra,* note 19 of this Order and Report-Recommendation.

23    *See, e.g., Race Safe Sys. v. Indy Racing League,* 251 F.Supp.2d 1106, 1109-1110 (N.D.N.Y.2003) (Munson, J.) (reviewing whether record contradicted defendant's arguments, and whether record supported plaintiff's claims, in deciding unopposed motion to dismiss, under Local Rule 7.1[b][3] ); *Wilmer v. Torian,* 96-CV-1269, 1997 U.S. Dist. LEXIS 16345, at *2 (N.D.N.Y. Aug. 29, 1997) (Hurd, M.J.) (applying prior version of Rule 7.1[b] [3], and recommending dismissal because of plaintiff's failure to respond to motion to dismiss *and* the reasons set forth in defendants' motion papers), *adopted by* 1997 U.S. Dist. LEXIS 16340, at *2 (N .D.N.Y. Oct. 14, 1997) (Pooler, J.); *accord, Carter v. Superintendent Montello,* 95-CV-989, 1996 U.S. Dist. LEXIS 15072, at *3 (N.D.N.Y. Aug. 27, 1996) (Hurd, M.J.), *adopted by* 983 F.Supp. 595 (N.D.N.Y.1996) (Pooler, J.).

24    I note that the Second Circuit had, between 2000 and 2005, the longest median time to disposition for prisoner civil rights cases, among the twelve circuits (including the D.C. Circuit)-specifically, 9.8 months, as compared to a national average of 5.7 months.

25    *See* Hemphill v. State of New York, 380 F.3d 680, 686, 691 (2d Cir.2004).

26    Hemphill, 380 F.3d at 686 (citation omitted).

27    *Id.* [citations omitted].

28    *Id.* [citations and internal quotations omitted].

29    As for Plaintiff's claims regard the (allegedly) harassing pat-frisks on March 10 and 11, 2004, the computer printout provided by Ms. Bellamy does indicate that, on March 13, 2003, Plaintiff filed a grievance at Great Meadow C.F. (GM-34283-03) entitled "Moorish Pat Frisk." (*Id.* at 4 [Ex. 1 to Decl. of Bellamy].) Of course, I am giving Plaintiff the benefit of the doubt here, since the title of his grievance suggests that the pat frisk at issue was objectionable because of it was due to Plaintiff's apparent Muslim religion, and not due to Plaintiff's having filed grievances against Defendant Bruce.

30    (*See, e.g.,* Dkt. No. 38, Part 7, at 10-11 [Ex. E to Defs.' Motion, attaching Plf.'s letter of 2/22/04 to Def. Goord regarding Defendant Bruce's alleged misconduct on 2/22/04]; Dkt. No. 38, Part 8, at 3-4 [Ex. F to Defs.' Motion, attaching Plf.'s letter of 3/11/04 to Def. Goord regarding "harassment & unlawful discrimination" by Def. Bruce].)

31    *See* Bell Atl. Corp. v. Twombly, --- U.S. ----, ----, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) (holding that, for a plaintiff's complaint to state a claim upon which relief might be granted under Fed.R.Civ.P. 8 and 12, his "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," or, in other words, there must be "plausible grounds to infer [actionable conduct]"), *accord,* Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir.2007) ("[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly]* is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

32    *See* Bell v. Wolfish, 441 U.S. 520, 556-57, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) ("[G]iven the realities of institutional confinement, any reasonable expectation of privacy that a detainee retain[s] necessarily [is] of a diminished scope.").

33    To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount*

*Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill v. Pidylpchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

34  (Dkt. No. 38, Part 6, at 10-11 [Ex. D to Defs.' Motion, attaching Plf.'s letter of 12/23/03 to Def. Greene regarding Def. Bruce's statement to Plf. on 12/23/04 that no notary was available]; Dkt. No. 38, Part 7, at 6-8, 11-13 [Ex. E to Defs.' Motion, attaching Plf.'s letter of 2/22/04 to Def. Greene regarding his "harassment & unlawful discrimination" against Plaintiff by [1] singling Plaintiff out of a group of inmates going to recreation on 2/22/04, thus preventing him from going to recreation, [2] "illegally" posting a sign on a menu board reading "Bruce Almighty," and [3] "over stepping his duties into other officers' duties," for example, by "commanding two posts" when he is only assigned to one such post; and stating, "[I]f I am attacked by this officer, I will defend my life" and requesting that action be taken "before something serious incidents [sic] occur with myself, this officer, or co-worker"].)

35  (Dkt. No. 38, Part 6, at 9 [Ex. D to Defs.' Motion, attaching Def. Greene's memorandum of 12/26/03 to Plf., stating "Your 12/23/04 letter to me complaining about security staff has been forwarded to DSS Vanguilder for his investigation and response to you"]; Dkt. No. 38, Part 6, at 2 [Ex. D to Defs.' Motion, attaching Captain Kelly's memorandum of 2/6/04 to Plf., reporting that "Superintendent Greene has referred your recent communication regarding the above subject to me for an investigation and response," and that, following a thorough investigation of Plf.'s complaint about the notary issue, it has been concluded that there was no malfeasance by Def. Bruce on 12/23/04]; Dkt. No. 38, Part 7, at 5 [Ex. E to Defs.' Motion, attaching Def. Greene's memorandum of 3/1/04 to Plf., stating "Your 2/22/04 letter to me complaining about C.O. Bruce has been forwarded to DSS Vanguilder for his investigation and response to you. I resent the statement made by you that I or members of the Executive Team have condoned inappropriate behavior. I did not see a sign 'Bruce Almighty' posted in the Mess Hall Foyer and, if I had, I would have assumed it listed the movie to be shown to you by that title. You are extremely paranoid and this latest letter to me borders on threats by you. If I continue to believe you to be a threat here, I will address that issue."]; Dkt. No. 38, Part 7, at 2 [Ex. E to Defs.' Motion, attaching P. Vanguilder's memorandum of 3/12/04 to Plf., reporting that, following a thorough investigation of Plf.'s complaint about the notary issue, it has been concluded that there was no harassment by Def. Bruce on 2/22/04] )

36  (*See* Dkt. No. 38, Part 5, at 2 [Ex. C to Defs.' Motion, attaching appellate decision dated 6/8/04, by Def. Selsky regarding Plf.'s disciplinary conviction].)

37  *See, e.g., Sandlin v. Conner,* 515 U.S. 472, 475-476, 486, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (30 days of disciplinary confinement in SHU under conditions that mirrored those of normal administrative segregation "with insignificant exceptions" did not rise to the level of atypicality); *Sealey v. Giltner,* 197 F.3d 578, 589-590 (2d Cir.1999) (101 days of disciplinary confinement in SHU under conditions that were "doubtless unpleasant and somewhat more severe than those of general population" did not rise to the level of atypicality).

38  I note that Defendants characterize these five discrete claims as *four* discrete claims, after combining the fourth and fifth claims described above into one claim. (Dkt. No. 38, Part 15, at 23-24 [Defs.' Memo. of Law].

39  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill v. Pidylpchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

40  *Mount Healthy City Sch. Dist. Bd. of Educ.,* 429 U.S. at 287; *Gill,* 389 F.3d at 380.

41  *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) [citations omitted].

42    *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

43    *See, e.g., Pilgrim v. Keane,* 97-CV1517 (E.D.N.Y.); *Pilgrim v. Wright,* 01-CV-0098 (N.D.N.Y.); *Pilgrim v. Brown,* 01-CV-0700 (N.D.N.Y.); *Pilgrim v. Luther,* 01-CV-8995 (S.D.N.Y.); *Pilgrim v. Wolczyl,* 02-CV-0901 (N.D.N.Y.); *Pilgrim v. Artus,* 07-CV-1001 (N.D.N.Y.); *Pilgrim v. Wright,* No. 03-0086 (2d Cir.); *Pilgrim v. Greene,* Index No. 505332/2003 (N.Y. Sup.Ct., Washington County); *Pilgrim v. Greene,* No. 95400 (N.Y.App.Div., 3d Dept.); *Pilgrim v. Greene,* Nos. 3-10, 526 (N.Y.); *Pilgrim v. New York,* UID 2001-005-512, Claim No. 103678 (N.Y.Ct.Cl.).

44    *Cagle v. Perry,* 04-CV-1151, 2007 WL 3124806, at *6, n. 45 (N.D.N.Y. Oct.24, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Savage v. Brue,* 05-CV-0857, 2007 WL 3047110, at *5, n. 35 (N.D.N.Y. Oct.18, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *3, n. 13 (N.D.N.Y. Sept.26, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n. 16 (N.D.N.Y. Sept. 26, 2006) 2006 WL 2799417, at *4, n. 16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

45    *Stinson v. Sheriff's Dep't of Sullivan County,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz,* 2007 WL 2027912, at *2 (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins,* 2007 WL 37404, at *4 (Kahn, J., adopting report-recommendation of Lowe, M.J.).

46    *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

47    *See Adelman v. Hobbie,* 03-CV-0032, 2006 WL 2639359, at *8 (N.D.N.Y. Sept.13, 2006) (Sharpe, J., adopting Report-Recommendation by Treece, M.J.) (dismissing *pro se* civil rights action for failure to prosecute under Rule 41[b] in part because "[o]ver three years has passed since this litigation was commenced, well past the eighteen months envisioned by Congress when the Civil Justice Reform Act of 1990 was instituted").

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.